## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MAYUKO HOLWILL, Individually and on Behalf of All Others Similarly Situated, | x : : |
| Plaintiff, | : : |
| v. | : Case No. 1:18-cv-06790 : Honorable Charles R. Norgle, Sr. |
| | : |
| ABBVIE INC., RICHARD A. GONZALEZ, and WILLIAM J. CHASE, | : : **JURY TRIAL DEMANDED** |
| | : |
| Defendants. | : : |
| ———————————————— | x |

## CONSOLIDATED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ...............................................................................................2

II.   JURISDICTION AND VENUE ..........................................................................................9

III.  PARTIES ........................................................................................................................10

     A.    Plaintiffs .............................................................................................................10

     B.    Corporate Defendant .........................................................................................10

     C.    Individual Defendants .......................................................................................11

IV.  SUBSTANTIVE ALLEGATIONS ....................................................................................12

     A.    AbbVie's Operations .........................................................................................12

     B.    Humira Was (and Is) Critically Important to AbbVie's Business .........................13

     C.    Relevant Industry Codes and Regulatory Framework Governing
           Pharmaceutical Companies .................................................................................16

           1.    The OIG Guidelines Prohibiting "White Coat Marketing" .......................17

           2.    The PhRMA Code .........................................................................................18

           3.    The Code of Ethics for Nurses ....................................................................20

           4.    Illinois' Nurse Practice Act .........................................................................21

           5.    Florida's Nurse Practice Act .......................................................................22

           6.    California's Nursing Practice Act ...............................................................23

           7.    The Federal Anti-Kickback Statute .............................................................24

           8.    AbbVie's Code of Business Conduct and Ethics Compliance
               Program ........................................................................................................24

     D.    AbbVie's Nurse Ambassador Program ..............................................................28

     E.    Throughout the Class Period, AbbVie Was Particularly Incentivized To
           Maximize Sales of Humira .................................................................................31

     F.    The Individual Defendants Were Strongly Incentivized To Engage In the
           Fraudulent Scheme ............................................................................................32

     G.    Suarez Files a *Qui Tam* Action in the Northern District of Illinois .....................34

     H.    The State of California Intervenes in the *Suarez* Action and Files the DOI
           Superseding Complaint; AbbVie's Stock Price Falls ...........................................36

     I.    A Former Nurse Ambassador Corroborates Suarez and the State of
           California's Allegations .....................................................................................40

V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND
     OMISSIONS ...................................................................................................................42

VI.  ABBVIE'S CLASS PERIOD SEC FILINGS DID NOT COMPLY WITH SEC DISCLOSURE
     REGULATIONS ..............................................................................................................93

VII. THE TRUTH EMERGES ................................................................................................98

i

VIII.   ADDITIONAL SCIENTER ALLEGATIONS ...................................................99

    A.   The 2015 Whistleblower Complaint and Subsequent California DOI
Investigation and False Claims Act Case Contribute to a Strong Inference
of Scienter ..........................................................................................99

    B.   The Sale of Humira Is a Core Operation of AbbVie ...........................101

    C.   AbbVie Operates in a Highly Regulated Industry ..............................102

    D.   Defendants Were Particularly Motivated to Increase the Sales of Humira
During the Class Period ......................................................................103

    E.   The Individual Defendants' Stock Sales Support a Motive to Defraud.............104

    F.   Defendants Have Engaged in a Pattern of Wrongdoing ......................105

    G.   Defendants' Violation of Company Policy Supports an Inference of
Scienter .............................................................................................107

    H.   The Duration of the Misconduct Adds to the Scienter Inference ........108

    I.   The Individual Defendants' SOX Certifications and Signing of SEC
Filings Further Support a Strong Inference of Scienter ......................108

    J.   The Abrupt Resignation of Defendant Chase Adds to the Strong Inference
of Scienter ..........................................................................................108

IX.   LOSS CAUSATION ...................................................................................109

X.   APPLICABILITY OF PRESUMPTION OF RELIANCE ....................................112

XI.   CONTROL PERSON ALLEGATIONS ..........................................................113

XII.   INAPPLICABILITY OF SAFE HARBOR ......................................................115

XIII.   CLASS ACTION ALLEGATIONS ...............................................................117

XIV.   COUNTS ..................................................................................................119

XV.   PRAYER FOR RELIEF ..............................................................................122

XVI.   JURY DEMAND ........................................................................................123

Lead Plaintiff Metzler Asset Management GmbH ("Metzler") and Named Plaintiff National Shopmen Pension Fund ("National Shopmen," and together, "Plaintiffs") bring this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, individually and on behalf of all other persons and entities other than defendants, who purchased or otherwise acquired the publicly traded common stock of AbbVie Inc. ("AbbVie" or the "Company") during the period between October 25, 2013 and September 18, 2018, inclusive (the "Class Period"), and were damaged thereby (subject to certain exclusions enumerated in ¶ 333, below) (the "Class").

Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, *inter alia*, the independent investigation of Court-appointed Lead Counsel, Motley Rice LLC, and its investigators. This investigation included review and analysis of, among other things: (i) AbbVie's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) research reports and advisories by securities and financial analysts; (iii) transcripts of AbbVie's conference calls with analysts and investors; (iv) wire and press releases published by and regarding AbbVie; (v) news reports and media concerning AbbVie and other facts related to this action; (vi) data reflecting the price of AbbVie common stock; (vii) filings in other actions against AbbVie, including *United States ex rel. Suarez v. AbbVie, Inc.*, No. 1:15-cv-08928 (N.D. Ill. Oct. 8, 2015); *California ex rel. Suarez v. AbbVie Inc.*, No. RG18893169 (Cal. Sup. Ct.); and *Law Enforcement Health Benefits Inc. v. AbbVie Inc.*, No. 1:19-cv-02415 (N.D. Ill.); (viii) consultation with counsel for the named plaintiff in *California ex rel. Suarez v. AbbVie Inc.*, No. RG18893169 (Cal. Sup. Ct.); and (ix) information readily available on the Internet. Lead Counsel further consulted with an expert in the field of pharmaceutical policy and prescribing practices. Lead

Counsel's investigation regarding the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for discovery, including access to the materials that AbbVie has produced to State of California Department of Insurance (the "California DOI") and other governmental regulators, but not to Plaintiffs.

## I. NATURE OF THE ACTION

1. This federal securities class action arises from Defendants' material misrepresentations and omissions to AbbVie's patients, regulators, and investors regarding the Company's compliance with applicable laws, regulations, and its own code of business conduct in the marketing and sales of its flagship drug, Humira. Humira is a prescription medication used to treat rheumatoid arthritis, Crohn's disease, and other serious ailments, and is administered by injection. Throughout the Class Period, Defendants repeatedly misrepresented to the market that the Company's sales of Humira were based on legitimate factors and that AbbVie was in full compliance with laws regulating the marketing and sales of prescription medication. In fact, the Company placed profits before patient safety by providing illegal kickbacks to healthcare professionals in exchange for their prescribing Humira. When AbbVie's illegal kickback scheme was revealed to the public, the price of the Company's securities fell, causing damages to Plaintiffs and the Class.

2. AbbVie is a global, research-based biopharmaceutical company that develops and markets advanced therapies for serious diseases. The Company was founded in 2013, following a spinoff from Abbott Laboratories ("Abbott").

3. Humira is AbbVie's single largest product and is critical to the Company's success. For example, sales of Humira accounted for approximately 61 percent, 63 percent, and 57 percent

2

of AbbVie's total net revenues in 2015, 2014, and 2013, respectively. AbbVie recorded Humira sales of $18.4 billion in 2017, representing approximately two-thirds of the Company's revenue. AbbVie expects sales of Humira will continue to exceed $18 billion in 2020. These sales were (and are) particularly important to AbbVie because it has faced generic competition in the EU since 2018 and is set to face competition in the U.S. from cheaper biosimilar (generic) manufacturers in the next few years.

4.      The motivation to maximize sales of Humira before the onset of biosimilar competition is not limited to the Company, but also to the Individual Defendants (defined below), whose compensation during the Class Period was tied directly to sales of Humira – something that Defendant Richard Gonzalez acknowledged was an "element of a set of financial factors that were evaluated as part of my compensation."

5.      While sales of Humira are extremely lucrative for AbbVie and its executives personally, it also is a dangerous medication that has been linked to serious infections and cancers. Accordingly, the FDA requires Humira to carry a "black-box warning," which is the strictest form of drug warning.

6.      As a manufacturer of a controlled drug, AbbVie is subject to numerous laws, regulations, and industry codes of conduct. Prominent among these is the Medicare-Medicaid Anti-Fraud and Abuse Act, 42 U.S.C. § 1320a-7b(b)(2) (the "Anti-Kickback Statute"), a healthcare fraud and abuse statute that prohibits the exchange of remuneration—which the statute defines broadly as anything of value—for referrals for services that are payable by a federal program (which, in the context of healthcare providers, is Medicare). States have similar statutes, including, as most relevant here, the California Insurance Frauds Prevention Act ("CIFPA")

7.     Throughout the Class Period, Defendants repeatedly ascribed Humira's growth and success to the Company's purportedly legitimate sales and marketing practices and programs.  For example, on March 5, 2014, AbbVie presented at the Cowen Health Care Conference.  During the presentation, Defendant Chase told investors that "*we have come up with very specific marketing programs that help drive that penetration*" and that "*[t]he other nice effect of those marketing programs are we have been able to actually grow Humira quicker than the market*."

8.     Indeed, during AbbVie's April 23, 2015 First Quarter 2015 Earnings Call, Defendant Chase noted that "*we use a unique selling model for HUMIRA.  We utilize specialized and dedicated sales organizations for all major indications*."

9.     Defendants publicly described how AbbVie developed these supposedly appropriate "programs" to "drive" Humira's penetration into the patient population.  For instance, on May 6, 2015, AbbVie presented at the Deutsche Bank Health Care Conference.  During the presentation, Defendant Chase or AbbVie Vice President of Pharmaceutical Development Scott Brun explained:  "*[W]e realized that if we could put specific programs in place that would drive getting biologics into the right patients, decreasing the amount of time it took to get a biologic in the hands of that patient, compliance programs, et cetera, we could actually grow the market and that's why you've seen acceleration in HUMIRA script volumes despite the age and size of the brand and it's really just that simple*."

10.     Then, on June 9, 2015, at the Goldman Sachs Healthcare Conference, Defendant Chase stated that "*[a] big part of [Humira's sales performance] has been the investment that we bolused into the program in 2012, 2013, a little bit in 2014*" and that "*we realized that if you put specific programs in place to drive appropriate utilization of biologics, Humira would disproportionately benefit from that.  And that's what we've done*."

11.     Defendants were clear that their marketing and promotional programs contributed to Humira's growth.  On May 23, 2016, at the UBS Global Healthcare Conference, Defendant Chase told analysts that "***it's been pretty clear that over the last couple of years volume has increased in the market and that is exclusively, in the case of Humira, due to the promotional programs we have in place***."

12.     Defendant Gonzalez echoed those statements, emphasizing during AbbVie's Third Quarter 2015 Earnings Call that "***AbbVie's strong commercial execution has made Humira the number-one prescribed biologic, with the highest commercial prescription market share, including the highest percentage of new patient starts***."  (Emphasis added.)

13.     In addition to such direct representations, during the Class Period, AbbVie maintained a Code of Business Conduct, which was publicly available on the Company's website and explicitly referenced in the Company's SEC filings.  AbbVie's Code of Business Conduct affirmatively stated that:   "***We never offer or provide anything of value to healthcare professionals or other individuals to inappropriately influence their medical judgment or purchasing or prescribing practices in favor of an AbbVie product***."

14.     Unknown to the market and in contrast to Defendants' repeated assurances, this is precisely the opposite of what AbbVie was doing.  As detailed herein, the Company engaged in an illegal scheme to bribe and influence medical professionals to prescribe Humira in return for the provision of goods and services.  AbbVie's scheme was perpetrated, in large part, by the use of "Nurse Ambassadors," who provided services to healthcare professionals who prescribed Humira, including assisting with pharmacy and insurance authorization, providing open enrollment resources, helping with paperwork, and giving advice about insurance products – all at no cost to physicians.  All of these services provided significant value to physicians, saving them

time, money, and resources. The services were provided on one condition: the physicians continued to prescribe Humira.

15.     This kickback scheme, which was intended to get healthcare providers to write more Humira prescriptions and refills, was successful. When given the choice between two medications, one which comes with free nurses and administrative staff and another that requires the healthcare provider to pay professional salaries, healthcare providers will take the substantial kickbacks into consideration when making their prescribing decisions. In turn, the kickback-motivated additional prescriptions cause insurers to pay more in Humira-related claims.

16.     As part of this scheme, AbbVie sent registered nurses directly to patients' homes. The nurses represented themselves as extensions of the doctors' offices when they were actually working on behalf of AbbVie and, according to David Jones ("Jones"), the Commissioner of the California DOI, running "a type of interference that kept patients and their physicians from communicating directly to one another about side effects and the potential consequences of the drug."

17.     The Company's wrongdoing was first challenged by Lazaro Suarez ("Suarez"), a former AbbVie Nurse Ambassador. As Jones later stated, Suarez "felt compelled to blow the whistle on AbbVie's fraud" and he "likely saved the lives or prevented injuries to patients who might otherwise have been prescribed Humira because of the incentives offered to physicians in the scheme."

18.     Suarez attended national trainings wherein Nurse Ambassadors were trained to conceal Humira's serious cancer and infection risks from patients. When patients asked about Humira's serious potential side effects, Suarez and others were explicitly taught to deflect the

question and reply that, while they were not able to discuss these side effects, they would help find a way to "get you your HUMIRA for five dollars or less."

19.    On October 5, 2015, Suarez filed a *qui tam* complaint alleging the wrongdoing described above. However, because that action was filed under seal, it was not until September 18, 2018, when the California DOI filed a Superseding Complaint for Civil Penalties, Assessments, Injunction and Other Relief in the matter of *California ex rel. Suarez v. AbbVie Inc.*, No. RG18893169 (Cal. Super. Ct.) (the "DOI Superseding Complaint"), that the nature and extent of AbbVie's misconduct was revealed to the investing public at large.

20.    In its superseding complaint, the California DOI alleged that AbbVie violated the CIFPA by providing illegal kickbacks to healthcare providers in return for prescribing Humira. As part of this matter, the California DOI alleged that AbbVie "engaged in a far-reaching scheme including both classic kickbacks – cash, meals, drinks, gifts, trips, and patient referrals – and more sophisticated ones – free and valuable professional goods and services to physicians to induce and reward Humira prescriptions." The California DOI further alleged that private insurers paid $1.2 billion in claims related to the drug and that the action is the largest health insurance fraud case in California DOI history.

21.    The pattern of misconduct alleged in the California matter was far more widespread than alleged by Suarez. The DOI Superseding Complaint included new allegations that, in addition to supplying healthcare providers with expensive and sophisticated software and technology, AbbVie also provided cash kickbacks to prescribers as well as meals, alcohol, gifts, and trips to healthcare providers at no cost, all to induce them to prescribe Humira. In addition, AbbVie used its pharmacy, Pharmacy Solutions, to provide valuable administrative support to healthcare providers' offices related to insurance and fulfillment issues, and AbbVie provided support to

7

healthcare prescribers to market their practices, all to boost Humira prescriptions and encourage healthcare providers to prescribe higher doses of Humira, including for off-label uses.

22.     According to Jones, while "AbbVie spent millions convincing patients and health care professionals that AbbVie Ambassadors were patient advocates – in fact, the Ambassadors were HUMIRA advocates hired to do one thing, keep patients on a dangerous drug at any cost." Jones further stated that "[p]harmaceutical companies know financial inducements are illegal, and patients depend on their health care professionals for straight forward honest information about their care and medication risks.  In this case [against AbbVie], patient care was traded for $1.2 billion in ill-gotten gains."

23.     In response to the news of the filing of the DOI Superseding Complaint and the allegations contained therein, the Company's stock price fell from an intra-day high of $96.06 per share on September 18, 2018, to close at $91.02 per share on September 19, 2018, a drop of $5.04 per share, or approximately 5%, on heavy trading volume.

24.     Financial analysts following AbbVie attributed the Company's stock price decline squarely to the release of the news of the filing of the DOI Superseding Complaint and the information contained therein, as opposed to other, non-fraud-related factors.  For example, an analyst from Morgan Stanley stated:  "ABBV shares traded down 3% on September 18 due to a California Insurance Commissioner lawsuit alleging Humira kickbacks."  On September 19, analysts at BMO issued a report that stated:  "ABBV shares are under pressure following release of a lawsuit from the California Insurance Commissioner vs. AbbVie, alleging that AbbVie has committed insurance fraud by providing kickbacks to healthcare providers throughout California." Analysts added that they viewed AbbVie's Nurse Ambassador program as "questionable and aggressive," while Credit Suisse wrote:  "Given how leveraged AbbVie is to Humira sales and

profit, we are not surprised by the stock's weakness after today's news came out, and think we could see some additional weakness as the story develops."

25.     While Plaintiffs and the Class suffered more than a billion dollars in losses as a result of the disclosure of Defendants' wrongdoing, the Individual Defendants reaped in excess of $87 million in insider sales during the Class Period.  Not only were these insider sales suspiciously significant in timing and size, but they dwarfed the sales made by these defendants in the period between AbbVie's first listing on the New York Stock Exchange ("NYSE") on January 2, 2013, and the start of the Class Period, even when taking into account the greater length of the Class Period.

26.     Just one month after the revelation of Defendants' fraud, AbbVie unexpectedly announced on October 19, 2018 that Defendant Chase would leave his position as the Company's CFO, effective immediately.  The market was surprised by the timing of Defendant Chase's "resignation," with Credit Suisse stating:  "We do not believe the Street had been expecting a CFO transition and, in fact, had expected a transition at the CEO level before one with the CFO."

27.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's publicly traded common stock, Plaintiffs and other Class members have suffered significant losses and damages.  By way of this Complaint, Plaintiffs bring claims under Section 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5, against both AbbVie and the Individual Defendants.

## II.    JURISDICTION AND VENUE

28.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9

29.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as AbbVie maintains its principal executive offices in this District and many of the acts and practices complained of herein occurred and were directed in substantial part in this District.

30.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.     Plaintiffs

31.     Lead Plaintiff Metzler is a German capital investment company headquartered in Frankfurt am Main, Germany.  Metzler controls and manages public and specialty investment funds.  As set forth in the certification previously submitted to the Court (*see* ECF No. 24-1), Metzler's funds purchased AbbVie common stock at artificially inflated prices during the Class Period and suffered damages as a result of the securities law violations alleged herein.  By order dated May 13, 2019, the Court appointed Metzler as Lead Plaintiff in this action.  ECF No. 64.

32.     Named Plaintiff National Shopmen is a multiemployer defined benefit plan that provides retirees with monthly retirement benefits and manages retirement assets. As set forth in the certification previously submitted to the Court (*see* ECF No. 14-3; 14-4), National Shopmen purchased AbbVie common stock at artificially inflated prices during the Class Period and suffered damages as a result of the securities law violations alleged herein.

### B.     Corporate Defendant

33.     Defendant AbbVie is incorporated in Delaware, with its principal executive offices in North Chicago, Illinois.  AbbVie is a global, research-based biopharmaceutical company that develops and markets pharmaceutical products, including Humira.  In 2018, Humira accounted for

61% of the Company's total net revenue. AbbVie's shares trade on the NYSE under the ticker symbol "ABBV."

### C.    Individual Defendants

34.    Defendant Richard A. Gonzalez ("Gonzalez") has served as AbbVie's Chief Executive Officer ("CEO") since 2012 and serves as Chairman of the Company's Board of Directors. He joined Abbott in 1977 and held various positions within the organization, including President of Abbott's Medical Products Group and President of Abbott's former Hospital Products Division, before briefly retiring in 2007. In 2010, he rejoined Abbott, serving as that company's Executive Vice President, Pharmaceutical Products Group until 2012. In this role, he was responsible for Abbott's worldwide pharmaceutical business, including commercial operations, research and development, and manufacturing. AbbVie's SEC filings, including its 2016 Proxy Statement, have referenced Gonzalez's "extensive knowledge of AbbVie and its global operations."

35.    During the Class Period, Defendant Gonzalez's compensation was tied directly to sales of Humira. In particular, as detailed in ¶¶ 97-98, AbbVie provides for cash bonuses of up to 200% of executives' base pay if designated revenue targets are met, which included sales of Humira.

36.    Defendant Gonzalez signed each of the Company's Forms 10-K and Forms 10-Q filed during the Class Period and certified them pursuant to the Sarbanes-Oxley Act ("SOX").

37.    Defendant William J. Chase ("Chase") served as AbbVie's Executive Vice President and Chief Financial Officer ("CFO") throughout the Class Period. Defendant Chase joined Abbott in 1989 and held various positions within that company, including as Abbott's Vice President, Licensing and Acquisitions from 2010 to 2012, and as Vice President, Treasurer from 2007 to 2010. On October 18, 2018, just one month after the filing of the DOI Superseding

Complaint, Defendant Chase abruptly resigned as CFO (with no reason provided by the Company). Defendant Chase currently serves as the Company's Executive Vice President, Finance and Administration and is scheduled to retire from AbbVie in mid-2019.

38.     During the Class Period, Defendant Chase's compensation was tied directly to sales of Humira.  In particular, as detailed in ¶¶ 97-98, AbbVie provides for cash bonuses of up to 200% of executives' base pay if designated revenue targets are met, which included sales of Humira.

39.     Defendant Chase signed each of the Company's Forms 10-K and Forms 10-Q filed during the Class Period and certified them pursuant to SOX.

40.     Defendants Gonzalez and Chase are sometimes referred to herein as the "Individual Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     AbbVie's Operations

41.     AbbVie is a global, research-based biopharmaceutical company that discovers, develops, manufactures, and sells pharmaceutical products in the United States and internationally. The Company was officially formed on January 1, 2013, following the split of Abbott into two publicly traded companies.  The "new" Abbott would specialize in diversified products including medical devices, diagnostic equipment, and nutrition products, while AbbVie would operate as a research-based pharmaceutical manufacturer.  Following the split, AbbVie was officially listed on the NYSE on January 2, 2013.

42.     Shortly after AbbVie was spun off, on June 13, 2013, Defendant Chase stated: "[W]hat's beautiful about this business is *its relatively simple business model*, right.  At the end of the day, *it's about making sure we achieve everything we can with Humira, which has tremendous growth potential*."

12

### B.  Humira Was (and Is) Critically Important to AbbVie's Business

43.     AbbVie's primary product is Humira, the brand name for adalimumab, a tumor necrosis factor ("TNF") inhibiting anti-inflammatory drug administered by subcutaneous injection.  Humira was approved for medical use in the United States in 2002, and costs approximately $5,400 for a supply of two injections, with patients generally taking one injection every two weeks.

44.     Humira acts by TNF alpha, a signaling protein, and thereby reducing the body's inflammatory response.  As a TNF blocker, Humira works by suppressing the immune system.

45.     Humira is currently indicated for the following conditions:  Rheumatoid Arthritis; Juvenile Idiopathic Arthritis; Psoriatic Arthritis; Ankylosing Spondylitis; Adult Crohn's Disease; Pediatric Crohn's Disease; Ulcerative Colitis; Plaque Psoriasis; Hidradenitis Suppurativa; and Uveitis.  For each of these conditions, alternative treatments exist.

46.     Humira is critically important to AbbVie.  Throughout the Class Period, Humira was responsible for billions of dollars in revenues and contributed well over half of AbbVie's revenues.  So important was (and is) Humira, that AbbVie cautioned investors that "*[a]ny significant event that adversely affects HUMIRA revenues could have a material and negative impact on AbbVie's results of operations and cash flows.*"

47.     On April 5, 2013, for example, AbbVie filed an amended annual report for the fiscal year ended December 31, 2012.  In it, AbbVie stated the following:

Strategic Objectives

AbbVie's long-term strategy is to maximize its existing portfolio through new indications, share gains, increased reach and geographic expansion in underserved markets while also advancing its new product pipeline. ***To successfully execute its long-term strategy, AbbVie will focus on expanding HUMIRA sales***, advancing the pipeline, expanding its presence in emerging markets and managing its product portfolio to maximize value.

13

> *AbbVie expects to continue to drive strong HUMIRA sales growth in several ways. AbbVie seeks to expand the HUMIRA patient base by applying for regulatory approval of new indications for HUMIRA, treating conditions such as axial and peripheral spondyloarthritis and uveitis. AbbVie will also seek to drive HUMIRA sales growth by expanding its market share and its presence in underserved markets.*

(Emphases added.)

48.     At the Morgan Stanley Healthcare Conference on September 10, 2014, Defendant Chase delivered a PowerPoint presentation that included a slide entitled "2014: Accomplishments to Date" that stated "Driving stellar growth from HUMIRA and several other products."  In a PowerPoint presentation at the Credit Suisse Healthcare Conference on November 13, 2014, AbbVie also described HUMIRA as a "*Key Product*[] with Category Leadership Positions." (Emphasis added.)

49.     Similarly, at a Global Health Care presentation on November 19, 2015, Defendant Chase stated: "*So HUMIRA has been a phenomenal growth driver for the company.  I mean, if you look at how it's performed over the last few years, it's grown at over $1 billion per year this year.  And of lately, this quarter, almost 20% growth on the brand.  So HUMIRA is obviously incredibly important and a huge cash flow generator for the company.*"

50.     In an October 27, 2017 "Strategic Update" presentation, AbbVie reported it was "On-Track to Exceed" "Total AbbVie sales of ~$37 billion by 2020" and *expected Humira sales in excess of $18 billion by 2020*.  Thus, by 2020, Humira was still expected to be responsible for nearly half of AbbVie's sales revenues.  In another slide, AbbVie noted that "Humira [is] expected to remain most widely prescribed front-line autoimmune agent" and "Humira to remain a significant part of ABBV cash generation story through 2025 and beyond."

51.     AbbVie's sales numbers confirm the Company's dependence on Humira throughout the Class Period.  The drug was the highest-grossing drug in the world in 2014,

achieving worldwide net sales on $12.5 billion, of which $6.5 billion was paid in the United States. In 2017, the Company sold $18.4 billion worth of Humira worldwide, accounting for 65% of AbbVie's revenue. In 2018, Humira earned $19.9 billion in revenue for AbbVie. The following chart shows AbbVie's revenues from Humira:



52. While Humira is the most prescribed drug in the world, it also tops the FDA's list of drugs with the most adverse event reports. Between 2013 and 2017, the drug was linked to about 209,000 adverse event reports, including more than 4,200 deaths. Accordingly, the FDA requires Humira to carry a "black-box warning" – the strictest form of drug warning. This label is necessary because Humira may increase the risk of serious and even fatal infections and may

increase the risk of patients developing lymphoma or other cancers. More specifically, the label warns:

> **WARNING: SERIOUS INFECTIONS AND MALIGNANCY**
> *See full prescribing information for complete boxed warning.*
>
> **SERIOUS INFECTIONS (5.1, 6.1):**
> - Increased risk of serious infections leading to hospitalization or death, including tuberculosis (TB), bacterial sepsis, invasive fungal infections (such as histoplasmosis), and infections due to other opportunistic pathogens.
> - Discontinue HUMIRA if a patient develops a serious infection or sepsis during treatment.
> - Perform test for latent TB; if positive, start treatment for TB prior to starting HUMIRA.
> - Monitor all patients for active TB during treatment, even if initial latent TB test is negative.
>
> **MALIGNANCY (5.2):**
> - Lymphoma and other malignancies, some fatal, have been reported in children and adolescent patients treated with TNF blockers including HUMIRA.
> - Post-marketing cases of hepatosplenic T-cell lymphoma (HSTCL), a rare type of T-cell lymphoma, have occurred in adolescent and young adults with inflammatory bowel disease treated with TNF blockers including HUMIRA.

### C. Relevant Industry Codes and Regulatory Framework Governing Pharmaceutical Companies

53. AbbVie's sales and marketing of Humira are regulated by rigid industry codes and federal and state laws that limit what pharmaceutical companies and their sales representatives can do to market and sell their products.

54. Indeed, during the Class Period, AbbVie told its investors and customers that the Company:

> ha[s] policies and procedures that guide employees as they conduct their day-to-day activities. They encompass relevant laws and regulations, including food and drug laws and laws relating to government health care programs. ***They also take into account industry best practices, including provisions of the International Federation of Pharmaceutical Manufacturers & Associations (IFPMA) Code of Pharmaceutical Marketing Practices, and the Pharmaceutical Research and Manufacturers of America (PhRMA) Code on Interactions with Healthcare Professionals, as well as other applicable industry codes. We regularly update our policies to incorporate changes to the law and industry codes, including rules regarding gifts, meals and education we provide to healthcare professionals***.

> ***AbbVie also complies with legal, industry and relevant institutions' requirements regarding the interaction of our employees with health care professionals and organizations***. We comply with national, regional, state and other requirements regarding transparency about our relationships with individuals and entities involved in providing health care. As required, we track and report payments and transfers of values (such as meals) provided to health care providers and organizations.

(Emphasis added.)

55. In relevant part, AbbVie's sales of Humira are covered by the following: (1) the Office of Inspector General of the Department of Health and Human Services ("OIG") Guidelines; (2) the PhMRA Code (defined below); (3) the Code of Ethics for Nurses; (4) Illinois' Nurse Practice Act; (5) Florida's Nurse Practice Act; (6) California's Nursing Practice Act; and (7) the federal Anti-Kickback Statute. In addition, AbbVie also has its own Code of Business Conduct that it purports to adhere to in its business dealings.[1]

### 1. The OIG Guidelines Prohibiting "White Coat Marketing"

56. The OIG has issued relevant guidance on pharmaceutical company sales and marketing, specifically as it relates to what the OIG has termed "white coat marketing." White coat marketing refers to the practice of healthcare professionals (like registered nurses) advertising and marketing pharmaceutical products while in a position of trust, as they may be able to exert influence when recommending drugs or services. The OIG is particularly concerned about such practices because patients may have difficulty distinguishing between professional medical advice and commercial sales activities.

57. The OIG's guidance regarding white coat marketing is directly related to AbbVie's business practice of using nurses to "educate" patients and market Humira. The OIG's guidance

---

[1] The citations herein to Nurse Practice Acts in California, Illinois, and Florida are for representative purposes only, and are not intended to represent an exclusive list of AbbVie's obligations under various state laws.

discusses the propriety of white coat marketing practices in similar contexts, noting that it has "long been concerned about aggressive marketing," including marketing practices such as "[i]n-person sales pitches or 'informational' sessions," which "are highly susceptible to fraud and abuse." That risk of fraud and abuse is compounded where "a physician or other health care professional is involved in the marketing activity," because "physicians and other health care professionals are in an exceptional position of public trust and thus may exert undue influence when recommending health care-related items or services – especially when marketing to their patients." "Given the nature of these relationships, when physicians or other health care professionals market items and services to their patients, patients may have difficulty distinguishing between professional medical advice and a commercial sales pitch." Under these conditions, the OIG concluded that white coat marketing should be avoided. OIG Advisory Opinion No. 11-08.

58.     In its *Compliance Program Guidance for Pharmaceutical Manufacturers*, the OIG has further expressed concern regarding the relationship between pharmaceutical manufacturers and their sales agents, noting that sales agents that "are paid to recommend and arrange for the purchase of the items or services they offer for sale on behalf of the pharmaceutical manufacturer they represent." The guidance recommends that manufacturers "should carefully review their compensation arrangements with sales agents" through reference to several factors including "the identity of the sales agent engaged in the marketing or promotional activity (*e.g.*, is the agent a 'white coat' marketer or otherwise in a position of exceptional influence) . . . ."

### 2.     The PhRMA Code

59.     In 2002, the Pharmaceutical Research and Manufacturers of America ("PhRMA"), a voluntary association of leading research-based pharmaceutical and biotechnology companies, adopted the Code on Interactions with Healthcare Professionals (the "PhRMA Code"). The

PhRMA Code governs the pharmaceutical industry's relationships with physicians and other health care professionals. An updated version of the PhRMA Code was implemented in January 2009. As noted above, ¶ 54, the Company's representations to investors expressly referenced the PhRMA Code.

60.    The PhRMA Code has been endorsed by the OIG, which, as noted above, has issued a *Compliance Program Guidance for Pharmaceutical Manufacturers* to reinforce the PhRMA Code. This endorsement establishes the PhRMA Code as a measure for compliance with the legal requirements that govern health care marketing. The OIG has issued guidance specifically warning against so-called white coat marketing because it leads to "increased costs to the Federal health care programs and beneficiaries, inappropriate medical choices, and adverse effects on the quality of care patients receive." OIG Op. 11-08, at 6 (June 14, 2011).

61.    The PhRMA Code requires that pharmaceutical and biotechnology companies pursue policies and practices that best serve the needs of patients and the healthcare community. Significantly, the PhRMA Code requires that pharmaceutical marketing practices comply with the highest ethical standards.

62.    The first tenet of the PhRMA Code is that interactions with physicians "should be focused on informing health care professionals about products, providing scientific and educational information, and supporting medical research and education." To that end, the PhRMA Code provides a series of rules that cover pharmaceutical marketing practices.

63.    In relevant part, the PhRMA Code provides direction on the relationship between pharmaceutical companies and prescribing physicians, noting that "[pharmaceutical company] representatives often serve as the primary point of contact between the companies who research, develop, manufacture and market life-saving and life-enhancing medicines and the healthcare

19

professionals who prescribe them." As such, the PhRMA Code mandates that "***the company representatives must act with the highest degree of professionalism and integrity***." PhRMA Code § 14 (emphasis added).

64. In turn, pharmaceutical companies must "ensure that all representatives who are employed by or [are] acting on behalf of the companies and who visit healthcare professionals receive training about the applicable laws, regulations and industry codes of practice, including this Code, that govern the representatives' interactions with healthcare professionals." Additionally, pharmaceutical companies are required to "assess their representatives periodically to ensure that they comply with relevant company polices and standards of conduct," and "should take appropriate conduct when representatives fail to comply." *Id.*

### 3. The Code of Ethics for Nurses

65. AbbVie's use of Nurse Ambassadors implicates the Code of Ethics for Nurses promulgated by the American Nurses Association ("ANA"), the largest professional association of nurses in the United States. The ANA's mission is to promulgate practice and ethical standards for all registered nurses. As alleged herein, AbbVie deployed nurses (purportedly) to educate doctors and patients about Humira. Again, the PhRMA Code requires AbbVie to ensure that its employees follow all "applicable laws, regulations and industry codes of practice," which would include the Code of Ethics for Nurses, adopted in 2001 and most recently updated in January of 2015.

66. The pertinent provisions of the ANA's Code of Ethics for Nurses include the following requirements:

a. "The nurse's primary commitment is to the . . . patient" and "[h]onest discussions about available resources, treatment options, and capacity for self-care are essential" (Provision 2.1);

20

b. "Nurses must identify and, whenever possible, avoid conflicts of interest . . . [and] [a]ny perceived or actual conflict of interest should be disclosed to all relevant parties and, if indicated, nurses should withdraw, without prejudice, from further participation" (Provision 2.2);

c. "Nurses must be alert to and must take appropriate action in all instances of incompetent, unethical, illegal, or impaired practice that place the rights or best interests of the patient in jeopardy" (Provision 3.5);

d. "The nurse has authority, accountability, and responsibility for nursing practice; makes decisions; and takes action consistent with the obligation to promote health and to provide optimal care" (Provision 4); and

e. "The nurse, through individual and collective effort, establishes, maintains, and improves the ethical environment of the work setting and conditions of employment that are conducive to safe, quality health care" (Provision 6).

### 4. Illinois' Nurse Practice Act

67. AbbVie's use of Nurse Ambassadors also implicates state-specific nurse practice acts, including the Illinois Nurse Practice Act. Specifically, Section 60-35 of the Illinois Nurse Practice Act, which governs a registered nurse's scope of practice, provides that "[t]he RN scope of nursing practice is the protection, promotion, and optimization of health and abilities, the prevention of illness and injury, the development and implementation of the nursing plan of care, the facilitation of nursing interventions to alleviate suffering, care coordination, and advocacy in the care of individuals, families, groups, communities, and populations." The pertinent provisions of the Illinois Nurse Practice Act describing the scope of a nurse's function include:

(1) *Collecting pertinent data and information relative to the patient's health or the situation on an ongoing basis through the comprehensive nursing assessment*.

21

. . . .

(7)    *Providing health education and counseling*.

(7.5)    *Advocating for the patient*.

(8)    *Practicing ethically according to the American Nurses Association Code of Ethics*.

(Emphases added.)

68.    The Illinois Nurse Practice Act also defines "comprehensive nursing assessment" as the "gathering of information about the patient's physiological, psychological, sociological, and spiritual status on an ongoing basis by a registered professional nurse and is the first step in implementing and guiding the nursing plan of care."

### 5.    Florida's Nurse Practice Act

69.    Florida's Nurse Practice Act defines the scope of a nurse's function in that state. For example, Section 464.003(18)(a)-(c) defines the "practice of professional nursing" to mean "the performance of those acts requiring substantial specialized knowledge, judgment, and nursing skill based upon applied principles or psychological, biological, physical, and social sciences which shall include, but not be limited to," the following:

(a)    The observation, assessment, nursing diagnosis, planning, intervention, and evaluation of care; *health teaching and counseling of the ill, injured, or infirm; and the promotion of wellness, maintenance of health, and prevention of illness of others*.

(b)    The administration of medications and treatments as prescribed by a duly licensed practitioner authorized by the laws of this state to prescribe such medications and treatments.

(c)    The supervision and teaching of other personnel in the theory and performance of any of the acts described in this subsection.

(Emphasis added.)

22

### 6.    California's Nursing Practice Act

70.    Additionally, AbbVie's Nurse Ambassador Program implicates California's Nursing Practice Act.  Section 2725 of California's Nursing Practice Act provides that "[t]he practice of nursing . . . means those functions, including basic health care, that help people cope with difficulties in daily living that are associated with their actual or potential health or illness problems or the treatment thereof, and that require a substantial amount of scientific knowledge or technical skill."  The section further lists specific functions that relate to a nurse's role, including, *inter alia*, the following:

   a.    ***Direct and indirect patient care services that ensure the safety***, comfort, personal hygiene, ***and protection of patients***; and the performance of disease prevention and restorative measures. . . .

   b.    ***Observation of signs and symptoms of illness, reactions to treatment, general behavior, or general physical condition, and (A) determination of whether the signs, symptoms, reactions, behavior, or general appearance exhibit abnormal characteristics, and (B) implementation, based on observed abnormalities, of appropriate reporting, or referral, or standardized procedures, or changes in treatment regimen in accordance with standardized procedures, or the initiation of emergency procedures***.

(Emphases added.)

71.    The Nurse Ambassador program flies in the face of these (and other) Nurse Practices Acts, and also contravenes the Code of Ethics for Nurses, because it was the Nurse Ambassador's job to conceal serious risks with Humira.  Indeed, the Company (or agents of AbbVie) trained the Nurse Ambassadors to, among other things, dodge patients' questions about known side effects of Humira.  By offering incomplete or select information on a patient's pharmacologic regimen, the Nurse Ambassador neglected his or her legal and professional obligation to, among other things, provide appropriate education.  Significantly, the Nurse Ambassador program violates the core tenet that a nurse's primary commitment is to the patient.

23

### 7. The Federal Anti-Kickback Statute

72. AbbVie also is required to comply with the Anti-Kickback Statute, which is a federal law that prohibits providing or receiving anything of value to induce a person to use a product if that product will be paid for in whole or in part by a federal insurance program. The Anti-Kickback Statute is intended to guard against increased costs through higher utilization of services or substitution of higher-cost products and to preserve the integrity of health care programs by prohibiting inducements that could bias treatment.

73. Specifically, the statute on its face prohibits the offering of remuneration for the purposes of "arranging for or recommending the purchasing, leasing, or ordering any . . . item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2). The Anti-Kickback Statute applies if at least one purpose of the remuneration is to induce referrals even if there may be other legitimate purposes. In addition to the federal statute, numerous states, such as California, have passed their own similar anti-kickback laws.

### 8. AbbVie's Code of Business Conduct and Ethics Compliance Program

74. In addition, during the Class Period, AbbVie maintained a Code of Business Conduct. The Code of Business Conduct, which was signed by Defendant Gonzalez and publicly available on the Company's website, was in effect as of April 25, 2013 (the "2013 Code") and remained in effect until 2017, when the Company issued a revised Code of Business Conduct. The 2013 Code contained a section titled "Maintaining Patient Safety," which provided:

> Our commitment to the safety of those who use our products is always at the forefront of everything we do. ***In order to protect patients, we must identify, evaluate, minimize and, whenever possible, eliminate patient safety concerns***.

> ***We also comply with all legal and regulatory requirements*** that govern the reporting of safety information to regulatory or public health agencies and communicate with each government agency that oversees our products to address potential safety concerns.

> *We communicate openly and honestly with healthcare professionals, institutions, patients, and public health agencies to ensure that they have the information that they need in order to use AbbVie's products safely and effectively.  We follow up on complaints received about our products in a timely manner and take appropriate corrective actions*.

(Emphases added.)

75.     The foregoing representations were not merely aspirational statements about what the Company should do, but were concrete statements about what AbbVie did do.

76.     Another section of the 2013 Code detailed the Company's policies regarding interactions with healthcare professionals.  In that section, titled "Interacting with Healthcare Professionals and Other Customers," AbbVie stated:

> On a regular basis, we interact with customers, including healthcare professionals who recommend and prescribe our products, pharmacy benefits managers who determine what drugs will be included on their formularies, and government officials, hospitals, and other healthcare facilities that make purchasing decisions. Healthcare professionals must decide the best course of care for their patients, and *we are committed to providing them with timely and accurate information to assist in treatment decisions*.

> *Because of the key role healthcare professionals play in determining which products to recommend, prescribe, or use to treat specific diseases or conditions, we take special care to avoid even the appearance of unduly influencing their decisions*.  We promote our products only for uses that have been approved, cleared, or authorized by the relevant government agency.

> Most countries have some form of regulations that govern how drug products may be promoted.  These laws may be at a national, regional, or local level.  For example, in the U.S., the Food and Drug Administration (FDA) requires that healthcare companies only promote prescription drugs for uses that it has approved or cleared.  Additionally, several U.S. states have implemented laws that may apply to our promotion of products.

> *Additionally, many countries prohibit a company from offering a healthcare professional anything of value in exchange for using or recommending the company's products.  A U.S. federal law, referred to as the Anti-Kickback Statute, makes it illegal to offer or give anything of value to induce a healthcare professional to use or recommend pharmaceutical products that are paid for or reimbursed by the government*.

The U.S. False Claims Act allows the government to receive up to three times the amounts paid for false or fraudulent claims submitted to the government for payment or reimbursement of healthcare expenses, including for products that were promoted in violation of the FDA regulations or for which illegal kickbacks were offered or paid. This law allows for individuals to report violations directly to the government and receive a share of any recovery the government makes. Employees who report violations to the company or the government may not be retaliated against for making such reports.

Other customers, such as health insurance plans and hospitals, also need accurate information about the safety, efficacy, and cost effectiveness of our products to make the best treatments available to their patients. We are truthful in all information we provide to assist our customers in making purchasing decisions.

***In interacting with healthcare professionals and other customers, we act with honestly, fairness, and integrity. We follow applicable laws and industry guidelines created to avoid potential conflicts of interest. We never offer or provide anything of value to healthcare professionals or other individuals to inappropriately influence their medical judgment or purchasing or prescribing practices in favor of an AbbVie product***. We will comply with all transparency reporting requirements, and will follow all laws and regulations that govern our pricing policies, including how we may provide discounts and rebates.

(Emphases added.)

77.     Here again, these are ***not*** aspirational statements, but rather are direct assurances about the nature of AbbVie's business dealings.

78.     In or around 2017, AbbVie released an updated Code of Business Conduct (the "2017 Code"). Like the 2013 Code, the 2017 Code was signed by Defendant Gonzalez. According to Defendant Gonzalez, the 2017 Code was "updated to reflect the AbbVie Way," which meant with "agility and transparency befitting our biopharmaceutical company."

79.     Like the predecessor code, the 2017 Code contained unqualified statements regarding the Company's practices and the state of its compliance program. For example, the 2017 Code provided that AbbVie "***interact[s] honestly with healthcare providers***," and stated:

***We take care to ensure product information is accurate, comprehensive, relevant and up to date. We are fair and open in our business dealings with healthcare providers and customers. We do not offer or give gifts or other items or services of value as a means to earn favor for our products or sway medical judgment.***

26

> ***We rely on product quality and healthcare outcomes to influence purchasing and prescribing practices***.  This reinforces the positive reputation we have earned worldwide.

(Emphases added.)

80.  AbbVie also emphasized that it "follow[s] industry laws and regulations."  In that regard, the Company stated:

> We value the long-standing trust we have earned worldwide.  Patients, healthcare providers, customers and suppliers know they can rely on us because ***we comply with the laws, regulations and codes that govern the pharmaceutical industry and our company*** (e.g., European Federal of Pharmaceutical Industries and Associations [EFPIA] and International Federal of Pharmaceutical Manufacturers and Associations [IFPMA]).

(Emphasis added.)

81.  With respect to its business practices and promotion of products, AbbVie stated:

> We maintain trustworthy business practices.  We comply with all applicable laws that regulate our business.  Many of these laws concern the way we promote and sell our medical products.  ***It is never acceptable to try to influence purchasing decisions in any way that is unethical, inappropriate or illegal or creates a potential conflict of interest.  We are honest, open and up-front when we interact with those who may be interested in buying or prescribing our products***.

(Emphasis added.)

82.  In addition, the 2017 Code specifically addressed the Company's compliance with certain laws, regulations, and policies, stating:

> Compliance with the law inspires trust in our culture of integrity.  We abide by all laws, regulations, policies and procedures that apply to our jobs including . . .

- **U.S. Anti-Kickback Statute.**  We don't give anything of value to induce a healthcare professional to use or recommend pharmaceutical products that are paid for or reimbursed by the government.

- **U.S. False Claims Act and similar laws in other countries.**  We don't submit or cause the submission of false claims for healthcare reimbursement to the government.

- **Food, Drug and Cosmetic Act and similar laws in other countries.** We don't promote a regulated product or an indication that has not received FDA or other appropriate regulatory approval.

- **Transparency Laws.** We report certain payments to physicians and other customers, as required by transparency laws and regulations in every location where we operate.

- **U.S. Foreign Corrupt Practices Act, the United Kingdom Bribery Act and similar laws in other countries.** We do not participate in bribery or corruption and adhere to all local laws and regulations that cover bribery and corruption.

83. AbbVie specifically referenced its Codes of Business Conduct in its SEC filings during the Class Period. For example, in its annual report (Form 10-K) filed on February 20, 2015, the Company stated: "AbbVie's code of business conduct *requires* all its business activities to be conducted in compliance with laws, regulations, and ethical principles and values. All directors, officers, and employees of AbbVie are *required* to read, understand, and abide by the requirements of the code of business conduct applicable to them. AbbVie's code of business conduct is available in the corporate governance section of AbbVie's investor relations website at www.abbvieinvestor.com." (Emphases added.)

### D. AbbVie's Nurse Ambassador Program

84. Many Humira prescribers work in Rheumatology, Gastroenterology, and Dermatology practices. Quite often, these practices directly employ nurses, prior authorization staff, and other personnel to provide insurance and practice-related advice and counseling to patients. For example, office staff counsel patients on how to self-inject, assist them with insurance coverage and insurance forms, navigate specialty pharmacy and prior authorization requirements, answer patient questions, and conduct follow-ups to ensure patient adherence to prescribed medication regimes. These services are time-consuming and resource intensive. The staff

members who perform them are professionals who command substantial salaries and benefits and are often overworked.

85.     During the Class Period, AbbVie offered a team of nurses at no cost to healthcare providers if – and only if – they chose to prescribe Humira.  AbbVie has referred to the nurses by several titles, including "Nurse Ambassador," "Clinical Nurse Educator," "Nurse Educator," "Patient Ambassador," and "HUMIRA Ambassador."  In sum, the Ambassador Program was (and is) a network of nurses across the United States that provides services for patients using Humira that ordinarily would be delivered by the prescribing physician or by persons directly employed by that physician.

86.     By furnishing "Nurse Ambassadors" to those healthcare providers – and only those healthcare providers – who prescribed Humira, AbbVie provided extensive, costly, and time-consuming nursing-support services.  AbbVie did so in the hope that it would encourage healthcare providers to write more Humira prescriptions and refills.  If given the choice between two medications, one which comes with free nurses and administrative staff and another that requires the provider to pay professional salaries, healthcare providers are likely to factor the substantial nursing kickback into the prescribing calculus.  These kickbacks motivated additional prescriptions and enabled AbbVie to reap greater sales revenues.

87.     AbbVie contracted with QuintilesIMS ("Quintiles") to implement its Ambassador Program and used Registered Nurses employed through Quintiles to serve as representatives for direct dealings with doctors, office staff, and patients.  Nurse Ambassadors also accompanied AbbVie sales representatives on visits to healthcare provider offices.

88.     In general, Nurse Ambassadors visited healthcare providers with the goal of encouraging patient enrollment in the Ambassador Program.  For example, the DOI Superseding

29

Complaint includes a Humira enrollment form, which states: "**Nursing Orders**: My signature on this Enrollment Form indicates I am requesting a Registered Nurse to either (i) provide patient training on proper technique for self-administration of HUMIRA or, if needed, (ii) the administration of HUMIRA during the teaching visit. Order valid for up to one year."

89.     AbbVie also provided Home Health Registered Nurses, or HHRN, as part of its Humira sales practices. HHRNs are registered nurses who train patients regarding injections and administer Humira injections to patients in their home. Patients gain access to an HHRN through enrollment in the Ambassador Program.

90.     While providing significant value to the doctors' offices, Nurse Ambassadors' interactions with patients also serve as a stand-in for what otherwise would be a conversation between patient and physician. AbbVie's Nurse Ambassadors therefore affected the relationship between patient and healthcare provider by gaining access to patients and capitalizing on their vulnerability to ensure they filled their prescriptions and started to take and continued to use Humira.

91.     The propriety of using Nurse Educators and Nurse Ambassadors, and the propriety of their contacts with patients, is controversial. One recent article, dated October 2, 2018, noted:

> *"This is the biggest topic in compliance circles, by far,"* said Manny Tzavlakis, a managing partner at Helio Health Group, which advises drug makers on regulatory issues. "You're seeing patients becoming more of the center of commercial programs now. And this is the new area where the government can take on the industry."
>
> . . . .
>
> Both Sanofi and Biogen have received notices from the federal government seeking information about clinical educator programs. And an upcoming industry conference devoted exclusively to nurse educator programs lists U.S. attorneys from Newark, N.J., and Philadelphia as speakers.
>
> . . . .

David Schumacher, a former deputy chief of the health care fraud unit in the U.S. attorney's office in Boston, ***said there are long-standing concerns about white coat marketing***. "If you're a nurse who can gain access [to the patient] and use professional bona fides to cloak the real objective — to promote the drug — that relationship is of concern, if it's coercive and can lead to overuse or inappropriate use of a drug," said Schumacher, now a partner at the Hooper, Lundy & Bookman law firm. "That type of arrangement is going to be very closely scrutinized."[2]

(Emphases added.)

### E. Throughout the Class Period, AbbVie Was Particularly Incentivized To Maximize Sales of Humira

92. Throughout the Class Period, AbbVie was incentivized to market Humira as aggressively as possible because of pending competition from biosimilars (generics) marketed by competitors. While the original patent on Humira expired in late 2016, AbbVie lost exclusivity on the drug in 2018 in the European Union, and is expected to lose exclusivity in the United States in 2023.

93. On May 4, 2018, *Thepharmaletter* published an article entitled, "AbbVie needs to brace itself for Humira Competition in Europe." The article stated in part:

Although US drugmaker AbbVie (NYSE: ABBV) has done a sterling job in fending off competition to its Humira (adalimumab), the world's biggest selling medicine and still growing, at least in Europe, ***that is all likely to come to an end later this year***. Humira biosimilars will have significant uptake in the European Union since they are anticipated to be priced 10%-20% lower than the originator brand across the EU. This will be further facilitated by the quotas that healthcare authorities have in place for biosimilar prescription, says data and analytics company GlobalData.

(Emphasis added.)

94. The effect of generic competition on brand-drugs is well-established. Once a cheaper generic alternative enters the market, sales of brand-drugs fall rapidly. A reduction in

---

[2]     *Caregivers or marketers? Nurses paid by drug companies facing scrutiny as whistleblower lawsuits mount*, Stat, Oct. 2, 2018, https://www.statnews.com/2018/10/02/nurse-educators-humira-whistleblowerlawsuits.

Humira's market share – and thus AbbVie's revenues – is expected with the onset of generic competition.

95.     While domestic sales of Humira remain strong, the recent onset of generic competition in the European Union has affected AbbVie significantly.  During the first quarter of 2019, the Company reported that non-U.S. Humira sales fell by 27.9%.  Accordingly, the Company was particularly incentivized to maximize sales of Humira throughout the Class Period.

96.     In connection with this pending loss of exclusivity, AbbVie is alleged to have engaged in certain illegal methods to protect its Humira revenues.  The Company currently is the subject of antitrust class action lawsuits that accuse it of dividing up markets with competitors so as to help insulate itself from generic competition.  For example, in *Law Enforcement Health Benefits Inc. v. AbbVie Inc.*, No. 1:19-cv-02415 (N.D. Ill.), the plaintiff alleges that "[a]t least nine companies have indicated an intent to market biosimilars to compete with Humira.  Three currently have approval from the FDA.  But none have launched.  Instead AbbVie entered into deals with each to delay their entry until various dates in 2023."  *Law Enforcement* Compl. ¶ 6.  According to that complaint, through "AbbVie's unlawful scheme and monopolization of the market, AbbVie has continued to reap the benefits of being the exclusive seller of Humira on the U.S. market, even though the primary patent on Humira expired at the end of 2016 and the FDA has approved several biosimilars to compete with Humira."  *Id.* ¶ 8.

**F.      The Individual Defendants Were Strongly Incentivized To Engage In the Fraudulent Scheme**

97.     During the Class Period, the Individual Defendants' compensation depended directly on sales of Humira.  For example, in AbbVie's March 19, 2018 Proxy Statement, the

Company disclosed that the following financial goals would determine the short-term incentives that executives could earn:

- Net revenues
- Income before taxes
- Operating margin
- ***HUMIRA sales***
- Return on assets
- Strategic and leadership goals

(Emphasis added.)

98.     The interrelationship between Humira sales and executive compensation was specifically acknowledged by Defendant Gonzalez in testimony before Congress. During a February 26, 2019 hearing, Defendant Gonzalez confirmed that sales of Humira had a material impact on his compensation:

> A Senate panel on Tuesday grilled AbbVie Chairman and CEO Richard Gonzalez about tying executive bonuses to sales of the U.S. drugmaker's blockbuster arthritis treatment Humira.
>
> ***Humira's $18.3 billion in 2017 sales*** — which rose 14.6 percent from the previous year and accounted for about 65 percent of the company's $28.1 billion in revenue — ***were a major factor in calculating the compensation for AbbVie's top executives last year***, according to the company's most recent compensation data.
>
> Humira sales comprise one of the company's four main financial targets — along with net revenues, operating margin and return on assets — that accounted for 60 percent of Gonzalez's short-term incentive plan. The plan pays out a cash award for each of the top five executives equal to up to 200 percent of their base salary, depending on if they meet the targets and other performance measures.
>
> ***The company hit its internal target for Humira sales last year, helping its top five executives to nearly max out their cash bonuses*** with a payout equal to 175 percent of their annual base pay, the company said.
>
> "In 2017 all financial and strategic goals were materially achieved, resulting in performance scores between 99% and 100% of target," the company said.
>
> Gonzalez, 64, made a total of $22.6 million for his performance in 2017, $4.3 million of which was his cash bonus. The rest of his compensation was base salary and a mix of stock, restricted shares and options.

"This strikes me as problematic," Sen. Ron Wyden, D-Ore., said in questioning the CEO at a hearing on prescription drug costs before the Senate Finance Committee on Tuesday. "Would you make a smaller bonus if you dropped the price of Humira?"

In response, *Gonzalez said, "Humira was one element of a set of financial factors that were evaluated as part of my compensation. It's obviously a very significant product for us. So it is clear it would be a part of the evaluation*."[3]

99.     Accordingly, under AbbVie's executive compensation plan in effect during the Class Period, the Company's executives – including the Individual Defendants – were incentivized to seek greater and greater Humira sales figures so that they could maximize their own personal compensation.

## G.     Suarez Files a *Qui Tam* Action in the Northern District of Illinois

100.     On October 5, 2015, Suarez, a former Nurse Educator and Patient Ambassador who worked for AbbVie via its subcontractor Quintiles, filed a *qui tam* action against AbbVie and Abbott in the U.S. District Court for the Northern District of Illinois, captioned *United States ex rel. Suarez v. AbbVie, Inc.*, No. 1:15-cv-08928 (N.D. Ill. Oct. 8, 2015). On February 12, 2018, Suarez filed an amended complaint. Suarez alleged violations of the False Claims Act and numerous state *qui tam* statutes in connection with AbbVie's kickbacks to prescribers to increase prescriptions and ensure patients' continued use of Humira.

101.     On March 13, 2018, the United States filed a Notice of Election to Decline Intervention in the action. In so doing, the government requested that the relator's complaint and amended complaint and notice of non-intervention be unsealed, but that all other papers on file in the action remain under seal.

---

[3]     Berkeley Lovelace, Jr., *Senate panel grills pharma CEO over executive bonuses and sales of AbbVie blockbuster drug Humira*, CNBC, https://www.cnbc.com/2019/02/26/senate-panel-grills-abbvie-ceo-over-bonusestied-to-sales-of-humira.html (emphases added).

102.    In filing the notice of non-intervention, the United States explicitly acknowledged that the State of California's non-intervention "is expressly limited to the State False Claims Act, Cal. Gov't Code, section 12650, et seq., and specifically all allegations of fraud against the State of California's Medi-Cal program.  This declination expressly does not apply to claims under the California Insurance Code section 1871.7, and California Penal Code sections 549, 550, and 551, which are being prosecuted in this action by the California Department of Insurance and County District Attorneys."

103.    In briefing filed with the Illinois federal district court, Suarez explained how the "Ambassador Program illegally pad[ded] profits under the guise of 'patient education,'" with appropriate citations to his amended complaint:

> Publicly, AbbVie claims the program is merely a patient education and support program.  *Id.* ¶ 8.  But, as Relator explains, once with patients one-on-one "*Ambassadors do not provide and are not permitted to provide fair and balanced information.*" *Id.* ¶ 6.  Instead, Ambassadors abandon their role as "educators" and deflect patients' frequent concerns about cancer and other risks in favor of overcoming patient objections and serving as the conduit to make sure that patients (though not the Government, which foots the bill) get financial assistance to help pay for HUMIRA.  *Id.* ¶¶ 6; 83-117 (emphasis added).  In trainings, Ambassadors practice deflecting patient concerns about side effects and referring the patient back to their doctor.  However, as the Ambassador Program reduces interactions between patients and their health care providers, far fewer patients are likely to get their questions and concerns about safety answered.  *Id.*  ¶¶ 96-97.
>
> The Ambassador Program works to maximize financial returns for AbbVie by ensuring that patients start on and continue to take HUMIRA, regardless of facts that, if properly presented to medical offices, could counsel against continued use. *Id.* ¶¶ 58-59; *see also id.* ¶ 100 (managers directed Ambassadors to track patient data to "focus resources to have maximal return"); ¶¶ 112-117 (Ambassadors report adverse events such as injection site reactions, infections, and failure to improve (or worsening conditions) *only* to AbbVie and *not to the patient's doctor or the FDA*, and are instructed not to put in writing questions about patient interactions, including adverse events).  Indeed, Ambassadors were evaluated based on prescription based metrics, such as number of patients enrolled, that had nothing to do with education.  ¶¶ 58-60.
>
> . . . .

Capitalizing on the value provided, the Ambassador Program is touted to physicians in *sales pitches* and at speaker events. *Id.* ¶¶ 67-70; 78-82. Sales Representatives entice interest and overcome hesitancy to prescribe HUMIRA by painting a vivid picture that the Ambassador (and not the doctor or his busy staff) "will take that [patient] call," "will answer that [patient's] insurance question" and take "concerns about [calls to the office, dealing with billing, disposal] *off the table*" *if* the doctor chooses to prescribe HUMIRA. *Id.* ¶ 68. In fact, senior members of AbbVie's *sales organization* would identify higher prescribing "key accounts" that could benefit from the Ambassador program. *Id.* ¶ 72. In the early years of the program, through some point in 2013, Ambassadors actually accompanied Sales Representatives on sales calls to pitch and market the Ambassador Program. Regardless of whether Ambassadors actually join the Sales Reps, the messaging about the value of the program to physicians remains consistent. *Id.* ¶ 67. When describing whether to prescribe HUMIRA or another drug, doctors are enticed by the invitation that they should think of an Ambassador as "an extension" of their office. *Id.* ¶ 69. This attractive incentive even led some doctors to market themselves to patients by implying the Ambassador Program was a concierge service the doctor had arranged. *Id.* ¶ 81.

**H.** **The State of California Intervenes in the *Suarez* Action and Files the DOI Superseding Complaint; AbbVie's Stock Price Falls**

104. While the *United States ex rel. Suarez v. AbbVie, Inc.* action was pending in the Northern District of Illinois, the State of California initiated its own investigation regarding AbbVie's marketing practices of Humira. Those efforts – which included investigative depositions over a seven-month period – focused on AbbVie's use of kickbacks to physicians for the purpose of encouraging them to prescribe Humira, and its improper efforts to influence or misinform Humira patients through "nurse educators" or "nurse ambassadors" associated with AbbVie. In this regard, a spokesman for the State of California confirmed: "We conducted an investigation. *We believe there is strong evidence that fraud was committed* against private insurance companies."

105. Following the filing of the amended complaint in the *Suarez* action in the Northern District of Illinois on February 12, 2018, three days later, on February 15, 2018, Suarez filed a sealed *qui tam* action in state court in California, captioned *California ex rel. Suarez v. AbbVie Inc.*, No. RG18893169 (Cal. Sup. Ct.).

106.    On September 6, 2018, the California DOI filed a notice of intervention (on behalf of the State of California) and took over the prosecution of the *Suarez* action.

107.    On September 18, 2018, the California DOI publicly filed the DOI Superseding Complaint against AbbVie in Alameda County Superior Court on behalf of the State of California, alleging that the Company "systematically and repeatedly" violated anti-kickback laws by "pa[ying] healthcare providers to prescribe HUMIRA far in excess of the amount that they would have prescribed this expensive and dangerous drug absent the illegal kickbacks."  The public version of the DOI Superseding Complaint (which laid out Defendants' fraudulent scheme in detail) is heavily redacted.

108.    In connection with that filing, the California DOI called the *Suarez* action the "largest health care fraud case" in the California DOI's history and alleged that AbbVie violated the CIFPA and defrauded the state by approximately ***$1.2 billion***.

109.    In particular, the California DOI alleges that AbbVie provided kickbacks in more traditional forms (such as meals, cash, gifts, drinks, and trips), as well as more sophisticated forms, including "free and valuable professional foods and services."  These services included marketing assistance, medical practice management technology, and free insurance processing services.

110.    In connection with AbbVie's scheme, the California DOI's Insurance Commissioner Dave Jones stated that "***the [Nurse] Ambassadors were HUMIRA advocates hired to do one thing, keep patients on a dangerous drug at any cost***."  As detailed in the DOI Superseding Complaint, the Nurse Ambassadors visited patients in their homes, giving AbbVie direct access that served its goal of promoting its drug over other constituencies.  The Nurse Ambassadors, who had nursing backgrounds, were trained to downplay the risks of the medication and deflect patient concerns.  Nurse Ambassadors also assisted doctors' offices with handling

37

insurance authorizations and claim processing, saving those physicians significant time and money. AbbVie, however, would only provide that assistance if the physician prescribed (or continued to prescribe) Humira.

111.    While much of the DOI Superseding Complaint is redacted, the following is known publicly regarding the key averments in that action:

- AbbVie has engaged in a far-reaching scheme including both "classic" kickbacks, including cash, meals, drinks, gifts, trips, and patient referrals, as well as more sophisticated ones, such as free and valuable professional goods and services to physicians to induce and reward HUMIRA prescriptions. For example, as part of its scheme, the Company gave providers "expensive and sophisticated proprietary software" at no charge to "increase HUMIRA prescriptions."

- The fulcrum of the fraudulent scheme, and among the most troubling aspects of it, is AbbVie's insertion of its own personnel directly into the homes of patients. When doctors prescribe HUMIRA, AbbVie sends registered nurses – which AbbVie calls "Ambassadors" – into patients' homes, representing them as an extension of the doctor's office. These Ambassadors save physicians time, money, and resources. At no cost and considerable gain to the physician's office, AbbVie nurses provide patient care, pharmacy and insurance authorization assistance, open enrollment resources, paperwork help, advice on insurance products, and other services, all of which provide a substantial value, so long as the doctors prescribe AbbVie's drug instead of selecting another course of treatment. These "Ambassadors" are required by AbbVie to take advantage of their nursing background and direct access to patients to serve AbbVie's financial interest in getting patients to take HUMIRA by downplaying its risks. Ambassadors provide unbalanced information: trained to tout the good while at the same time instructed on methods to avoid directly answering patient questions on the bad, even those pertaining to HUMIRA's serious and important side effects.

- AbbVie's scheme as to HUMIRA is particularly egregious because its purpose is to induce prescriptions of a drug that carries deadly risks and that has single-handedly caused ratepayers in California to spend more money on insurance. Specifically, HUMIRA has FDA boxed warnings (commonly referred to as "black box" warnings) – the strictest prescription-warning level – because of its risk of death by cancer or infection.

- Given HUMIRA's black box warnings, before injecting HUMIRA, patients deserve advice from a healthcare provider (and provider staff) that is free from the taint of kickbacks to induce prescriptions, or any motive other than

the best-interests of the patient. Unfortunately, as a result of AbbVie's kickback scheme, too many Californians unwittingly receive HUMIRA prescriptions from providers who selected and prescribed the drug while taking kickbacks from AbbVie.

• Suarez was originally interested in the Nurse Ambassador position because he understood he would be an educator helping patients with challenging diagnoses. He grew concerned that this was a subterfuge, however, and that his role was instead focused on rewarding prescribing physicians and obfuscating his role with respect to patients and patient care.

• Suarez was correct to develop suspicions: what he and his colleagues did not know was that they were effectively being used by AbbVie as runners and cappers, people working at the behest of AbbVie in connection with its concrete, internal financial goals.

• For example, Suarez visited physicians' offices alongside sales representatives, with his Nurse Ambassador services touted as a benefit of prescribing HUMIRA. Indeed, AbbVie referred to him and other nurse Ambassadors as "an extension" of the doctor's office, available in exchange for choosing an AbbVie drug.

• Overall, Suarez felt that the focus of the Ambassador program was getting and keeping patients on HUMIRA to maintain and increase AbbVie's profits. Suarez, as a medical professional, was troubled by this emphasis on the bottom line. He attended national trainings wherein Nurse Ambassadors were trained to hide HUMIRA's serious cancer and infection risks from patients. In response to patient concerns about serious potential side effects, he and others were explicitly trained to deflect the questions and reply that while they were not able to discuss these side effects, they would help find a way to "get you your HUMIRA for five dollars or less." As a Nurse, he felt compelled to blow the whistle on AbbVie's fraud.

• Additionally, AbbVie employed healthcare providers to promote the use of Humira at higher dosages and frequencies than those indicated on the drug's label (off-label escalated dosing).

112. In connection with the filing of the DOI Superseding Complaint, Adriane Fugh-Berman, a professor at Georgetown University Medical Center, stated: "This is marketing laundered through your doctor. . . . You're providing services to a patient so that patient will be motivated to stay on a drug which may not be the best drug for them and may not be the most cost-effective drug."

113.    On October 19, 2018, AbbVie removed the case to federal court.  During a February 7, 2019 hearing addressing the potential remand of the action back to state court, counsel for the State of California stated:  "We did a very extensive prefiling investigation in this case" and that "*there is no more important consumer case, I think, before the State of California right now than this one*.  I think it's an incredibly important case for the State."  In addition, the State's counsel confirmed that "we will be pursuing this case very vigorously on behalf of the State of California, the people of California.  And *it's an extremely important case for the public of California*."

## I.    A Former Nurse Ambassador Corroborates Suarez and the State of California's Allegations

114.    FE-1, a Nurse Ambassador at AbbVie in 2013 for two months, has been a nurse for over thirty years.  She explained that she only briefly worked for AbbVie because she would not drink "the Kool-aide" associated with the Ambassador program.  During her time as a Nurse Ambassador, she reported to Lane Murray, an AbbVie manager, and to Catherine Poisson, a Quintiles manager.

115.    According to FE-1, the Nurse Ambassadors underwent a five-week training program prior to going out into the field.  The training began with five days of training in Chicago, followed by home-based training for two weeks, and then finished with two full weeks in Chicago. On the second to last night of training in Chicago, the nurse ambassadors met with their assigned sales representatives.   Personnel from both AbbVie and Quintiles conducted the Nurse Ambassador training.  FE-1 specifically recalled that one of the people leading the Ambassador training was not a nurse, which she found odd as she could not understand how a non-nurse could train nurses.

116.    Despite all of this training, FE-1 said the Nurse Ambassadors' "only role" was to get patients committed to Humira and teach them how to self-administer the Humira injection. She felt as though "the whole purpose" of the Ambassador program was to get "patients onto Humira" "for $5.00 a month."

117.    FE-1 said that her experience at AbbVie as a Nurse Ambassador was different than her prior nursing jobs.  First, she was **not** allowed to take a patient's vital signs, which made her "pretty uncomfortable" as she felt like taking vital signs was a "safety precaution" when injecting a patient.

118.    Second, she explained that as a Nurse Ambassador, she was **not** allowed to provide any medical advice to the patients.  During training, "they didn't tell us one time, they told us 400 times" that if a patient had a complaint or concern, the Nurse Ambassadors were told to tell the patient to call the patient's doctor.  Indeed, FE-1 recalled that they were told "a thousand times" that nurse ambassadors could not tell a patient to "take two Tylenol" or administer Benadryl if a patient experienced a side effect while taking Humira.

119.    While the Ambassador training discussed the side effects of Humira, the Ambassadors were told repeatedly that they were **not** supposed to review the side effects with the patients with whom they met.  When FE-1 asked during the training session who would go over the side effects with the patients, she was informed that AbbVie had training that they provided to the physicians.

120.    This inability to discuss side effects with patients went against FE-1's professional commitment to and belief in transparency, especially with regard to pharmaceuticals.  As a nurse, FE-1 felt like it was her duty to review the possible side effects of the drugs with the patients, but AbbVie said that the Ambassadors were "not supposed to educate" the patients about side effects.

41

If the patient ever asked about potential side effects, the Ambassador could only tell him or her to speak with their physician.

121.    FE-1 also expressed that there was "absolutely" an overlap between the role of the Nurse Ambassadors and the sales representatives.  For example, she recalled meeting with her sales representative and a pharmaceutical distributor during her brief time at AbbVie.  She asked why she needed to participate in the meeting because it had no clear relevance to her job as a Nurse Ambassador (which was to teach patients how to self-inject Humira) and where the drug came from was of "no concern" to her.

122.    In addition, FE-1 reported that she knew Lazaro Suarez and that she interacted with him directly during training and after the training.  While she did not know him well, she said he came across as "very professional" and a "real stand-up guy."  During the training, the two discussed that all of the nurses seemed "tickled to be there" [working for AbbVie] and that they were making "unbelievable" money for what seemed to be a very easy job.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS[4]

123.    The Class Period begins on October 25, 2013. On that date, the Company held its Third Quarter 2013 Earnings Conference Call.  During the call, Defendant Gonzalez commented on the growth of Humira, and stated, in pertinent part:

> I am pleased with the performance of our product portfolio including Humira, which delivered more than 19% global operational growth in the quarter.  ***This strong growth was driven by several factors, including continued robust market growth resulting from increasing penetration across therapeutic categories and geographies; market share gains, particularly in the GI segment where our UC launch is progressing ahead of our expectations; and we delivered this performance despite the entry of new competitors into the category***.

---

[4]    In this section, statements that are ***bold and italicized*** are specifically alleged to be materially false and misleading.

124.    On the call, Defendant Chase also discussed AbbVie's plans to increase Humira's

market penetration, stating, in pertinent part:

> And we now expect SG&A expense to be approximately 27% of sales in 2013, *reflecting increased investment in our key brands, including Humira, where we are pursuing opportunities to further increase penetration rates across indications*.

125.    In response to a question from JP Morgan Analyst Chris Schott regarding the

particulars of higher spending on Humira promotional programs, Defendant Gonzalez described

the framework AbbVie had built to defend and grow Humira's market share, stating, in pertinent

part:

> If you talk about Humira spend, one of the things I would say to you is, as we approached the beginning of this year one of the things that we knew is that we were going to face some new competitive challenges. *And in anticipation of that we did some things from an investment standpoint that we thought would put us in a position to be able to defend and still grow our share.*
>
> *And I would say if I look at the results 9 or 10 months into it we are pretty happy with the investment that we made there, because it's given us back a pretty healthy return and it is really -- it has allowed us from a competitive standpoint to really deal with new competition in a very effective way*.
>
> As far as HCV is concerned, I think as Scott pointed out, a significant part of this is really built around the performance of the product. We have done a lot of market research, and when you look at prescribing preference of physicians, the first five, six attributes are all related to performance of the product -- cure rates in different populations.
>
> So as the competitive environment rolls out and as we get to our second-generation product, I think we will then take another incremental step in this particular disease treatment paradigm that will be difficult to beat. I think it is incredibly difficult to get performance that is better than this -- or at least what we anticipate.
>
> *And then it will be all about how you built your infrastructure, how well established it is. That will make it difficult*.
>
> You look, again, at the anti-TNF market. Think how difficult it is for a new competitor to break into that market. And it is because of both the performance of the product and the value that it provides *and the established infrastructure that is in place that has a lot of experience at being able to drive those products*.

43

126.     The statements contained in ¶¶ 123-25 were materially false and/or misleading because Defendants Gonzalez and Chase misrepresented and failed to disclose the following adverse facts pertaining to the growth of Humira's sales and Company's strategy for maintaining and growing Humira's market share and sales, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants Gonzalez and Chase made materially false and/or misleading statements and/or failed to disclose that:   (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, the public statements of Defendants Gonzalez and Chase were materially false and misleading at all relevant times.

127.     On January 15, 2014, AbbVie presented at the JPMorgan Healthcare Conference. During that presentation, Defendant Chase stated, in pertinent part:

> Certainly an important component of our performance over the past year has been Humira and we continue to be very, very pleased with its trajectory.  Since 2006, we have added really $1 billion of Humira sales growth each year.  We will provide more specifics on our 2013 performance later this month, but I can tell you that once again we delivered stellar growth from our flagship product in 2013.
>
> ***Humira has a number of unique attributes that set it apart from its competitive peers***.  These include a strong and differentiated clinical profile, a label that supports the use across the broadest spectrum of autoimmune conditions, strong managed care positions ***and importantly development, regulatory, manufacturing, commercial organizations that are truly exceptional***.

128.     The statements contained in ¶ 127 were materially false and/or misleading because Defendant Chase misrepresented and failed to disclose the following adverse facts pertaining to the reasons for the growth in Humira's sales and the success of Humira's commercial organization, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendant Chase made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira,

44

relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Chase's public statements were materially false and misleading at all relevant times.

129.    On January 31, 2014, AbbVie held its Fourth Quarter 2013 Earnings Conference Call.  During the call, Defendant Chase stated, in pertinent part:

> In the US, Humira sales increased 18.1%, ***reflecting continued market expansion, as well as share gains, particularly in the gastro segment***.  Internationally, Humira sales grew 8% on an operational basis.
>
> . . . .
>
> ***We also expect to see an increase in SG&A as we invest in our key brands, including Humira, where we are pursuing opportunities to further increase penetration rates across indications and drive both disease and brand awareness***.

130.    The statements contained in ¶ 129 were materially false and/or misleading because Defendant Chase misrepresented and failed to disclose the following adverse facts pertaining to the reasons for the growth in Humira's sales and AbbVie's pursuit of increased penetration rates for Humira, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendant Chase made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Chase's public statements were materially false and misleading at all relevant times.

131.    On February 21, 2014, the Company filed its annual report for the fiscal year ended December 31, 2013 on Form 10-K (the "2013 10-K") with the SEC, which provided the Company's annual financial results and position.  The 2013 10-K was signed by Defendants

Gonzalez and Chase. As detailed below, the 2013 10-K contained materially false and misleading Management Discussion and Analysis ("MD&A") and statements concerning the Company's Code of Business Conduct.

132. The 2013 10-K MD&A described the Company's strategic objectives to "drive HUMIRA sales growth," stating in pertinent part:

**Strategic Objectives**

AbbVie's long-term strategy is to maximize its existing portfolio of products through new indications, share gains, increased geographic expansion in underserved markets while also advancing its new product pipeline to meet unmet medical needs. ***To successfully execute its long-term strategy, AbbVie will focus on expanding HUMIRA sales, advancing the pipeline, expanding its presence in emerging markets and managing its product portfolio to maximize value***.

AbbVie expects to continue to drive strong HUMIRA sales growth in several ways. AbbVie seeks to expand the HUMIRA patient base by applying for regulatory approval of new indications for HUMIRA, treating conditions such as uveitis, hidradenitis suppurativa and pediatric Crohn's disease. ***AbbVie will also seek to drive HUMIRA sales growth by expanding its market share and its presence in underserved markets***.

133. The statements contained in ¶ 132 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to the Company's strategy for expanding Humira's sales, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendants' public statements were materially false and misleading at all relevant times.

134. The 2013 10-K also described AbbVie's Code of Business Conduct, stating, in pertinent part:

> ***AbbVie's code of business conduct requires all its business activities to be conducted in compliance with laws, regulations, and ethical principles and values***. All directors, officers, and employees of AbbVie are required to read, understand, and ***abide by the requirements of the code of business conduct*** applicable to them. AbbVie's code of business conduct is available in the corporate governance section of AbbVie's investor relations website at ww.abbvieinvestor.com.
>
> Any waiver of the code of business conduct for directors or executive officers may be made only by AbbVie's audit committee. ***AbbVie will disclose any amendment to, or waiver from, a provision of the code of conduct for the principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, on its website within four business days following the date of the amendment or waiver***. In addition, AbbVie will disclose any waiver from the code of business conduct for the other executive officers and for directors on the website.

135. The statements contained in ¶ 134 were materially false and/or misleading because Defendants misrepresented and failed to disclose that AbbVie was neither in compliance with its Code of Business Conduct, including the requirement that AbbVie conduct its business "in compliance with laws, regulations, and ethical principles and values" nor the requirement that waivers from the Code of Business Conduct be made public, which was known to Defendants or recklessly disregarded by them. Specifically, Defendants made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendants' public statements were materially false and misleading at all relevant times.

136.     The disclosures in AbbVie's 2013 10-K concerning its Code of Business Conduct were repeated, in all material respects, in AbbVie's Forms 10-K during the Class Period, and were materially false and misleading when made for the same reasons described in ¶ 135.[5]

137.     AbbVie's Code of Business Conduct was mandated by a Corporate Integrity Agreement ("CIA") between the OIG and Abbott, dated May 7, 2012.  The CIA was entered into in connection with the settlement of a federal and 49 state investigations into improper sales and marketing activities for the drug Depakote, which included $700 million in criminal fines and forfeitures and approximately $900 million to resolve civil claims.

138.     Because AbbVie was spun-off as the pharmaceutical arm of Abbott at the time of the CIA, AbbVie assumed "sole responsibility for the terms and obligations of the CIA."  Among other things, the CIA required that AbbVie create and maintain the Code of Business Conduct. The Code of Business Conduct recognized that "[v]iolating the Code exposes AbbVie and our people to potential criminal or civil liability and puts our reputation and success at risk."

139.     The Code of Business Conduct, which was signed by Defendant Gonzalez and referenced in the Company's 2013 10-K stated, in pertinent part:

- *We follow all laws and regulations that govern how we work with various governments and their representatives when promoting and selling our product*.

- *We are committed to providing fair, balanced, and accurate information to help patients and their healthcare professionals select the most appropriate treatments*.

- Because of the key role healthcare professionals play in determining which products to recommend, prescribe, or use to treat specific diseases or conditions, *we take special care to avoid even the appearance of unduly influencing their decisions.  We promote our products only for uses that*

---

[5]     AbbVie's Forms 10-K for the years ending in 2014, 2015, 2016, and 2017 were filed during the Class Period on February 20, 2015; February 19, 2016; February 17, 2017; and February 16, 2018, respectively.

*have been approved, cleared, or authorized by the relevant government agency*.

- *In interacting with healthcare professionals and other customers, we act with honesty, fairness, and integrity. We follow applicable laws and industry guidelines created to avoid potential conflicts of interest. We never offer or provide anything of value to healthcare professionals or other individuals to inappropriately influence their medical judgment or purchasing or prescribing practices in favor of an AbbVie product*.

- *Our commitment to the safety of those who use our products is always at the forefront of everything we do*. In order to protect patients, we must identify, evaluate, minimize and, whenever possible, eliminate patient safety concerns.

- *We also comply with all legal and regulatory requirements that govern the reporting of safety information to regulatory or public health agencies* and communicate with each government agency that oversees our products to address potential safety concerns.

- We communicate openly and honestly with healthcare professionals, institutions, *patients*, and public health agencies *to ensure that they have the information that they need in order to use AbbVie's products safely and effectively*. We follow up on complaints received about our products in a timely manner and take appropriate corrective actions.

- *None of us should ever, directly or through an intermediary, offer or give anything of value to anyone in order to obtain an improper business advantage*, nor should we ever accept anything of value from a third party in return for preferential treatment.

- All of us and our business partners are expected to be aware of *and follow all anti-corruption and anti-bribery laws* everywhere we do business.

- *We will not improperly offer, pay, or receive anything of value to obtain business or to influence a business decision. We must be careful not to give any appearance of offering, paying or accepting things of value for a corrupt purpose*.

140.    The statements contained in ¶ 139 were materially false and/or misleading because Defendants misrepresented and failed to disclose that AbbVie was not in compliance with the terms of its Code of Business Conduct, which was known to Defendants or recklessly disregarded by them.  Specifically, Defendants made materially false and/or misleading statements and/or

failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendants' public statements were materially false and misleading at all relevant times.

141.     Apart from the foregoing, during March 2013 and thereafter, the following description of the Company's compliance program appeared on the AbbVie website:

> [The Company] ha[s] policies and procedures that guide employees as they conduct their day-to-day activities. They encompass relevant laws and regulations, including food and drug laws and laws relating to government health care programs. ***They also take into account industry best practices, including provisions of the International Federation of Pharmaceutical Manufacturers & Associations (IFPMA) Code of Pharmaceutical Marketing Practices, and the Pharmaceutical Research and Manufacturers of America (PhRMA) Code on Interactions with Healthcare Professionals, as well as other applicable industry codes. We regularly update our policies to incorporate changes to the law and industry codes, including rules regarding gifts, meals and education we provide to healthcare professionals***.
>
> ***AbbVie also complies with legal, industry and relevant institutions' requirements regarding the interaction of our employees with health care professionals and organizations***. We comply with national, regional, state and other requirements regarding transparency about our relationships with individuals and entities involved in providing health care. As required, we track and report payments and transfers of values (such as meals) provided to health care providers and organizations.

142.     These statements were materially false and misleading when made for the same reasons as described in ¶ 140.

143.     AbbVie's Forms 10-K during the Class Period each referenced and provided a website link to the Company's Code of Business Conduct, which repeated the same or similar materially false and misleading statements, as described in ¶ 139. The Code of Business Conduct

was updated in 2017 and was therefore referenced in AbbVie's Form 10-K for the years ending in

2016 and/or 2017.  The 2017 update to the Code of Business Conduct stated, in pertinent part:

- We take care to ensure product information is accurate, comprehensive, relevant and up to date.  ***We are fair and open in our dealings with healthcare providers and customers.  We do not offer or give gifts or others items or services of value as a means to earn favor for our products or to sway medical judgment***.

- ***We comply with all applicable laws that regulate our business***.  Many of these laws concern the way we promote and sell our medical products.  ***It is never acceptable to try to influence purchasing decisions in any way that is unethical, inappropriate or illegal or create a potential conflict of interest***.

- U.S. Anti-Kickback statute.  ***We don't give anything of value to induce a healthcare professional to use or recommend pharmaceutical products that are paid for or reimbursed by the government***.

- U.S. False Claims Act and similar laws in other countries. ***We don't submit or cause the submission of false claims for healthcare reimbursement to the government***.

- ***We comply with anti-bribery and anti-corruption laws.  We do not tolerate improper payments.  We understand that accepting, offering or giving anything of value to influence a business decision or gain an unfair business advantage is improper***.  We also understand that improper payments received or given can have severe repercussions for the individuals involved, for AbbVie and ultimately, for our industry and the people we serve.  We are careful to maintain accurate books and records to reflect all payments made and received, ***and we avoid even the appearance of anything improper***.

144.    These statements were materially false and misleading when made for the same

reasons as described in ¶ 140.

145.    On March 5, 2014, AbbVie presented at the Cowen Health Care Conference.

During the presentation, in response to a question from an audience member regarding the

competition facing Humira, Defendant Chase had the following exchange:

**<u>Defendant Chase</u>**:   So the question and I will paraphrase but the question specifically was how do we view SG&A with Humira in that period of time where there is biosimilar competition six to seven years from now?

51

And I think the reality is one thing we are certain of is biosimilar competition is not going to look like small molecule competition and that is going to result in probably different behaviors with the brands when they lose exclusivity than you would happen to see in a small molecule environment where you are absolutely right the first thing you do is pull away that SG&A resource.

We will want to be out in the market detailing it. That said, I don't think it will require the SG&A investment that you are seeing on the brand right now. *A lot of what you are seeing on the brand right now is actually driving the growth of the brand. What we have been able to establish over the last couple of years is that Humira is indeed promotionally responsive. And so we have made measured investments for the brand and they have paid off remarkably well, again 15% growth this past year, probably the fifth or sixth year of $1 billion growth.*

And so we are happy with those investments. When you get out in the biosimilar time frame, we are going to be managing the P&L a little differently but that doesn't mean we will pull all support off of the product. Does that help?

**Audience Member**: Well, you made an interesting comment. When you say the demand is responsive to your marketing investments, what do you attribute that to -- just you are calling on more doctors or (inaudible)?

**Defendant Chase**: *I don't want to get specifically on what our marketing programs are but they are geared primarily at the penetration in the marketplace*. Again this is a market that if you look at those patients that would benefit from a biologic even if you go back to rheumatology where we have been competing the longest and the anti-TNF class has been competing the longest, those penetration rates when you look at patients that would benefit from a biologic they are in the high 20%. If you get out to gastro, you are probably talking high single digits, maybe 10%. You get to derm, you are talking 5% to 6% penetration of those patients that would benefit from a biologic. And we are not talking total patients.

*And so we see tremendous growth opportunities on the brand just in penetration alone and we have come up with very specific marketing programs that help drive that penetration.*

*The other nice effect of those marketing programs are we have been able to actually grow Humira quicker than the market. We are taking share and that is really a testament to the strength of the brand, to our marketing execution and to the broad halo of indications that we have.*

146.    The statements contained in ¶ 145 were materially false and/or misleading because

Defendant Chase misrepresented and failed to disclose that the growth in Humira's sales and the

ability of AbbVie's marketing program to maintain and increase the growth of Humira relied, in

part, on illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendant Chase made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Chase's public statements were materially false and misleading at all relevant times.

147. On May 8, 2014, the Company filed its quarterly report for the first quarter of 2014 on Form 10-Q (the "Q1 2014 10-Q") with the SEC, which provided the Company's quarterly financial results and position. The Q1 2014 10-Q was signed by Defendants Gonzalez and Chase.

148. The Q1 2014 10-Q enumerated the drivers of Humira's sales growth in the quarter, stating, in pertinent part:

> On a constant currency basis, global HUMIRA sales increased 18 percent ***primarily as a result of continued market growth across therapeutic categories and geographies, higher market share and higher pricing in certain geographies***. In the United States, HUMIRA sales continued to expand across therapeutic categories. Internationally, growth is driven by the continued uptake of new indications, increased market share and market growth in most key countries. AbbVie is pursuing several new indications to help further differentiate from competitive products and add to the sustainability and future growth of HUMIRA.

149. The statement contained in ¶ 148 was materially false and/or misleading because Defendants misrepresented and failed to disclose that the growth of Humira sales relied, in part, on illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendants made a materially false and/or misleading statement and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened

scrutiny by state governments and agencies; and (3) as a result, Defendants' public statement was materially false and misleading at all relevant times.

150.    The statement contained in ¶ 148 alleged to be materially false and misleading concerning the quarterly growth of Humira's sales was repeated, in all material respects, in AbbVie's Forms 10-Q filed on August 7, 2014 and November 7, 2014, and was materially false and misleading when made for the same reasons as stated in ¶ 149.

151.    On May 15, 2014, AbbVie presented at the Bank of America Merrill Lynch Health Care Conference.  During the presentation, in response to a question from Bank of America analyst Colin Bristow regarding the drivers of Humira's growth, Defendant Chase stated, in pertinent part:

> It is an extraordinary brand and we feel that if you had to have a pharmaceutical asset, this is the one you want.  I mean the growth potential of this brand, as well as the growth that it's delivered over the last few years, this is a brand that has increasing sales over the last five years at about $1 billion, over $1 billion per year.  And it is absolutely -- it is a remarkable product.
>
> **How does that happen?  Well, first of all, it stems directly from the compelling benefits that Humira offers both patients and payers, but then specifically the growth drivers begin with the fact that, if you look at the markets that Humira is applicable in, the autoimmune markets, whether it is rheum, gastro, derm, the reality is the penetration of biologics versus the total population that would benefit from biologics, it is still quite low, even with the fact that anti-TNFs have been out for -- since the beginning of the decade**.  In rheumatology, you are probably talking a penetration rate of 20%, 25%.  You go down to derm, we are talking 5%, 6%, highly, highly underpenetrated markets when you compare it to the population of patients who would benefit from the therapy.  **So that is a huge driver.  And that is the primary driver**.
>
> **That said, the benefits that Humira brings and the comfort that physicians have with Humira and its strong safety record are such that actually Humira is picking up share in these markets and that is our second growth driver.  The third growth driver is new indications**.  Scott can certainly tell you about the additional indications we are pursuing, but even without those, we have the broadest aura of indications of any anti-TNF out there.
>
> **And then finally there is an interesting geographic play to the brand given that if you move outside of the developed market, those penetration rates are still yet lower than what we see in the developed markets and so there is, in a way, a**

*geographic expansion story for Humira as well. You add those four drivers up and you see the performance we have been putting up on the brand.*

152. The statements contained in ¶ 151 were materially false and/or misleading because Defendant Chase misrepresented and failed to disclose that a "driver" of Humira's sales growth and market share included illegal kickbacks and unlawful sales and marketing tactics, which were known to Defendants or recklessly disregarded by them. Specifically, Defendant Chase made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Chase's public statements were materially false and misleading at all relevant times.

153. On June 11, 2014, AbbVie presented at the Goldman Sachs Healthcare Conference. During the presentation, in response to a question by Goldman Sachs analyst Jami Rubin on investment spending, Defendant Chase described AbbVie's promotional spending for Humira and its effect on Humira's growth, stating, in pertinent part:

> So, let me answer it on both an absolute and a profile standpoint. On an absolute basis, we already have the bulk of our launch for HCV built into our P&L. We certainly will have to go and look at launch requirements for products like 199, daclizumab, elagolix -- other compounds. We're going to fund those.
>
> *That said, when you look at the top line growth -- and additionally, we have shown, I think, very, very compellingly in 2013 and 2014, that Humira itself is promotional-responsive. And what we're going to do is, we're going to make sure that we invest appropriately in Humira to continue the growth in that brand.*

154. The statements contained in ¶ 153 were materially false and/or misleading because Defendant Chase misrepresented and failed to disclose that AbbVie's promotion of Humira, and the resulting sales growth, relied, in part, on illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically,

55

Defendant Chase made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Chase's public statements were materially false and misleading at all relevant times.

155.    On June 25, 2014, AbbVie held a conference call to discuss a possible combination with Shire plc.  During the conference call, in response to a question from Cowen and Company analyst Steve Scala regarding Defendants' long term view on Humira, Defendant Gonzalez discussed AbbVie's strategy for maintaining and growing Humira's sales, stating, in pertinent part:

> As far as Humira is concerned, *we have talked many, many times publicly about our views of Humira and our ability to be able to protect and grow Humira.  And as I indicated in my interim -- my remarks today, we have put in a very robust strategy to protect Humira from an IP standpoint, to enhance Humira, to make it even more appealing for patients and give patients more benefit*.

156.    The statements contained in ¶ 155 were materially false and/or misleading because Defendant Gonzalez misrepresented and failed to disclose that AbbVie's strategy to maintain and grow Humira sales included illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them.  Specifically, Defendant Gonzalez made materially false and/or misleading statements and/or failed to disclose that:  (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Gonzalez's public statements were materially false and misleading at all relevant times.

157. On July 25, 2014, AbbVie held its Second Quarter 2014 Earnings Call. During the call, Defendant Chase reported on the drivers of Humira's sales growth, stating, in pertinent part:

Humira delivered global sales of nearly $3.3 billion, up 25.4% on an operational basis and 26.2% on a reported basis. In the United States, Humira sales increased 35.6%, *driven by continued market expansion, share gains, and particularly strong growth in the gastro segment. Growth in the second quarter also benefited from retail buying patterns and a favorable comparison to the prior year*.

158. The statements contained in ¶ 157 were materially false and/or misleading because Defendant Chase misrepresented and failed to disclose that Humira's sales growth was driven, in part, by illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendant Chase made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Chase's public statements were materially false and misleading at all relevant times.

159. On August 7, 2014, the Company filed its quarterly report for the second quarter of 2014 on Form 10-Q (the "Q2 2014 10-Q") with the SEC, which provided the Company's quarterly financial results and position. The Q2 2014 10-Q was signed by Defendants Gonzalez and Chase.

160. The Q2 2014 10-Q enumerated the drivers of Humira's sales growth in the quarter, stating, in pertinent part:

On a constant currency basis, global HUMIRA sales increased 25 percent and 22 percent during the three and six months ended June 30, 2014, respectively, *primarily as a result of continued market growth across therapeutic categories and geographies, higher market share and higher pricing in certain geographies. In the United States, HUMIRA sales were driven by continued market expansion, market share gains and growth across therapeutic categories, gastroenterology in particular, and higher pricing. Sales also benefited from retail buying patterns and a favorable comparison to the prior year, particularly for the three months ended June 30, 2014*. Wholesaler inventory levels remained at

approximately two weeks, consistent with the first three months of 2014. Internationally, growth is driven by the continued growth in new indications, increased market share and market growth in most key countries. AbbVie is pursuing several new indications to help further differentiate from competitive products and add to the sustainability and future growth of HUMIRA.

161. The statements contained in ¶ 160 were materially false and/or misleading because Defendants misrepresented and failed to disclose that the drivers of Humira's sales growth included illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendants made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendants' public statements were materially false and misleading at all relevant times.

162. On September 10, 2014, AbbVie presented at the Morgan Stanley Healthcare Conference. During the presentation, Morgan Stanley analyst David Risinger asked Defendant Chase a question regarding the "ongoing Humira growth drivers." Defendant Chase responded, stating, in pertinent part:

> Yes. Humira is an incredible, incredible product. And when married with the team that supports it, you've seen -- as well as prudent investment, you've seen just what the product can do. Our second quarter growth rates were absolutely phenomenal, both in the US and abroad. And we continue to forecast strong growth from the product.
>
> **The key drivers of that growth start with the fact that, in the autoimmune segments that Humira participates in, anti-TNF penetration is actually surprisingly low**. And so, if you look at rheumatology, penetration of patients that would benefit from a biologic is probably in the high 20%'s, and much lower when you get into GI, and still lower yet with dermatology where you see about 6% to 7% penetration rates.
>
> So, there's still profound opportunities for penetration. **We continue to gain share on our competitors, so that's a growth driver**. We have an active program in place

58

to continue to expand our indications for Humira.  It's already the most broadly indicated anti-TNF, but we're continuing to work on new and exciting indications.

*And then, if you move outside of the developed markets, those penetration rates are still yet lower.  And so, there is a pretty impressive geographic expansion story behind Humira as well*.

*So, those are four very, very powerful growth drivers*.  You can certainly see what they've contributed to the brand over the last five to six years.  And we remain very, very bullish on the brand going into 2015, 2016, and beyond.

163.    The statements contained in ¶ 162 were materially false and/or misleading because Defendant Chase misrepresented and failed to disclose that the growth of Humira's sales and penetration rates were driven, in part, by illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them.  Specifically, Defendant Chase made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Chase's public statements were materially false and misleading at all relevant times.

164.    On October 20, 2014, AbbVie held a conference call regarding the termination of the Shire plc transaction.  During the call, Defendants Gonzalez discussed the growth drivers for Humira, stating, in pertinent part:

Our fundamental strategy is strong, and *we have built an excellent foundation.  As a result, AbbVie is now poised to deliver top-tier performance through multiple growth drivers.  We expect continued growth from our flagship product, Humira, driven by market expansion, share gains and new indications*.  We believe Humira will generate strong revenues for many years to come.

165.    The statements contained in ¶ 164 were materially false and/or misleading because Defendant Gonzalez misrepresented and failed to disclose that Humira's sales growth was driven,

in part, by illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendant Gonzalez made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Gonzalez's public statements were materially false and misleading at all relevant times.

166.    On October 31, 2014, AbbVie held its Third Quarter 2014 Earnings Call. During the call Defendant Gonzalez discussed Humira's sales growth for the quarter. Defendant Gonzalez stated, in pertinent part:

> Our third-quarter results were led by Humira, which delivered nearly 18% global operational growth. ***Humira's performance was driven by several factors including continued market growth resulting from increasing penetration across therapeutic categories and geographies***. As we've indicated in the past, Humira's broad label and new indications are a competitive advantage.

167.    On the call, Defendant Chase also discussed Humira's growth drivers in the third quarter, stating, in pertinent part:

> Humira delivered global sales of more than $3.2 billion, up 17.8% operationally and up 17.5% on a reported basis. ***In the United States Humira sales increased 25.3% driven by continued market expansion, strong prescription trends and share gains partially offset by a reduction in retail buying patterns***. Internationally, Humira sales grew 10.3% on an operational basis excluding a 0.6% unfavorable impact from exchange.

168.    During the question and answer portion of the Third Quarter 2014 Earnings Call, Goldman Sachs analyst Jami Rubin asked a question regarding expected 2015 earnings growth for Humira. In response, Defendant Gonzalez stated, in pertinent part:

> And so we've obviously modeled what that looks like and I can tell you we have confidence in what we can do in that area. I'm not going to give you a lot more specifics on that at this point. ***We've described in detail what it looks like, that is***

*a combination of three major areas: product enhancements, both formulation as well as device, intellectual property and commercial strategies*.

169.    The statements contained in ¶¶ 166-68 were materially false and/or misleading because Defendants Gonzalez and Chase misrepresented and failed to disclose that Humira's sales growth was driven, and would continue to be driven, in part, by illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendants Gonzalez and Chase made materially false and/or misleading statements and/or failed to disclose that:  (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, the public statements of Defendants Gonzalez and Chase were materially false and misleading at all relevant times.

170.    On November 20, 2014, AbbVie presented at the Jefferies Global Healthcare Conference.  During the presentation, Jefferies analyst Jeff Holford asked a question concerning the reasons for Humira's performance in the second and third quarters of 2014.  Defendant Chase responded, stating, in pertinent part:

> Well, obviously, let's start with Humira because that is a huge part of the business. Humira has just been performing outstandingly.  If you really look at it, we came into the year guiding double-digit growth, which we thought was appropriate.  If you look at the TRX trends in Q3 in the US for example, we had a 14% TRX growth and I think what that speaks to is a number of different things.  ***Clearly, this is a market that's underpenetrated by biologics and there's a lot of patients out there that would be well-served and that's been driving market growth and we've expected to see that and we've enjoyed that.  But I think what you're seeing on top of it is just how compelling Humira is as a brand and how our execution is on the marketing front***.  And we're just very, very pleased with the progress.

171.    The statement contained in ¶ 170 was materially false and/or misleading because Defendant Chase misrepresented and failed to disclose that Humira's sales growth was driven "on the marketing front," in part, by illegal kickbacks and unlawful sales and marketing tactics, which

61

was known to Defendants or recklessly disregarded by them. Specifically, Defendant Chase made a materially false and/or misleading statement and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Chase's public statement was materially false and misleading at all relevant times.

172. On January 6, 2015, AbbVie participated in the Goldman Sachs CEOs Unscripted Healthcare Conference. During a question and answer session, Goldman Sachs analyst Jami Rubin asked about AbbVie's longer term growth outlook. In response, Defendant Gonzalez discussed AbbVie's strategy, stating, in pertinent part:

> Obviously, the second part of that is how we deal with biosimilar competition if and when it comes. And that's an area we've been working on and planning for for an extended period of time. ***We have put in place what we believe is a robust strategy to manage that. And it obviously consists of really four key elements.*** One is we have a robust portfolio of intellectual property that covers both process patents, manufacturing patents, method of use patents, and a number of other areas. And we think that will be an important part of our overall strategy.

> In addition to that, we are in the process of making enhancements to HUMIRA, both formulation enhancements as well as device enhancements, to further differentiate the product. And we think that will be an important set of enhancements that will allow us to differentiate ourselves versus any biosimilars.

> ***Our commercial strategy will play an important role in how we deal with biosimilar competitors.*** And then finally, we've obviously been working on an immunology pipeline to develop additional assets beyond HUMIRA which can continue to drive our leadership position in those categories.

> And so when I stepped back and I look at that strategy, I feel confident that we can manage effectively the biosimilar impact that would occur in that timeframe. And we are clearly committed to being able to drive strong performance in that window.

173. The statements contained in ¶ 172 were materially false and/or misleading because Defendant Gonzalez misrepresented and failed to disclose that AbbVie's commercial strategy for maintaining and increasing Humira's sales growth included illegal kickbacks and unlawful sales

and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendant Gonzalez made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Gonzalez's public statements were materially false and misleading at all relevant times.

174. On January 14, 2015, AbbVie presented at the JPMorgan Healthcare Conference. During the presentation, Defendant Chase discussed Humira's 2015 growth outlook, stating, in pertinent part:

> As we plan for 2015, we expect Humira to be an important contributor to our robust growth. ***Humira has delivered significant annual growth in recent years and it has several unique attributes that we believe will help it to continue to grow in the years to come***.
>
> One of these attributes, of course, is Humira's broad and growing list of approved indications. In 2014, we completed our clinical program evaluating Humira as a treatment for HS, a chronic inflammatory skin disease. We reported positive results from two Phase III studies and our US and EU regulatory applications are currently under review. Given disease prevalence and the lack of effective treatment options, we believe HS has the potential to be a meaningful indication with peak year sales that could approach $1 billion.
>
> We're also exploring Humira as a possible treatment for uveitis, a sight threatening inflammatory eye disease. We expect to complete a Phase III program and submit our regulatory applications for uveitis later this year.
>
> ***Other factors that have driven strong Humira growth to date are expected to continue as well, including robust underlying demand resulting from increased penetration, marketshare gains and further geographic expansion***. 2014 was another stellar year for our flagship product and the dynamics are favorable for continued growth and cash flow generation in 2015 and in the years to come.

175. The statements contained in ¶ 174 were materially false and/or misleading because Defendant Chase misrepresented and failed to disclose that Humira's sales growth and penetration

was driven, in part, by illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendant Chase made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Chase's public statements were materially false and misleading at all relevant times.

176. On February 20, 2015, the Company filed its annual report for the fiscal year ended December 31, 2014 on Form 10-K (the "2014 10-K") with the SEC, which provided the Company's annual financial results and position. The 2014 10-K was signed by Defendants Gonzalez and Chase.

177. The 2014 10-K enumerated the Company's strategic objectives for 2015 to "continue to drive strong HUMIRA sales growth," stating in pertinent part:

**2015 Strategic Objectives**

***In 2015, AbbVie expects sales performance to be driven by continued strong growth from HUMIRA, the launch of VIEKIRA PAK, and sales growth in certain key products including Creon and Duodopa, partially offset by a decline in several products due to generic competition, including AndroGel 1% and the remainder of the lipid franchise***. In addition, AbbVie expects to achieve operating margin improvements while continuing to invest in its pipeline in support of opportunities in oncology, HCV, and immunology, as well as continued investment in key products. AbbVie expects to grow operating cash flows in 2015, which will enable the company to continue to augment its pipeline through concerted focus on strategic licensing, acquisition and partnering activity and returning cash to shareholders via dividends and share repurchases. ***AbbVie expects to continue to drive strong HUMIRA sales growth in several ways***. AbbVie seeks to expand the HUMIRA patient base by applying for regulatory approval of new indications for HUMIRA, treating conditions such as uveitis and hidradenitis suppurativa. ***AbbVie will also seek to drive HUMIRA sales growth by expanding its market share and its presence in underserved markets***. AbbVie plans to continue making investments in key emerging markets, including Brazil, China, and Russia.

178.    The 2014 10-K also described the drivers of Humira's sales growth in 2014, stating, in pertinent part:

> On a constant currency basis, global HUMIRA sales increased 19 percent in 2014 and 15 percent in 2013, ***primarily as a result of market growth across therapeutic categories and geographies, approval of new indications, higher market share, and favorable pricing in certain geographies***.  AbbVie is pursuing several new indications to help further differentiate HUMIRA from competing products and add to the sustainability and future growth of HUMIRA.

179.    The statements contained in ¶¶ 177-78 were materially false and/or misleading because Defendants misrepresented and failed to disclose that Humira's sales growth was driven, and would continue to be driven, in part, by illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them.  Specifically, Defendants made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendants' public statements were materially false and misleading at all relevant times.

180.    On March 5, 2015, AbbVie held a conference call to discuss the Company's acquisition of Pharmacyclics.  During the call, Defendant Gonzalez discussed AbbVie's strategy to continue to grow Humira sales, stating, in pertinent part:

> Clearly we have a strong leadership position in the immunology market with Humira, the world's leading anti-TNF; ***and we have a multifaceted strategy in place which we believe will allow us to protect and grow our position***.  Humira has averaged well over $1 billion of growth per year over the past eight years, and it has many unique attributes that will help it continue to grow in the years to come.

181.    The statement contained in ¶ 180 was materially false and/or misleading because Defendant Gonzalez misrepresented and failed to disclose that AbbVie's strategy to maintain and

grow Humira's sales was driven, in part, by illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendant Gonzalez made a materially false and/or misleading statement and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Gonzalez's public statement was materially false and misleading at all relevant times.

182.    On April 23, 2015, AbbVie held its First Quarter 2015 Earnings Call. During that call, Defendant Gonzalez discussed the Company's strategy for driving Humira sales, stating, in pertinent part:

> As we have said, we expect HUMIRA to continue to drive strong growth and significant cash flow generation for many years. ***We have a multifaceted strategy in place, which we believe will allow us to protect and grow our immunology position***. We have two new indications in late-stage develop, as well as a new formulation currently under regulatory review in the US and in Europe.

183.    During the question and answer portion of the call, Defendant Chase responded to a question from Evercore analyst Mark Schoenbaum regarding AbbVie's long range plans, stating, in pertinent part:

> Now, let's take the opposite example of that, HUMIRA. HUMIRA is a complex business model. HUMIRA sales and profit contributions come from a broad geographic footprint, with about 40% of its sales coming from outside the United States. ***HUMIRA has an unparalleled breadth of indications and we use a unique selling model for HUMIRA. We utilize specialized and dedicated sales organizations for all major indications. We manage and invest in HUMIRA to maximize its short- and its long-term value to the Company and to our shareholders***.
>
> I think it's pretty hard to argue with our success. When we took the Company public a little over two years ago, HUMIRA was a $9 billion product. Today, in 2015, HUMIRA is a $14 billion product. $5 billion of growth in 2.5 years, despite the foreign exchange headwinds. The brand is 55% larger.

66

184.   The statements contained in ¶¶ 182-83 were materially false and/or misleading because Defendants Gonzalez and Chase misrepresented and failed to disclose that Humira's sales growth and "selling model" were driven, in part, by illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendants Gonzalez and Chase made materially false and/or misleading statements and/or failed to disclose that:  (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, the public statements of Defendants Gonzalez and Chase were materially false and misleading at all relevant times.

185.   On May 6, 2015, AbbVie presented at the Deutsche Bank Health Care Conference. During the presentation, Deutsche Bank analyst Robyn Karnauskas asked a question regarding AbbVie's Selling, General and Administrative expenses for supporting Humira's sales.   In response, Defendant Chase or AbbVie Vice President of Pharmaceutical Development Scott Brun ("Brun") responded, stating, in pertinent part:

> Well the first thing you got to ask is what is the decline curve on HUMIRA, right? In the extent that there our theses is right and that's a relatively moderate decline and that we're continuing to capture patients.  You know that SG&A is valuable SG&A.  *The SG&A that we built out on HUMIRA, we made a purposeful decision in 2012 -- end of 2012, 2013 somewhat in 2014 to invest in HUMIRA, because we knew with our preferred payer position as well as the fact that we were gaining the majority of new patients we knew that if we could deploy SG&A in an effort to drive penetration and get biologics into the hands of those patients that needed biologics, forget about branding, we were going to pick up an unfair share of the patients as a result.  And it was just that simple.  We saw the net, if you will, being built downstream between our preferred position and the fact that the brand itself had a very, very strong capture rate of new patients and we realized that if we could put specific programs in place that would drive getting biologics into the right patients, decreasing the amount of time it took to get a biologic in the hands of that patient, compliance programs, et cetera, we could actually grow the market and that's why you've seen acceleration in HUMIRA*

*script volumes despite the age and size of the brand and it's really just that simple*.
So that's productive SG&A and we love that investment.

186. The statements contained in ¶ 185 were materially false and/or misleading because Defendant Chase or Brun misrepresented and failed to disclose that AbbVie's strategy and "specific programs" to maintain and increase Humira sales and market penetration included illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendant Chase or Brun made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, the public statements of Defendant Chase or Brun were materially false and misleading at all relevant times.

187. On May 8, 2015, the Company filed its quarterly report for the first quarter of 2015 on Form 10-Q (the "Q1 2015 10-Q") with the SEC, which provided the Company's quarterly financial results and position. The Q1 2015 10-Q was signed by Defendants Gonzalez and Chase.

188. The Q1 2015 10-Q enumerated the drivers of Humira's sales growth in the quarter, stating, in pertinent part:

> Global HUMIRA sales increased 26 percent on a constant currency basis during the three months ended March 31, 2015, ***primarily as a result of market growth across therapeutic categories and geographies, higher market share, and favorable pricing in certain geographies***. AbbVie continues to pursue several new indications to help further differentiate HUMIRA from competing products and add to the sustainability and future growth of HUMIRA.

189. The statement contained in ¶ 188 was materially false and/or misleading because Defendants misrepresented and failed to disclose that the growth of Humira sales relied, in part, on illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendants made a materially false and/or

misleading statement and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendants' public statement was materially false and misleading at all relevant times.

190.     The statement contained in ¶ 189 alleged to be false and misleading concerning the quarterly growth of Humira's sales was repeated, in all material respects, in AbbVie's Forms 10-Q filed on August 7, 2015 and November 6, 2015, and was materially false and misleading when made for the same reasons as stated in ¶ 189.

191.     On May 13, 2015, AbbVie presented at the Bank of America Merrill Lynch Health Care Conference. During that presentation, Bank of America analyst Colin Bristow asked a question regarding AbbVie's strategy for addressing biosimilar competition for Humira. Defendant Gonzalez responded, stating, in pertinent part:

> ***We have a multi-facetted strategy to protect or grow our position in immunology and it's comprised of our portfolio of intellectual property that we believe will protect the asset enhancements that we will make with HUMIRA formulation device enhancements, the commercial strategy we will put in place and then obviously launching new assets into this category like the JAKs, like ABT-122 or dual variable domain antibody or DVD that has an IL-17 and TNF on it to be able to grow those assets going forward.***
>
> . . . .
>
> And so, that's the strategy we use on our solids, that's what we used with TriCor and TRILIPIX and Niaspan and we're doing some of that right now with AndroGel as an example. But in case of biosimilars, it's a very different situation. So at the point at which we assume, we could see biosimilar competition in the marketplace, the strategy we have in place now is one where we titrate the expenses down in that country. ***But ultimately, we have a strategy that we believe will sustain our position in that market.*** But then, we have a contingency plan ourselves. If for whatever reason within that country, it doesn't go the way we thought it would go and we start to see erosion occurring more rapidly than we expected, we are in a position to be able to take resources down correspondingly, but we don't want to do it like we do in small molecules ahead of the event because you might pre-

69

determine your fate in that example and we certainly don't want to do that in this example.

192. Defendant Gonzalez then provided further detail regarding AbbVie's strategy, stating, in pertinent part:

> *I think we have articulated clearly how we're thinking about the various spaces of biosimilar competition, and it really starts with how do we believe HUMIRA will behave in an indirect biosimilar environment*. We've seen now playing out in the international markets for the last couple of years, and I would say our operating assumption when we went into that was that HUMIRA would not be negatively impacted by indirect biosimilar competition. We continue to monitor every single country, whether you look at them in aggregate or you look at them individually, HUMIRA continues to gain patient share on a constant dollar basis -- continues to grow constant dollars share as well. And so, indeed it is performing within the range of what we expected. I'd also say the pricing is within the range of what we expected to discount, it's in the range of what we expected for the biosimilars. But we continue to study about the competitive response and the biosimilars response in each of those marketplaces. So that's kind of the first phase.
>
> . . . .
>
> So you are going to see all of that play out as someone moves forward with an application in the US. And so as we lay all of that out we have made a set of assumptions as to when we would likely see biosimilar competition, many of those patents have expirations that are out in the 2022 to 2026 patent range themselves. So if we prevail in that litigation, obviously, those patents will be upheld through that period of time. So that's the first phase of the strategy. Then the second phase will be the new formulations and new devices and then at that point, if there is a biosimilar, they maybe the predominant formulation in the marketplace. *And then there is the commercial strategy and are in the United States in particular, our position in managed care*, and then ultimately it would be the assets that we have in development now, giving them into the marketplace and starting to grow on top of HUMIRA. We believe those assets, the target product profile that we have for those assets will allow us to reinstate standard of care in some of these areas. And if we get those launched and in the marketplace where we can be up the ramp of those assets, then obviously any erosion that we would see on biosimilars, we would be hopeful that we can offset or even grow above that with those other assets. So that's the fundamental strategy that we've put in place and thus far, it is tracking the way we assume.

193. The statements contained in ¶¶ 191-92 were materially false and/or misleading because Defendant Gonzalez misrepresented and failed to disclose that AbbVie's strategy to maintain Humira sales included illegal kickbacks and unlawful sales and marketing tactics, which

70

was known to Defendants or recklessly disregarded by them. Specifically, Defendant Gonzalez made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Gonzalez's public statements were materially false and misleading at all relevant times.

194. On May 20, 2015, AbbVie presented at the UBS Global Healthcare Conference. During the presentation, UBS analyst Marc Goodman asked a question regarding AbbVie's plan for addressing a biosimilar that competes with Humira. Defendant Chase responded by discussing AbbVie's strategy, stating, in pertinent part:

> Eventually, though, there will be a biosimilar that makes it to market, ***and that's where the commercial strategy comes into play. And if you look at our position in the US, for example, with payers, we are now the preferred anti-TNF agent in well over 80% of the lives. That preferred position is supported by a rebate stream. We think it's going to be difficult for a biosimilar competitor to actually challenge us within a payer environment purely on price, which will be really their only advantage, given that in this space it's not good therapy to be taking a patient and actively switching it to an alternate anti-TNF. You run the risk of throwing a patient out of remission, at which point that adds cost, it's not good for the patient, etc. So, when we look at how the battle will play out commercially with the payers, we think it is much more likely that there will be some price concessions, but that we will hold a dominant position within those specific payers***, and that you will not see a small molecule decline, if you will, play out when a biosimilar enters.

195. The statements contained in ¶ 194 were materially false and/or misleading because Defendant Chase misrepresented and failed to disclose that AbbVie's strategy to maintain Humira sales and market share included illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendant Chase made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy

71

to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Chase's public statements were materially false and misleading at all relevant times.

196.    On June 4, 2015, AbbVie presented at the Jefferies Global Healthcare Conference. During the presentation, Jefferies analyst Jeff Holford asked a question concerning how AbbVie had dealt with competitive pressure in the market for Humira.  Defendant Gonzalez responded, discussing Humira's growth, in the following exchange:

> **Jeff Holford**: Okay, that's great. I just wanted to get back to you, Rick, and maybe Bill as well, if you want to jump in on this.  So I think what a lot of people do forget about once we do see a biosimilar environment is that they've seen the (inaudible) markets actually being very competitive for a very long time with multiple comparable products in it.  And I just wonder if you have any good anecdotes about how you've managed some of that pricing pressure, contracting pressure, etc. in the past.  It might just be useful if you can walk people through how the market has been.

> **Defendant Gonzalez**:  Well, I think it is interesting what you point out.  I think if you look at the RA market, there are probably today somewhere in the neighborhood of 11 or 12 innovative competitors that participate in that market and *Humira has continued to gain share, significant share in that market and still enjoys the vast majority of new patients*.  These are products that have some level of differentiation versus other products in the marketplace.  *So Humira has established itself and our ability to be able to execute within this market is very clear that we are able to compete effectively in what is a highly competitive market*.

197.    The statements contained in ¶ 196 were materially false and/or misleading because Defendant Gonzalez misrepresented and failed to disclose that AbbVie's strategy to "compete effectively" and maintain and increase Humira sales and market share included illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them.  Specifically, Defendant Gonzalez made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales

growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Gonzalez's public statements were materially false and misleading at all relevant times.

198. On June 9, 2015, AbbVie presented at the Goldman Sachs Healthcare Conference. During the presentation, Goldman Sachs analyst Jami Rubin asked a question concerning the amount spent on Selling, General and Administrative expenses for supporting Humira's sales:

> On the last earnings call, Rick said that you're spending over $2.5 billion on Humira SG&A, which was a higher number than I think we and many other people were anticipating doing our own bottoms up analysis. But obviously this has turned out to be a great investment given the superior performance of Humira, so nobody is complaining. But the question is how quickly you can cut that if you do see a more negative scenario playing out from biosimilars?

> So the question is how do you cut the spend without sacrificing sales? If you cut that spend, won't that accelerate the decline in sales or can you cut that spend and maintain a sort of level of spend or might you even have to increase spending. So if you can kind of clarify that because I think that's something that investors would be comfortable understanding. At $2.5 billion, you're doing the right thing with that, but 2, 3 years from now, 3, 4 years from now as competitors come to the market and start to eat your market share, it may not be as wise to spend that much.

199. In response, Defendant Chase stated, in pertinent part:

> Sure. Well, first of all, obviously Humira has been a spectacular story. ***And if you look at how the brand has performed since we spun off, it is several billion dollars higher in sales than it was even back in 2012. A big part of that has been the investment that we bolused into the program in 2012, 2013, a little bit in 2014***.

> ***And that was really premised on the fact that we knew that we had the majority of new patient starts given our preferred position with payers and just the overall strength of the brand, and we realized that if you put specific programs in place to drive appropriate utilization of biologics, Humira would disproportionately benefit from that. And that's what we've done***.

> Now what I would tell you is, we look at all of our SG&A investments on a zero based basis. We run IRRs on every single program we have. So this isn't a case of Humira is a big product, let's slather money into the SG&A budget. ***To the contrary each of these were specific programs with the intent to drive Humira***.

*And you've seen it play through in the market with the acceleration of script trends, most notably in the US*. So we are very pleased.

200.    Thereafter, Jami Rubin asked the follow up question: "But are these variable costs or are they – how much of the $2.5 billion is variable? How much is fixed? What can you get rid of quickly if you needed to?" In response, Defendant Chase stated:

> Well, there is certainly variable components. ***There is people, there is DTC, there is programs in place to drive adherence to expand the market if you will***. Those are largely variable. I mean this is not a budget where we've allocated tremendous amounts of costs on overhead, this is primarily a variable budget. But it will remain there as long as the programs are driving a positive return. And that will always be the measuring stick that we apply to that budget.

201.    The statements contained in ¶¶ 199-200 were materially false and/or misleading because Defendant Chase misrepresented and failed to disclose that AbbVie's strategy and the "specific programs" designed to drive sales and "adherence" to Humira included illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendant Chase made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Chase's public statements were materially false and misleading at all relevant times.

202.    On July 24, 2015, AbbVie held its Second Quarter 2015 Earnings Call. During the question and answer portion of that call, BMO Capital Markets analyst Alex Arfaei asked for further details regarding the reasons behind Humira's performance. Defendant Chase responded, discussing the "investments" AbbVie made in the Humira brand, in the following exchange:

> <u>**Alex Arfaei**</u>: Regarding HUMIRA, you mentioned you are seeing accelerated market growth in the US -- very impressive US performance, by the way. Are you seeing increased penetration of biologics in these markets, or is it overall volume

74

growth or both? And can you provide more color on some of the efficiencies we are seeing, some of the operating efficiencies we are seeing? Where are you cutting and why? Thank you.

**Defendant Chase**: So Alex, on HUMIRA, if you look at the US, it's really been a remarkable story. If you look at market growth last year, it was in the 6% range. That has now moved to about a 13%. We've held that pretty steady across the quarter. ***So what that's a sign of is that the SG&A that we put behind the brand continues to work and it continues to give a positive return. And the way that that growth is delivered is in fact by penetration, as well as improved patient compliance and a number of other things. But there's definitely a penetration element***. That is the big growth driver in this market and as you know, all of the immuno -- autoimmune segments are relatively underpenetrated versus what you would expect given the power of a biologic. So that is a big part of the story.

In terms of efficiencies, look, we've been focused on efficiencies from the very beginning. Now they shake out in a number of different places. In manufacturing, they are the traditional efficiencies you would expect, whether it be purchasing, better utilization of plants or in some cases even taking offline nonproductive capacity. We've done all of those sorts of things. Across the P&L though, leverage itself presents a different type of efficiency. We are obviously no longer in a situation where we need to grow expense at the same rate as the top line. ***In fact, if you look at our expense growth, particularly on SG&A, it is far, far, far below what the top line is growing and that's pretty much the new model for this business now that we've made the investments we needed to make back in 2013 and 2014*** and we are on track to start delivering growth through the introduction of new products in 2015 and beyond. So there's really two different types of efficiencies in the numbers.

203.    The statements contained in ¶ 202 were materially false and/or misleading because Defendant Chase misrepresented and failed to disclose that AbbVie's strategy of SG&A investment in Humira to drive sales and growth included funding a program of illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendant Chase made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened

scrutiny by state governments and agencies; and (3) as a result, Defendant Chase's public statements were materially false and misleading at all relevant times.

204.    On July 29, 2015, less than a week after Defendant Chase's misrepresentation on the Second Quarter 2015 Earnings Call, Defendant Gonzalez sold 65,000 shares of AbbVie stock for proceeds of $4,622,941.07.

205.    On September 18, 2015, AbbVie presented at the Morgan Stanley Healthcare Conference.  During the question and answer portion of the presentation, Morgan Stanley analyst David Risinger asked a question regarding the drivers of Humira's growth.  Defendant Chase responded, stating, in the following exchange:

> **David Risinger**:  That's a great kick-off.  Thank you.  So, with respect to Humira in the US, obviously the growth has been phenomenal.  Could you just talk about ongoing volume drivers ahead and additional price opportunities?

> **Defendant Chase**: . . . . So, *what we did in 2012 and 2013, knowing that -- we made very targeted SG&A investments that were drive -- that sought to drive patients to have better uptake on biologics; get on biologics sooner; as well as, once on a biologic, improve compliance so that it incrementally approached what you see in clinical environment*.

> And you add all of those things together, and what you see is a beautiful thing.  The brand is accelerating.  I think we're driving growth of the market in general.  And our script trends 16%, 18%.  *And it's just -- it's a combination of what the brand has to offer, the market growth, and then some very, very intelligently invested SG&A*.

206.    Defendant Chase continued to discuss AbbVie's strategy for driving Humira growth and the investment AbbVie made in selling Humira, stating in pertinent part:

> I think initially people were somewhat surprised when they found out that the spend on Humira was approaching $2.5 billion.  *And that number is an accurate number. And the reason that number exists the way it does, is -- goes right back to the targeted investments we made in 2013 and late 2012, because we knew we were getting the majority of new patients on biologics*.

> Look, here's our philosophy on how we handle SG&A.  We zero-base our budgets. We make sure every marketing program carries a positive ROI.

And when we chose to make those investments, it was clear that they carried an incredible ROI.  And I think the fact that we've accelerated the market overall, and certainly Humira growth in the US since we made those investments attests to.

207.    The statements contained in ¶¶ 205-06 were materially false and/or misleading because Defendant Chase misrepresented and failed to disclose that AbbVie's strategy and "targeted investments" to drive Humira's sales included funding a program of illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them.  Specifically, Defendant Chase made materially false and/or misleading statements and/or failed to disclose that:  (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Chase's public statements were materially false and misleading at all relevant times.

208.    On October 30, 2015, AbbVie held its Third Quarter 2015 Earnings Call.  During the call, Defendant Gonzalez discussed Humira's growth and growth strategy, stating, in pertinent part:

> Moving on to slide 18, Humira's unique product profile and ***AbbVie's strong commercial execution has made Humira the number-one prescribed biologic, with the highest commercial prescription market share, including the highest percentage of new patient starts***.  Humira holds a preferred or co-preferred position on managed care of more than 90% of US covered lives.
>
> Patients, physicians, and payers recognize the meaningful clinical and economic value of Humira as a treatment option for the broadest set of immune-mediated diseases.  We've demonstrated that treatment with Humira is more cost-effective and saves payers on downstream costs associated with diseases like RA, Crohn's, and psoriasis.

209.    The statement contained in ¶ 208 was materially false and/or misleading because Defendant Gonzalez misrepresented and failed to disclose that AbbVie's commercial strategy to maintain and increase Humira sales and market share included illegal kickbacks and unlawful sales

and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendant Gonzalez made a materially false and/or misleading statement and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Gonzalez's public statement was materially false and misleading at all relevant times.

210. On January 16, 2016, AbbVie presented at the JPMorgan Healthcare Conference. During the presentation, Defendant Gonzalez discussed the drivers of Humira's growth and the strategy for future growth of the Humira brand, stating, in pertinent part:

> ***Growth of Humira over the next several years will be driven by continued biologic penetration rates increasing across disease categories and new indications***. I'll talk more about the comprehensive plan we have in place to increase and grow our leadership position in immunology in just a couple of moments.
>
> . . . .
>
> Our strong long-term guidance is built in part upon our confidence in the longevity of Humira. Our growth outlook for Humira is based on a thorough analysis of global market dynamics ***and the comprehensive four point strategy that we have put in place***.
>
> ***Humira's unique product profile and AbbVie's strong commercial execution has made Humira the number one prescribed biologic with the highest commercial prescription market share and the highest percentage of new patient starts***.
>
> Humira also holds a preferred or co-preferred position on managed care representing more than 90% of US covered lives. Patients, physicians and payers recognize the meaningful clinical and economic value of Humira as a treatment option for the broadest set of immune-mediated diseases.

211. The statements contained in ¶ 210 were materially false and/or misleading because Defendant Gonzalez misrepresented and failed to disclose that AbbVie's commercial strategy to maintain and increase Humira sales and market share included illegal kickbacks and unlawful sales

and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendant Gonzalez made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Gonzalez's public statements were materially false and misleading at all relevant times.

212. On February 19, 2016, the Company filed its annual report for the fiscal year ended December 31, 2015 on Form 10-K (the "2015 10-K") with the SEC, which provided the Company's annual financial results and position. The 2015 10-K was signed by Defendants Gonzalez and Chase.

213. The 2015 10-K enumerated the Company's strategic objectives for 2016 to increase "HUMIRA sales growth," stating, in pertinent part:

**2016 Strategic Objectives**

AbbVie's mission is to be an innovation-driven, patient-focused specialty biopharmaceutical company capable of achieving top-tier financial performance through outstanding execution and a consistent stream of innovative new medicines. ***AbbVie intends to continue to advance its mission in a number of ways, including (i) growing revenues through continued strong performance from its existing portfolio of on-market products, including its flagship brands, HUMIRA, IMBRUVICA and VIEKIRA PAK, as well as growth from pipeline products*** . . . .

AbbVie expects to achieve its revenue growth objectives as follows:

• ***HUMIRA sales growth by driving biologic penetration across disease categories, increasing market leadership, strong commercial execution*** and expansion to new indications for hidradenitis suppurativa (regulatory approval in the United States and EU achieved in 2015) and uveitis (regulatory submissions in the United States and the EU are under review with approval expected in 2016).

214. The 2015 10-K also described the drivers of Humira's sales growth in 2015, stating in pertinent part:

> Global HUMIRA sales increased 19 percent in both 2015 and 2014, ***primarily as a result of market growth across therapeutic categories and geographies, higher market share, approval of new indications, and favorable pricing in certain geographies***. In the United States, HUMIRA revenues increased 29 percent in 2015 and 25 percent in 2014, driven by prescription volume, favorable pricing, and market growth across all indications. Internationally, HUMIRA revenues increased 9 percent in 2015 and 13 percent in 2014, ***driven primarily by growth across indications in certain geographies***. AbbVie continues to pursue several new indications to help further differentiate HUMIRA from competing products and add to the sustainability and future growth of HUMIRA.

215. The statements contained in ¶¶ 213-14 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to the Company's marketing practices and commercial strategy: that Humira's sales growth was driven, and would continue to be driven, in part, by illegal kickbacks and unlawful sales and marketing tactics, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendants' public statements were materially false and misleading at all relevant times.

216. On March 17, 2016, AbbVie presented at the Barclays Global Healthcare Conference. During the presentation, Defendant Chase stated, in pertinent part:

> And then outside of the US, we are anticipating biosimilar competition in the fourth quarter of 2018. So that is how we build our models.
>
> ***The other thing we like to remind people is, even when a biosimilar competitor comes to market, we've got commercial strategies that we think can do a very, very good job of ensuring long-term durability of HUMIRA in the US that has to***

*do with our preferred position of payers and the difficulty in switching a well-controlled patient and the familiarity that the HUMIRA brand has from a safety standpoint from a halo of indications*.

So even after the biosimilar comes to market, we have commercial strategies that we think and feel very confident will in the long term blunt the impact of biosimilars.

217. The statement contained in ¶ 216 was materially false and/or misleading because Defendant Chase misrepresented and failed to disclose the following adverse facts pertaining to AbbVie's commercial strategies to drive Humira sales, which were known to Defendants or recklessly disregarded by them. Specifically, Defendant Chase made a materially false and/or misleading statement and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, HUMIRA, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Chase's public statement was materially false and misleading at all relevant times.

218. On May 6, 2016, the Company filed its quarterly report for the first quarter of 2016 on Form 10-Q (the "Q1 2016 10-Q") with the SEC, which provided the Company's quarterly financial results and position. The Q1 2016 10-Q was signed by Defendants Gonzalez and Chase.

219. The Q1 2016 10-Q enumerated the drivers of Humira's sales growth in the quarter, stating, in pertinent part:

Global HUMIRA sales for the first quarter of 2016 increased 19% *primarily as a result of market growth across therapeutic categories and geographies and favorable pricing in certain geographies*. In the United States, HUMIRA revenues increased 32% *driven by prescription volume, favorable pricing, and market growth across all indications*. Internationally, HUMIRA revenues increased 5%, driven primarily by growth across indications in certain geographies. AbbVie continues to pursue several new indications to help further differentiate HUMIRA from competing products and add to the sustainability and future growth of HUMIRA.

81

220.    The statements contained in ¶ 219 were materially false and/or misleading because Defendants misrepresented and failed to disclose that the growth of Humira sales relied, in part, on illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them.  Specifically, Defendants made materially false and/or misleading statements and/or failed to disclose that:  (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendants' public statements were materially false and misleading at all relevant times.

221.    The statements contained in ¶ 219 alleged to be materially false and misleading concerning the quarterly growth of Humira's sales were repeated, in all material respects, in AbbVie's Forms 10-Q filed on August 5, 2016, November 7, 2016, and May 5, 2017, and were materially false and misleading when made for the same reasons as stated in ¶ 220.

222.    On May 23, 2016, AbbVie presented at the UBS Global Healthcare Conference. During the presentation, Defendant Chase stated, in pertinent part:

> The other nice story we have with -- on our spending profile is the fact that we've got a very rapidly-growing top line.  Our top line in Q1 grew 22%.
>
> We're obviously not increasing expenses anywhere near that rate.  And so, you see some nice operating margin improvement.  In terms of what we do as the LOE event plays out, when it plays out, what we have told the market is, you can be absolutely certain that we're going to protect the bottom line to the greatest extent possible.  ***There is a sizeable spend on Humira today, and we view that as very, very productive spend.  If you look at TRx growth in the United States, it's been pretty clear that over the last couple of years volume has increased in the market and that is exclusively, in the case of Humira, due to the promotional programs we have in place.  So, these are very, very high ROI-generating investments.***

223.    The statements contained in ¶ 222 were materially false and/or misleading because Defendant Chase misrepresented and failed to disclose the following adverse facts pertaining to

AbbVie's promotional programs used to drive Humira sales, which were known to Defendants or recklessly disregarded by them. Specifically, Defendant Chase made false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, HUMIRA, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Chase's public statements were materially false and misleading at all relevant times.

224.    A few days after Defendant Chase's false statements on May 23, 2016, Defendant Gonzalez sold 285,953 shares of AbbVie stock on June 2, 2016 for proceeds of $18,233,001.30.

225.    On October 28, 2016, AbbVie held its Third Quarter 2016 Earnings Call. During the call, Defendant Chase discussed Humira's sales and the outlook for Humira's sales for full year 2016, stating, in pertinent part:

> Humira delivered another quarter of strong sales growth with global sales of more than $4 billion, up 12.1% operationally. Globally, we continue to see strong volume growth across all therapeutic segments.
>
> In the US, Humira sales increased 16.7% compared to the prior year. The growth rate in the quarter was negatively impacted by 4 points due to higher customer ordering patterns in the prior year, a reversal of what we experienced with second-quarter growth rates. Normalized for this, Humira performance in the quarter exceeded 20% comprised of low teens prescription growth and single-digit price. Wholesaler inventory levels remain below half a month across all periods.
>
> On a year-to-date basis, Humira US sales growth exceeds 24%. For the fourth quarter, we forecast sales growth in excess of 20%, which will contribute to our full-year forecast of above 20%.
>
> International Humira sales were more than $1.4 billion in the quarter, up 4.5% on an operational basis. Biosimilar Remicade has not had a material impact on performance and the Enbrel biosimilar continues to perform in line with our previously communicated assumptions. We continue to forecast Humira international operational sales growth in the mid single digits for the full year.

*Humira's unique product profile and AbbVie's strong commercial execution has made Humira the number one prescribed biologic and we continue to see strong momentum for Humira as market leader around the world.*

. . . .

If you look at the US, the US has had just truly outstanding growth. If you look at the past six quarters, on average Humira has averaged about 25% growth. The last two quarters, second and third quarter, if you average the two of them together, the growth was 21.7%. If you make the adjustment for the ordering patterns that Bill described, third quarter was just over 20% growth.

And as Bill indicated, we are forecasting 20% growth again in the fourth quarter. The October weeklies are consistent with that; *we obviously pay a lot of attention to Humira. This brand continues to grow extremely well and the vast majority of that growth is volume*.

If you look at market share, in the US we continue to perform well. Probably the best way look at market share would be if you track it at the beginning of 2016 and look at it through the latest data points that we have, which would be September data points, the overall market share for Humira is about 31.8%. It's up 0.6% over that period of time from January through September.

Rheumatology, our share is 26.8%. It has increased a full point over that period of time. Gastro and derm, our market share remains basically flat at 43% and 35% market share. *This brand continues to perform extremely well in the marketplace and it's because of the attributes of this product and how well-accepted is it by physicians and by patients*.

We are continuing to see good market growth. There is an anomaly in the IMS data because a large managed care organization has blinded their data, but it's still in the base. But what I would tell you is that if you look at script growth on Humira, it's above 13% when you make the appropriate adjustments and the market is growing high single digits, around 9% or so. So prescription growth continues to be extremely robust.

. . . .

In terms of Humira, we are not backing off our spend on Humira. *The spend on Humira has been the driver of the spectacular growth that the brand has put up and all of those programs are very, very high ROI, which as you can see -- as you can imagine, based on the sales growth*.

226. The statements contained in ¶ 225 were materially false and/or misleading because

Defendant Chase misrepresented and failed to disclose that the "programs" AbbVie utilized to

drive Humira's sales growth included illegal kickbacks and unlawful sales and marketing tactics,

which was known to Defendants or recklessly disregarded by them. Specifically, Defendant Chase made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Chase's public statements were materially false and misleading at all relevant times.

227.    On January 27, 2017, AbbVie held its Fourth Quarter 2016 Earnings Call. During the call, Defendant Chase discussed Humira's sales and the outlook for Humira's sales for the quarter and full year 2017, stating, in pertinent part:

> Humira delivered another quarter of strong growth with global sales of $4.3 billion, up 16.2% operationally. In the US, Humira sales increased 23.5% compared to the prior year, driven by volume growth of roughly 14% plus price. Wholesaler inventories remained below half a month in the quarter.
>
> . . . .
>
> For the full year 2016, global Humira sales were $16.1 billion, reflecting incremental sales of more than $2 billion. Full-year sales of Humira in the US grew more than 24% with midteens prescription growth and a contribution from price in the high single-digits.
>
> . . . .
>
> ***This exceptional performance was driven by Humira's overall level of efficacy and safety, long physician experience, and continued biologic penetration across disease categories. Its unique product profile and AbbVie's strong commercial execution has made Humira the number one prescribed biologic and it remains the undisputed market leader, despite competition***.

228.    The statements contained in ¶ 227 were materially false and/or misleading because Defendant Chase misrepresented and failed to disclose that Humira's "performance" was driven, in part, by illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendant Chase made materially

false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Chase's public statements were materially false and misleading at all relevant times.

229.    On February 17, 2017, the Company filed its annual report for the fiscal year ended December 31, 2016 on Form 10-K (the "2016 10-K") with the SEC, which provided the Company's annual financial results and position. The 2016 10-K was signed by Defendants Gonzalez and Chase.

230.    The 2016 10-K enumerated the Company's strategic objectives for 2017 to drive "HUMIRA sales growth," stating, in pertinent part:

**2017 Strategic Objectives**

AbbVie's mission is to be an innovation-driven, patient-focused specialty biopharmaceutical company capable of achieving top-tier financial performance through outstanding execution and a consistent stream of innovative new medicines. *AbbVie intends to continue to advance its mission in a number of ways, including: (i) growing revenues through continued strong performance from its existing portfolio of on-market products, including its flagship brands, HUMIRA and IMBRUVICA as well as growth from pipeline products* . . . .

AbbVie expects to achieve its strategic objectives as follows:

•    *HUMIRA sales growth by driving biologic penetration across disease categories, increasing market leadership, strong commercial execution.*

231.    The 2016 10-K also described the drivers of Humira's sales growth in 2015, stating in pertinent part:

Global HUMIRA sales increased 16% in 2016 and 19% in 2015. The sales increase in 2016 was *driven by market growth across therapeutic categories and geographies, favorable pricing in certain geographies and approval of new indications*. The sales increase in 2015 *was primarily as a result of market growth across therapeutic categories and geographies, higher market share, approval of new indications and favorable pricing in certain geographies*. In the United

States, HUMIRA revenues increased 24% in 2016 and 29% in 2015, *driven by prescription volume, favorable pricing, market growth across all indications and higher market share*. Internationally, HUMIRA revenues increased 4% in 2016 and 9% in 2015, driven primarily by growth across indications. AbbVie continues to pursue strategies to help further differentiate HUMIRA from competing products and add to the sustainability and future growth of HUMIRA.

232. The statements contained in ¶¶ 230-31 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to the Company's marketing practices and commercial strategy: that Humira's sales growth was driven, and would continue to be driven, in part, by illegal kickbacks and unlawful sales and marketing tactics, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendants' public statements were materially false and misleading at all relevant times.

233. On April 27, 2017 during the Company's Q1 2017 Earnings Call with investors, Defendant Gonzalez stated: "In the U.S. Humira grew 22.8%, *driven by robust underlying demand, including prescription volume growth of 12%*."

234. The statement contained in ¶ 233 was materially false and/or misleading because Defendant Gonzalez misrepresented and failed to disclose the following adverse facts pertaining to the growth of Humira's sales, which were known to Defendants or recklessly disregarded by them. Specifically, Defendant Gonzalez made a materially false and/or misleading statement and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales

and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Gonzalez's public statement was materially false and misleading at all relevant times.

235. Defendant Gonzalez capitalized on his false statements in ¶ 233, selling 71,235 shares of his AbbVie stock for $4,665,386.91 on May 19, 2017.

236. On May 22, 2017, AbbVie presented at the UBS Global Healthcare Conference. During the presentation, in response to a question from UBS analyst Marc Harold Goodman, Defendant Gonzalez stated:

> This has been a category where there has been and continues to be a tremendous amount of competition. But yet we have continued to grow. In fact, what you've seen is that HUMIRA's growth has actually accelerated. *If you go back to 2011, 2012 and you look at the growth rates, the growth rates have accelerated pretty dramatically starting in 2013. Much of that is driven by the efforts that we had put in place to expand biological penetration. And what we mean by that is getting patients on a therapy that ultimately will put their disease under control or in remission as rapidly as possible*. That's a theme that we drive in the marketplace because what we found through market research is that patients prior to that would stay on ineffective DMARD therapy sometimes for 7 to 10 years, as an example, and not move to a biologic. *So our whole philosophy is drive the patient through a therapy that ultimately will be able to give them the kind of effect that you want and we will get more than our fair share. And clearly, that has played out the way we've expected it to*.

237. The statements contained in ¶ 236 were materially false and/or misleading because Defendant Gonzalez misrepresented and failed to disclose the following adverse facts pertaining to AbbVie's "efforts" to expand Humira's patient penetration and drive Humira sales, which were known to Defendants or recklessly disregarded by them. Specifically, Defendant Gonzalez made false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to

heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Gonzalez's public statements were materially false and misleading at all relevant times.

238.    On August 7, 2017, the Company filed its quarterly report for the second quarter of 2017 on Form 10-Q (the "Q2 2017 10-Q") with the SEC, which provided the Company's quarterly financial results and position.  The Q2 2017 10-Q was signed by Defendants Gonzalez and Chase.

239.    The Q2 2017 10-Q enumerated the drivers of Humira's sales growth in the quarter, stating, in pertinent part:

> Global HUMIRA sales increased 15% for both the three and six months ended June 30, 2017 *primarily as a result of market growth across therapeutic categories and geographies as well as favorable pricing in certain geographies*. In the United States, HUMIRA sales increased 18% for the three months and 20% for the six months ended June 30, 2017 *driven by market growth across all indications and favorable pricing*.  Internationally, HUMIRA sales increased 9% for the three months and 7% for the six months ended June 30, 2017 driven primarily by market growth and tender timing.  AbbVie continues to pursue strategies intended to further differentiate HUMIRA from competing products and add to the sustainability and future growth of HUMIRA.

240.    The statements contained in ¶ 239 were materially false and/or misleading because Defendants misrepresented and failed to disclose that the growth of Humira sales relied, in part, on illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them.  Specifically, Defendants made materially false and/or misleading statements and/or failed to disclose that:  (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendants' public statements were materially false and misleading at all relevant times.

241.    That same day, Defendant Gonzalez sold 193,131 shares of his AbbVie stock for proceeds of $13,713,242.59.

89

242.    The statements contained in ¶ 239 alleged to be materially false and misleading concerning the quarterly growth of Humira's sales were repeated, in all material respects, in AbbVie's Forms 10-Q filed on November 7, 2017 and May 4, 2018, and were materially false and misleading when made for the same reasons as stated in ¶ 240.

243.    On January 26, 2018, AbbVie held its Fourth Quarter 2017 Earnings Call. During the call, Defendant Chase discussed the reasons reflecting Humira's success, stating, in pertinent part:

> Fourth quarter global sales of HUMIRA were $4.9 billion, up 12.3% operationally, driven by strong demand. HUMIRA sales in the U.S. were up 15.1% year-over-year, reflecting volume of approximately 10% plus price. International HUMIRA sales were $1.6 billion in the quarter, an increase of 6.5% operationally or 11.7% on a reported basis. Sales growth in the quarter benefited from the timing of tenders in select markets, which contributed approximately 2.5% to the growth rate. Global HUMIRA sales for the full year 2017 were $18.4 billion, reflecting operational sales growth of 14.4%. ***HUMIRA remains the undisputed market leader across the broadest range of therapeutic indications, reflecting its strong position with physicians, unique product profile and strong commercial execution.***

244.    The statement contained in ¶ 243 was materially false and/or misleading because Defendant Chase misrepresented and failed to disclose that the "strong commercial execution" and Humira's position as a "market leader" was driven, in part, by illegal kickbacks and unlawful sales and marketing tactics, which was known to Defendants or recklessly disregarded by them. Specifically, Defendant Chase made a materially false and/or misleading statement and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon systematic illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Chase's public statement was materially false and misleading at all relevant times.

245.    That same day, AbbVie's stock price increased to $125.86, its Class Period-high.

246.    On February 16, 2018, the Company filed its annual report for the fiscal year ended December 31, 2017 on Form 10-K (the "2017 10-K") with the SEC, which provided the Company's annual financial results and position. The 2017 10-K was signed by Defendants Gonzalez and Chase.

247.    The 2017 10-K enumerated the Company's strategic objectives for 2018 to drive "HUMIRA sales growth," stating, in pertinent part:

**2018 Strategic Objectives**

AbbVie's mission is to be an innovation-driven, patient-focused specialty biopharmaceutical company capable of achieving top-tier financial performance through outstanding execution and a consistent stream of innovative new medicines. ***AbbVie intends to continue to advance its mission in a number of ways, including: (i) growing revenues by diversifying revenue streams, driving late-stage pipeline assets to the market and ensuring strong commercial execution of new product launches*** . . . .

**AbbVie expects to achieve its strategic objectives through:**

•       ***HUMIRA sales growth by driving biologic penetration across disease categories, increasing market leadership, strong commercial execution and expansion***.

248.    The 2017 10-K also described the drivers of Humira's sales growth in 2017, stating in pertinent part:

Global HUMIRA sales increased 14% in 2017 and 16% in 2016.  The sales increases in 2017 and 2016 ***were driven by market growth across therapeutic categories and geographies as well as favorable pricing in certain geographies. The sales increase in 2016 was also driven by the approval of new indications***.  In the United States, HUMIRA sales increased 18% in 2017 and 24% in 2016.  ***The sales increase in 2017 was driven by market growth across all indications and favorable pricing.  The sales increase in 2016 was driven by market growth across all indications, higher market share and favorable pricing***.  Internationally, HUMIRA revenues increased 7% in 2017 and 4% in 2016, driven primarily by market growth across indications.  AbbVie continues to pursue strategies intended to further differentiate HUMIRA from competing products and add to the sustainability and future growth of HUMIRA.

249. The statements contained in ¶¶ 247-48 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to the Company's marketing practices and sales strategy: that Humira's sales growth was driven, and would continue to be driven, in part, by illegal kickbacks and unlawful sales and marketing tactics, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendants' public statements were materially false and misleading at all relevant times.

250. On July 27, 2018, AbbVie held its Second Quarter 2018 Earnings Call. During the call, Defendant Gonzalez discussed the reasons for Humira's success, starting, in pertinent part:

> Certainly, getting access in the U.S. is an important issue for any product in any category, and [rebates] play a role in that. But if you look at HUMIRA, I think there's 4, 5 important points the investors need to keep in mind. One is if you look at our percent rebate as it relates to the competitors' rebates, I would tell you that we're certainly nowhere near the highest. And in fact, we're probably in the middle or slightly below the middle from a percent rebate standpoint. The second thing I'd say is if you look at the cost of therapy for HUMIRA for those assets that are on contract, again, we're not the highest-priced product on contract, and we're not the lowest-priced product on contract. We're pretty much in the middle of the pack. ***The third thing, I think this is a very important issue. Over the course of the last couple of years, most covered lives in the United States have moved to these open formularies, and those formularies typically have between 5 and 7 products on contract with HUMIRA. And HUMIRA does extremely well in an environment where there's full choice. Physicians have total choice to prescribe any one of those drugs, and HUMIRA has maintained its position as the #1 product for capturing naive patients. And so it's not like we have this position where we have exclusive contracts where physicians have to prescribe HUMIRA. They prescribe HUMIRA because of the attributes of the product, the experience they've had, the comfort they have with the safety profile of it and the rest of the attributes of the product***.

251. The statements contained in ¶ 250 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to Humira's success and the Company's marketing practices and sales strategy, which were known to Defendants or recklessly disregarded by them. Specifically, Defendant Gonzalez made materially false and/or misleading statements and/or failed to disclose that: (1) AbbVie's strategy to maintain and increase the sales growth of its blockbuster drug, Humira, relied in part upon illegal kickbacks and unlawful sales and marketing tactics; (2) such practices would foreseeably lead to heightened scrutiny by state governments and agencies; and (3) as a result, Defendant Gonzalez's public statements were materially false and misleading at all relevant times.

## VI. ABBVIE'S CLASS PERIOD SEC FILINGS DID NOT COMPLY WITH SEC DISCLOSURE REGULATIONS

252. Item 7 of Form 10-K and Item 2 of Form 10-Q require SEC registrants to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. § 229.303], *Management's Discussion and Analysis of Financial Condition and Results of Operations* (MD&A). Among other things, Item 303 of Regulation S-K required that AbbVie's Class Period Forms 10-K and 10-Q disclose known trends or uncertainties that had, or were reasonably likely to have, a material impact on the Company's revenues or income from continuing operations.

253. In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K concerning the disclosure of material trends or uncertainties. The interpretative guidance states, in pertinent part:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.
>
> . . . .
>
> Events that have already occurred or are anticipated often give rise to known uncertainties. . . . In situations such as these, a registrant would have identified a

93

known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required.

254.    In 2003, the SEC issued additional interpretive guidance relating to the requirements of Item 303.  Such guidance states, in pertinent part:

> We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner.  MD&A is a critical component of that communication.  The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent.
>
> . . . .
>
> Financial measures generally are the starting point in ascertaining these key variables and other factors.  However, financial measures often tell only part of how a company manages its business.  Therefore, when preparing MD&A, companies should consider whether disclosure of all key variables and other factors that management uses to manage the business would be material to investors, and therefore required.
>
> . . . .
>
> Companies should also consider disclosing information that may be peripheral to the accounting function, but is integral to the business or operating activity.  Examples of such measures, depending on the circumstances of a particular company, can include those based on units or volume, customer satisfaction, time-to-market, interest rates, product development, service offerings, throughput capacity, affiliations/joint undertakings, market demand, customer/vendor relations, employee retention, business strategy, changes in the managerial approach or structure, regulatory actions or regulatory environment, and any other pertinent macroeconomic measures.

255.    Thus, the MD&A disclosures in AbbVie's Forms 10-K and 10-Q filed with the SEC during the Class Period were materially false and misleading because Defendants failed to disclose material uncertainties and trends associated with AbbVie's improper sales and marketing practices then known to management that were reasonably likely to result in lawsuits and regulatory actions that would have a material effect on the Company's future operating results, including by ending

the improper, but effective and profitable, sales and marketing practices that had increased sales of Humira for years.

256.    In addition, Item 1A of both Form 10-K and Form 10-Q requires SEC registrants to furnish the information called for under Item 503 of Regulation S-K [17 C.F.R. § 229.503], *Risk Factors*.  Item 503 of Regulation S-K required that AbbVie's Class Period Forms 10-K and 10-Q disclose the most significant matters that make an investment in AbbVie risky.  During the Class Period, however, AbbVie's Forms 10-K and 10-Q instead made materially false and misleading representations about *potential* regulatory and legal risks when, in fact, such risks were *then existing*.

257.    The risk factor disclosure included in the Company's Forms 10-K deceptively referred to *potential and "new" risks* associated with anti-kickback laws and state laws relating to sales and marketing practices, when, in fact, such risks were *then existing* due to AbbVie's illegal kickback scheme and unlawful sales and marketing practices.  These disclosures stated, in pertinent part:

> Laws and regulations affecting government benefit programs *could impose new obligations on AbbVie*, require it to change its business practices, and restrict its operations in the future.
>
> The health care industry is subject to various federal, state, and international laws and regulations pertaining to government benefit programs reimbursement, rebates, price reporting and regulation, and health care fraud and abuse.  In the United States, these laws include anti-kickback and false claims laws, the Medicaid Rebate Statute, the Veterans Health Care Act, and individual state laws relating to pricing and sales and marketing practices.  Violations of these laws may be punishable by criminal and/or civil sanctions, including, in some instances, substantial fines, imprisonment, and exclusion from participation in federal and state health care programs, including Medicare, Medicaid, and Veterans Administration health programs.  These laws and regulations are broad in scope and they are subject to change and evolving interpretations, which could require AbbVie to incur substantial costs associated with compliance or to alter one or more of its sales or marketing practices.  In addition, violations of these laws, or allegations of such violations, could disrupt AbbVie's business and result in a material adverse effect on its business and results of operations.

258.    AbbVie's Forms 10-Q during the Class Period incorporated by reference this materially false and misleading risk factor disclosure.

259.    Further, Item 9A of Form 10-K and Item 4 of Form 10-Q require SEC registrants to furnish the information called for under Item 307 of Regulation S-K [17 C.F.R. § 229.307], *Disclosure Controls and Procedures*.  Item 307 of Regulation S-K required AbbVie's Class Period Forms 10-K and 10-Q to disclose Defendant Gonzalez's and Defendant Chase's conclusions about the effectiveness of AbbVie's disclosure controls, defined by relevant regulation as the controls and procedures designed to ensure that information required to be disclosed in reports filed with the SEC is appropriately recorded, processed, summarized, and reported.

260.    During the Class Period, AbbVie falsely and misleadingly represented in the Forms 10-K and 10-Q it filed with SEC that its disclosure controls were operating effectively when they were not, as detailed herein.  These materially false and misleading representations were then fraudulently certified by Defendants Gonzalez and Chase, as set forth herein.

261.    Specifically, AbbVie's Forms 10-K and 10-Q contained materially false and misleading representations regarding AbbVie's disclosure controls being effective, when in reality they were poorly designed and "ineffective" in assessing the risk of material misstatements.  These filings stated, in pertinent part:

**Evaluation of disclosure controls and procedures.**

The Chief Executive Officer, Richard A. Gonzalez, and the Chief Financial Officer, William J. Chase, ***evaluated the effectiveness of AbbVie's disclosure controls and procedures as of the end of the period covered by this report, and concluded that AbbVie's disclosure controls and procedures were effective*** to ensure that information AbbVie is required to disclose in the reports that it files or submits with the Securities and Exchange Commission under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms, and to ensure that information required to be disclosed by AbbVie in the reports that it files or submits under the Exchange Act is accumulated and communicated to AbbVie's management,

including its principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

262. The representations in the Company's Forms 10-K and 10-Q about AbbVie's disclosure controls being effective were then falsely and misleadingly certified by Defendants Gonzalez and Chase:

I, [Defendant Gonzalez/Chase], certify that:

1. I have reviewed this annual report on Form [10-K or 10-Q] of AbbVie Inc.;

2. *Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of AbbVie as of, and for, the periods presented in this report;

4. AbbVie's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for AbbVie and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to AbbVie, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of AbbVie's disclosure controls and procedures and presented in this report our conclusions about the

effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in AbbVie's internal control over financial reporting that occurred during AbbVie's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, AbbVie's internal control over financial reporting; and

5. ***AbbVie's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to AbbVie's auditors and the audit committee of AbbVie's board of directors***:

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect AbbVie's ability to record, process, summarize and report financial information; and

(b) ***Any fraud, whether or not material, that involves management or other employees who have a significant role in AbbVie's internal control over financial reporting***.

263. The material misstatements and omissions included in the Forms 10-K and 10-Q failed to disclose material facts required by SEC rules and regulations associated with AbbVie's reliance upon systematic illegal kickbacks and unlawful sales and marketing tactics to maintain and increase the sales growth of its blockbuster drug, Humira.

## VII. THE TRUTH EMERGES

264. On September 18, 2018, the DOI Superseding Complaint was filed against AbbVie in what has been called the "largest health care fraud case" in the California DOI's history. The DOI Superseding Complaint alleges, *inter alia*, that AbbVie engaged in a sophisticated kickback scheme which, among other things, used nurse ambassadors to induce doctors to write prescriptions of Humira and violate the CIFPA, causing private insurers to pay out over $1.2 billion in Humira-related claims between 2013 and 2018.

265.    On this news, the Company's stock price fell from an intra-day high of $96.06 per share on September 18, 2019, to close at $91.02 per share on September 19, 2018, a drop of $5.04 per share, or approximately 5%, on heavy trading volume.

266.    The market attributed the stock drop to the filing of the DOI Superseding Complaint, with CrispIdea Research noting that the Company's stock "dipped due to the lawsuit filed against its drug HUMIRA, which is the strongest drug in its pipeline."  Likewise, Morgan Stanley reported that AbbVie's stock price fell "due to a California Insurance Commissioner lawsuit alleging Humira kickbacks."   BMO Capital Markets reported that the "'*Nurse Ambassador' program is questionable and aggressive . . . . [and] its execution (i.e., downplaying the safety issues) is probably not fully compliant*" with applicable rules and regulations.

267.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

268.    Numerous additional facts give rise to a strong inference that, throughout the Class Period, Defendants knew or, at a minimum, recklessly disregarded that their statements were materially false and misleading.[6]

### A.    The 2015 Whistleblower Complaint and Subsequent California DOI Investigation and False Claims Act Case Contribute to a Strong Inference of Scienter

269.    Engaging in illegal behavior is probative of scienter.  In 2015, Suarez filed a whistleblower action against AbbVie in the U.S. District Court for the Northern District of Illinois

---

[6]     The cumulative knowledge of all members of the Company's management team, including, but not limited to, the Individual Defendants, is properly imputed to AbbVie.

alleging violations of the federal False Claims Act. Suarez alleged that AbbVie engaged in a kickback scheme by providing free support services to healthcare providers to induce them to prescribe Humira. That whistleblower action was maintained under seal until 2018.

270. The State of California initiated its own investigation regarding AbbVie's marketing practices with respect to Humira. That investigation focused on AbbVie's alleged use of kickbacks to physicians for the purpose of encouraging them to prescribe Humira, and improper efforts to influence or misinform Humira patients through "nurse educators" or "nurse ambassadors" paid for by AbbVie. In this regard, Nancy Kincaid, a spokeswoman for the California DOI, stated: "We conducted an investigation. *We believe there is strong evidence that fraud was committed* against private insurance companies."

271. On September 18, 2018, the California DOI intervened in the *qui tam* lawsuit that Suarez filed against AbbVie in California, in what it called the "largest health care fraud case" in the California DOI's history. The lawsuit alleges that AbbVie violated the CIFPA, causing private insurers to pay out over $1.2 billion in Humira-related claims between 2013 and 2018.

272. The DOI Superseding Complaint further alleges that AbbVie engaged in a far-reaching scheme to maximize profits and increase the number of prescriptions of Humira via "classic" kickbacks – including cash, meals, drinks, gifts, trips, and patient referrals – as well as more sophisticated kickbacks, including professional services to physicians to induce and reward Humira prescriptions.

273. The DOI Superseding Complaint also alleges that AbbVie deployed Nurse Ambassadors directly into patients' homes, ostensibly to act as patient advocates, but in fact to provide valuable services to benefit healthcare providers, ensure Humira prescriptions were filled, and to keep patients on Humira at any cost.

274.     In connection with the action, Jones, the California DOI Commissioner, stated that "AbbVie *spent millions* convincing patients and health care professional that AbbVie Ambassadors were patient advocates.  In fact, the Ambassadors were Humira advocates hired to do one thing:  "keep patients on a dangerous drug at any cost."

275.     The Nurse Ambassadors, who had nursing backgrounds, were trained to downplay the serious risks of Humira and deflect patient concerns about Humira's side effects.  Indeed, AbbVie directed the Nurse Ambassadors to avoid patient questions about the risks for the dangerous drug.  According to Jones, AbbVie's alleged misconduct "*is particularly egregious because it is well-known the drug has very adverse side effects*."

**B.     The Sale of Humira Is a Core Operation of AbbVie**

276.     The Individual Defendants' knowledge of the illicit practices discussed herein can readily be inferred because sales of Humira were absolutely critical to AbbVie's overall operations during the Class Period.

277.     Humira is the Company's blockbuster drug, accounting for two-thirds of AbbVie's overall sales.  In 2017, for example, the Company sold $18.4 billion worth of the drug worldwide, accounting for 65% of AbbVie's revenue.  In 2018, global sales of Humira reached $19.9 billion, an 8.2% increase from the prior year.  Since 2010, AbbVie has collected more than $115 billion in global Humira sales, 58% of which has come from U.S. sales.  Indeed, Humira is the most prescribed medication in the world and its sales grew exponentially during the Class Period.  *See* ¶¶ 51-52.

278.     That Humira sales (and the practices that led to increased sales of the drug over the course of the Class Period) constitute a "core operation" at AbbVie is readily apparent from the Defendants' own statements.  As detailed herein, the Individual Defendants spoke regularly about Humira's significance to the Company, the purported reasons for the growth of Humira, and the

Company's strategies for driving that growth.  As just one example, at a Jeffries Global Health Care presentation on November 19, 2015, Defendant Chase, recognizing the drug's importance to the Company, stated:  "So HUMIRA has been a phenomenal growth driver for the company.  I mean, if you look at how it's performed over the last few years, ***it's grown at over $1 billion per year this year.  And of lately, this quarter, almost 20% growth on the brand.  So HUMIRA is obviously incredibly important and a huge cash flow generator for the company***."  In the prior month (late October 2015), Defendant Gonzalez specifically addressed Humira's growth and growth strategy, stating that "Humira's unique product profile and AbbVie's strong commercial execution has made Humira the number-one prescribed biologic, with the highest commercial prescription market share, including the highest percentage of new patient starts."  Numerous other examples of these and other similar Humira-related statements are contained in Part V, *infra*.

279.    The Individual Defendants' detailed pronouncements on these topics provide strong circumstantial evidence that they were receiving specific information about such matters.  Alternatively, if the Individual Defendants were not knowledgeable about these matters (on which they spoke in detail), such recklessness would readily satisfy the scienter requirement.

## C.    AbbVie Operates in a Highly Regulated Industry

280.    As noted in various Company SEC filings during the Class Period, AbbVie's marketing, sales, and promotional activities "are subject to comprehensive government regulation."  Those same filings state that "[c]ompliance with these [applicable] laws and regulations is costly and materially affects AbbVie's business. . . . AbbVie expects compliance with these regulations to continue to require significant technical expertise and capital investment to ensure compliance."  The Company also has indicated that a "[f]ailure to comply" in this regard "can . . . result in regulatory and enforcement actions, the seizure or recall of a product, the suspension or revocation of the authority necessary for a product's production and sale and other

civil or criminal sanctions, including fines and penalties." Given the existence of that "comprehensive" regulatory scheme and the potential significant penalties associated with non-compliance, it can be readily inferred that the Individual Defendants and those working at or under their direction closely monitored the Company's marketing, sales, and promotional activities during the Class Period.

### D. Defendants Were Particularly Motivated to Increase the Sales of Humira During the Class Period

281. During the Class Period, Defendants Gonzalez and Chase collectively received more than $176 million in compensation, which was heavily weighted in stock awards and other incentive compensation. Defendant Gonzalez earned between $1.5 million and $1.65 million in annual salary, yet he received annual stock awards and other incentive compensation totaling over $116 million during the Class Period. Defendant Chase earned between $790,000 and $1,038,773 in annual salary, yet he received nearly $45 million in annual stock awards and other incentive plan compensation during the Class Period.

282. AbbVie utilized a Performance Incentive Plan, or "PIP," which rewarded executives for achieving key financial and non-financial goals measured at the Company and individual executive levels.

283. Defendants Gonzalez and Chase were motivated to increase the sales of Humira in order to maximize their compensation because "Humira sales" were one element of a set of financial factors that were evaluated as part of the Company's executives' compensation, which directly impacted their PIP award. Recent Congressional testimony by Gonzalez underscores the direct relationship between Humira sales and executive compensation at the Company. *See* ¶¶ 97-98.

284.     Likewise, the Company was particularly motivated to increase sales of Humira during the Class Period because of the pending threat of generic competition.  *See* ¶¶ 92-96.  As explained above, AbbVie was incentivized to maximize its returns from Humira before sales plummeted because of the impact of cheaper generic competition.

### E.     The Individual Defendants' Stock Sales Support a Motive to Defraud

285.     The Individual Defendants also were motivated to misrepresent the Company's strategy for maintaining and growing Humira's market share and sales so that they could artificially inflate the price of AbbVie's stock to profit from insider sales of AbbVie's stock.  The Individual Defendants' transactions in the Company's stock during the Class Period were highly suspicious, unusual, and out of character with prior sales, with millions of dollars in insider sales occurring shortly after Defendants' false statements that contributed to or maintained the artificial inflation in AbbVie's stock price.  *See* ¶¶ 204, 224, 241.

286.     AbbVie was first listed on the NYSE on January 2, 2013.  Between that date and the start of the Class Period on October 25, 2013, Defendant Gonzalez acquired 257,720 shares and exercised 10,846 shares for $401,034.08.

287.     By contrast, during the Class Period Defendant Gonzalez acquired 592,450 shares and converted 1,097,669 shares for $48,198,905.20.  Defendant Gonzalez then exercised 397,089 shares for $27,959,474.59 and sold 1,220,983 shares for $87,708,436.62.  Many of these trades were made shortly after Defendants' false statements.  *See* ¶¶ 204, 224, 241.  In sum, Defendant Gonzalez made $67,469,006.01 from his dispositions of AbbVie common stock during the Class Period.

288.     Defendant Chase's insider transactions were equally suspicious.  Between January 2, 2013 and the start of the Class Period, Defendant Chase acquired no shares, converted 4,567 shares for $147,080.11, and exercised 4,188 shares for proceeds of $155,542.32.

289.     By contrast, during the Class Period, Defendant Chase acquired 209,450 shares and converted 93,407 shares for $2,583,499.02.  Defendant Chase then exercised 148,790 shares for $10,383,683.05 and sold 128,271 shares for $11,981,054.44.  In sum, Defendant Chase made $19,781,238.47 from his dispositions of AbbVie common stock during the Class Period.

290.     The enormous personal benefits that Defendants Gonzalez and Chase received through their insider sales were in addition to other significant compensation that they received, including their bonuses, which were tied to the sales of Humira.  *See supra* ¶¶ 97-98.

### F.     Defendants Have Engaged in a Pattern of Wrongdoing

291.     Courts have recognized that "pattern evidence," i.e., evidence that a defendant participated in a pattern of malfeasance over a significant period of time, is probative of scienter. That rule has direct application to the case at bar.  Significantly, the DOI Superseding Complaint was not the first time that AbbVie had been accused of providing kickbacks to induce physicians to write prescriptions for its drugs.  In October 2018, AbbVie and Abbott settled a whistleblower lawsuit filed in 2009 that claimed those companies had increased prescriptions for their heart medication, Tri Cor, by providing kickbacks to physicians and promoting it for unapproved use.

292.     Indeed, the kickback scheme alleged herein is not even the first time that AbbVie has been accused of using illegal means to increase profits generated by sales of Humira.

293.     U.S. lawmakers and others have called on the Federal Trade Commission to investigate whether patent-related settlements involving Humira are "pay-for-delay" tactics calculated to hinder generic equivalents from entering the market.  "AbbVie is using pay-for-delay deals to keep a cheaper generic off the market and patients are the victims," said David Mitchell, president and co-founder of Patients For Affordable Drugs.  "We believe it is illegal and anti-competitive, and we are asking the FTC to step in and protect patients from AbbVie's price hikes."

294.    For example, on September 28, 2017, AbbVie issued a press release announcing a global resolution of all intellectual property-related litigations with Amgen regarding Amgen's proposed biosimilar adalimumab product (i.e., generic of Humira).   Under the terms of the settlement agreement, AbbVie granted Amgen a non-exclusive license to AbbVie's intellectual property relating to Humira beginning on January 31, 2023 in the United States.

295.    Additionally, in July 2018, AbbVie announced that it had reached a patent license agreement with Mylan, a generic developer, over a biosimilar adalimumab.  Under the agreement, AbbVie granted Mylan a nonexclusive license to sell its drug in the United States and in other markets outside of Europe.  Notably, Mylan's U.S. license will not start until July 2023.

296.    AbbVie also engages in a concept known as "patent-thicket" to protect its Humira profits and keep competitors from entering the market with a generic equivalent.  While patents provide companies the exclusive right to sell their drug for 20 years, AbbVie has gamed the system to extend these protections well beyond the allotted protection period.  To that end, the Company filed applications for additional, overlapping patents to prevent competitors from entering the market.

297.    In August 2018, the Initiative for Medicines, Access, and Knowledge ("I-MAK"), a public interest group that seeks to ensure that patents do not obstruct patient access to affordable medicines, issued a report detailing the number of patents that drug makers have attempted to secure for the highest-grossing drugs in the United States.  I-MAK called AbbVie "the worst patent offender" in the pharmaceutical landscape for attempting to obtain 247 patents for Humira, while raising the drug's price by 144% since 2012.

298.    In March 2019, a class action lawsuit was filed against AbbVie and a group of rival pharmaceutical manufacturers, alleging that the Company colluded to divide the market for

AbbVie's blockbuster drug Humira between the United States and Europe, and that AbbVie used a "patent thicket" to maintain an illegal monopoly on Humira. The action seeks damages and injunctive relief for individuals who purchased Humira and for entities that provided reimbursement for some or all of the purchase of Humira in the United States since January 1, 2017. According to the complaint, AbbVie "secured over 100 patents designed solely to insulate Humira from any biosimilar competition in the U.S. for years to come."

299. Since March 2019 at least five other lawsuits have been filed against AbbVie alleging that the Company engaged in anti-competitive behavior by creating a patent thicket to prevent competitors from entering the market with a generic equivalent to Humira. These actions have since been consolidated into the single action of *In re: Humira (Adalimumab) Antitrust Litigation*, 1:19-cv-01873 (N.D. Ill.).

300. AbbVie executives have stated their intention to use patents to deter competition. For example, at the Goldman Sachs Healthcare Conference on June 11, 2014, Defendant Chase stated: "The bulk of that IP strategy, although there's a lot of strategies in there, ***is designed to make it more difficult for a biosimilar to follow behind you*** and come up with a very, very similar biosimilar."

### G. Defendants' Violation of Company Policy Supports an Inference of Scienter

301. The Company purports to have a robust ethics and compliance program. *See* ¶¶ 74, 76, 78-82. In that regard, AbbVie stressed that it "does not tolerate illegal or unethical behavior in any aspect of our business" and that it "emphasizes the importance of ethical and honest conduct, [and] adhering to AbbVie's policies and procedures." AbbVie further emphasized that it "complie[d] with legal, industry and relevant institutions' requirements regarding the interaction of our employees with healthcare professionals and organizations."

302.    Despite these and other such affirmative commitments, *see* ¶¶ 54, 80-81, 141, the Company continuously violated its own ethics and conduct policies throughout the Class Period. These violations enhance the inference of scienter.

### H.    The Duration of the Misconduct Adds to the Scienter Inference

303.    The duration of the misconduct also supports an inference of scienter.  That the fraudulent kickback scheme addressed herein lasted for several years demonstrates that the fraud was not the result of a temporary lapse in otherwise rigorous management oversight, but rather was caused by a sustained course of misconduct facilitated by AbbVie's senior executives.

### I.    The Individual Defendants' SOX Certifications and Signing of SEC Filings Further Support a Strong Inference of Scienter

304.    The SOX Certifications executed by Defendants Gonzalez and Chase are another strong indicator of scienter because the Individual Defendants were at that time aware of and/or recklessly disregarded material weaknesses in AbbVie's system of internal controls that were not disclosed to the investing public.  *See* ¶¶ 36, 39, 251, 260, 262.

305.    Moreover, as signatories to the Company's SEC filings, *see* ¶¶ 36, 39, 131, 147, 159, 176, 187, 212, 218, 229, 238, 246, the Individual Defendants had an affirmative obligation to familiarize themselves with the facts relevant to AbbVie's core operations.  To the extent that the Individual Defendants failed to fulfill that obligation, their recklessness would satisfy the scienter element of a claim brought under Section 10(b) and Rule 10b-5.

### J.    The Abrupt Resignation of Defendant Chase Adds to the Strong Inference of Scienter

306.    On October 18, 2018, just one month after news of the filing of the DOI Superseding Complaint came to light and caused AbbVie's stock price to fall and investors to incur hundreds of millions of dollars in damages, AbbVie announced that Defendant Chase had abruptly

stepped down from his position as CFO of the Company after six years in that role. No explanation for his sudden resignation was provided.

307. Defendant Chase's unexplained resignation – which occurred one month after the truth fully emerged – was highly suspicious and constitutes further evidence of Defendants' recklessness and conscious misconduct.

## IX. LOSS CAUSATION

308. Plaintiffs incorporate by reference the allegations set forth above.

309. During the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of AbbVie common stock. This scheme operated as a fraud or deceit on Class Period purchasers of AbbVie common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations, omissions, and fraudulent conduct were revealed and became apparent to the market, the price of AbbVie common stock fell as the prior artificial inflation dissipated.

310. As a result of their purchases of AbbVie common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, i.e., damages, under the federal securities laws. When Defendants' prior misrepresentations, omissions and fraudulent conduct were disclosed and became apparent to the market, the price of AbbVie common stock fell as the prior artificial inflation dissipated. Defendants' materially false and misleading statements and omissions had the intended effect and caused AbbVie common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $125.86 per share on January 26, 2018.

311. By issuing materially false and misleading statements and failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of AbbVie's prospects, business, and compliance with relevant laws and regulations. Defendants' materially

false and misleading statements had the intended effect and caused AbbVie common stock to trade at artificially inflated levels throughout the Class Period.

312.    The decline in the price of AbbVie common stock after the corrective disclosure came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in AbbVie common stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of AbbVie's common stock and the subsequent significant decline in the value of AbbVie's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed to the investing public at large.

313.    On September 18, 2018, the California DOI issued a press release stating that Insurance Commissioner Jones had filed an insurance-fraud complaint in Alameda County Superior Court on behalf of the State of California against the Company, alleging that AbbVie provided illegal kickbacks to health care providers to prescribe HUMIRA.

314.    The press release announcing the DOI Superseding Complaint stated:

> AbbVie engaged in a far-reaching scheme including both classic kickbacks—cash, meals, drinks, gifts, trips, and patient referrals—and more sophisticated ones—free and valuable professional goods and services to physicians to induce and reward HUMIRA prescriptions. These professional goods and services included free insurance processing and prior authorizations, gifts of medical practice management hardware and software, and even marketing assistance.

> "AbbVie spent millions convincing patients and health care professionals that AbbVie Ambassadors were patient advocates—in fact, the Ambassadors were HUMIRA advocates hired to do one thing, keep patients on a dangerous drug at any cost," said Insurance Commissioner Dave Jones. "Pharmaceutical companies know financial inducements are illegal, and patients depend on their health care

professionals for straight forward honest information about their care and medication risks. In this case, patient care was traded for $1.2 billion in ill-gotten gains."

The key to AbbVie's success in pulling off its scheme, and among the most troubling aspects of it, is the fact that AbbVie inserts its own personnel directly into the homes of patients. When doctors prescribe HUMIRA, AbbVie sends its registered nurses—which AbbVie calls "Ambassadors"—into patients' homes, representing them to be an extension of the doctor's office.

The system AbbVie established takes advantage of the Ambassadors' nursing background and direct access to patients to serve the biopharma giant's financial interest in getting patients to take HUMIRA by downplaying its risks. Ambassadors are trained to send patient complaints directly to AbbVie and not the patients' treating physicians. Ambassadors also provide unbalanced information, as they are trained to tout the drug while at the same time also instructed on methods to avoid directly answering patient questions about risks of the medication, including those pertaining to HUMIRA's serious and important side effects.

At no cost and considerable gain to the physician's office, AbbVie nurses provide pharmacy and insurance authorization assistance, open enrollment resources, paperwork help, advice on insurance products, and other services, all of which provide a substantial value and save physicians' time, money, and resources. The catch is AbbVie only provides the Ambassadors as long as the physicians continue to prescribe AbbVie's drug instead of selecting another course of treatment.

315. When the marketplace was made aware of the lawsuit and the details alleged therein, AbbVie stock declined by approximately 5%, on higher than usual trading volume, over the course of the next two consecutive trading days to close at $91.02 per share on September 19, 2018.

316. Securities analysts attributed the aforementioned stock price decline (¶ 315) to the DOJ Superseding Complaint. On September 18, 2018, CrispIdea Research noted: "The stock price was volatile during the quarter and dipped due to the lawsuit filed against its drug HUMIRA, which is the strongest drug in its pipeline."

317.    Other analyst reports also issued on September 18, 2018, echoed CrispIdea. Analysts at Morgan Stanley stated:  "ABBV shares traded down 3% on September 18 due to a California Insurance Commissioner lawsuit alleging Humira kickbacks."

318.    The next day, on September 19, 2018, analysts at BMO issued a report that: "ABBV shares are under pressure following release of a lawsuit from the California Insurance Commissioner vs. AbbVie, alleging that AbbVie has committed insurance fraud by providing kickbacks to healthcare providers throughout California."  The analysts added that they viewed AbbVie's Nurse Ambassador program as "*questionable and aggressive*."

319.    Analysts at CFRA then lowered their recommendation on AbbVie from "buy" to "hold" on September 19, 2018, citing the filing of the DOI Superseding Complaint.  CFRA's report stated:  "we see increased risk to ABBV's future earnings, hence we have lowered our opinion on ABBV shares to hold."

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE

320.    Plaintiffs and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon omissions of material fact that Defendants were under a duty to disclose.

321.    In addition, Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory, because AbbVie's common stock traded in an efficient market during the Class Period, as follows:

a.    The Company's common stock was actively traded on the NYSE, an informationally efficient market, throughout the Class Period.  Shares were highly

liquid during the Class Period, with an average daily volume of 8,134,723 shares traded;

b.     As a regulated issuer, AbbVie filed periodic public reports with the SEC and the NYSE;

c.     The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

d.     The market reacted promptly to public information disseminated by the Company;

e.     AbbVie's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace; and

f.     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of AbbVie's common stock.

322.     Therefore, the market for AbbVie common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in AbbVie's share price.  Under these circumstances, all purchasers of AbbVie common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

## XI.   CONTROL PERSON ALLEGATIONS

323.     By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about AbbVie, its business, operations, operational

trends, finances, and present and future business prospects. The Individual Defendants would ascertain such information through the Company's internal corporate documents, conversations, and connections with other corporate officers, bankers, traders, risk officers, marketing experts, employees, attendance at management and Board meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as the Company officers and/or directors.

324. It is appropriate to presume that the materially false, misleading, and incomplete information conveyed in AbbVie's public filings and press releases and Defendants' public statements, as alleged herein, was the result of the collective actions of the Individual Defendants identified above. The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

325. The Individual Defendants were involved in drafting, producing, reviewing, approving, and/or disseminating the materially false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the fact that materially false and misleading statements were being issued regarding the Company and themselves, and approved or ratified these statements, in violation of the federal securities laws.

326. As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, each of the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to AbbVie's financial

condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

327. The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of AbbVie, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein.

328. The Individual Defendants are liable as participants in a scheme, plan, and course of conduct that operated as a fraud and deceit on Class Period purchasers of AbbVie's common stock.

## XII. INAPPLICABILITY OF SAFE HARBOR

329. Defendants acted with scienter because at the time that they issued public documents and other statements in AbbVie's name they knew, or with extreme recklessness disregarded, the fact that such statements were materially false and misleading or omitted material facts. Moreover, Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

330. As set forth in detail throughout this Complaint, Defendants, by virtue of their control over, and/or receipt of, AbbVie's materially misleading statements and their positions with the Company that made them privy to confidential proprietary information, used such information to inflate artificially the Company's financial results. Defendants were informed of, participated in, and knew of the improprieties and unlawful conduct alleged herein and understood their material effect on the Company's business and future prospects. With respect to non-forward-looking statements and omissions, Defendants knew and recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

331. The Private Securities Litigation Reform Act's statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint. None of the statements pleaded herein are forward-looking statements and no such statement was identified as a forward-looking statement when made. Rather, the statements alleged herein to be materially false and misleading by affirmative misstatement and/or omissions of material fact all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

332. Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that

those statements were false when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XIII. CLASS ACTION ALLEGATIONS

333.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased or otherwise acquired the publicly traded common stock of AbbVie during the period between October 25, 2013 and September 18, 2018, inclusive, and were damaged thereby (the "Class"). Excluded from the Class are: Defendants; members of the immediate families of the Individual Defendants; the Company's subsidiaries and affiliates; any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

334.    The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, the Company had between approximately 1.572 and 1.664 billion shares of common stock outstanding and actively trading on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

335.    Plaintiffs' claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

336.    Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs have retained counsel competent and experienced in class and securities litigation.

337.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include:

a.      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.      whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

c.      whether and to what extent the market price of AbbVie's common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

d.      whether Defendants acted with the requisite level of scienter;

e.      whether the Individual Defendants were controlling persons of the Company;

f.      whether reliance may be presumed; and

g.      whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

338.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may

be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress the wrongs done to them individually. There will be no difficulty in the management of this action as a class action.

## XIV. COUNTS

### COUNT I
### Violation of § 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

339. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

340. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

341. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made materially untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and maintain the prices of AbbVie's common stock; and (iii) cause Plaintiffs and members of the Class to purchase the Company's common stock at artificially inflated prices.

342. Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated

documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

343.     As set forth above, Defendants made their materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner, as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased AbbVie's common stock during the Class Period.

344.     In ignorance of the materially false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for the Company's common stock, Plaintiffs and other members of the Class purchased the Company's common stock at artificially inflated prices during the Class Period.  But for the fraud, Plaintiffs and members of the Class would not have purchased the Company's common stock at such artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of AbbVie's common stock declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of the Company's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed to the investing public at large.

345.     By virtue of the foregoing, Defendants are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5.

### COUNT II
### Violation of § 20(a) of the Exchange Act
### Against the Individual Defendants

346.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

347. This Count is asserted pursuant to Section 20(a) of the Exchange Act against each of the Individual Defendants.

348. As alleged above, AbbVie violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omitting material information in connection with the purchase and sale of the Company's common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter, and AbbVie is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

349. As set forth above, the Individual Defendants were controlling persons of AbbVie during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same.

350. By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content of its public statements with respect to its operations, corporate governance, and compliance with regulators.

351. The Individual Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Plaintiffs and the other members of the Class who purchased AbbVie's common stock during the Class Period.

352.    In ignorance of the materially false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for the Company's common stock, Plaintiffs and other members of the Class purchased the Company's common stock at an artificially inflated price during the Class Period.  But for the fraud, Plaintiffs and members of the Class would not have purchased the Company's common stock at artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of the Company's common stock declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of AbbVie's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed to the investing public.

353.    By reason of the foregoing, the Individual Defendants are liable to Plaintiffs and the members of the Class as controlling persons of the Company in violation of Section 20(a) of the Exchange Act.

## XV.    PRAYER FOR RELIEF

354.    WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

a.    Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives, and appointing Motley Rice LLC as class counsel pursuant to Rule 23(g);

b.    Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

c.    Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

    d.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorney's fees and costs incurred; and

    e.      Granting such other and further relief as the Court deems just and proper.

## XVI.  JURY DEMAND

355.    Plaintiffs demand a trial by jury of all issues so triable.

DATED:  July 22, 2019                     Respectfully submitted,

**MOTLEY RICE LLC**

_s/ Christopher F. Moriarty_

Gregg S. Levin (_pro hac vice_)
Christopher F. Moriarty (N.D. Ill. #SC100187)
Erin C. Williams (_pro hac vice_)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone:  (843) 216-9000
Facsimile:   (843) 216-9450
glevin@motleyrice.com
cmoriarty@motleyrice.com
ecwilliams@motleyrice.com

_Counsel for Lead Plaintiff_
_Metzler Asset Management GmbH and_
_Lead Counsel for the Class_

**ROBBINS GELLER RUDMAN**
    **& DOWD LLP**
Arthur C. Leahy (_pro hac vice_ pending)
Lucas F. Olts (_pro hac vice_ pending)
Kevin A. Lavelle (_pro hac vice_ pending)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  (619) 231-1058
Facsimile:   (619) 231-7423

_Counsel for Named Plaintiff_
_National Shopmen Pension Fund_

**CAFFERTY CLOBES MERIWETHER**
    **& SPRENGEL LLP**
Anthony F. Fata

John D. Scheflow
150 S. Wacker Dr., Suite 3000
Chicago, IL  60606
Telephone:  (312) 782-4880
Facsimile:   (312) 782-4485
afata@caffertyclobes.com
jscheflow@caffertyclobes.com

*Liaison Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 22, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 22, 2019.

*s/ Christopher F. Moriarty*
Christopher F. Moriarty