**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MAYUKO HOLWILL, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | No. 18 C 06790 |
| v. | ) ) | Judge John J. Tharp, Jr. |
| ABBVIE INC., RICHARD A. GONZALEZ, and WILLIAM J. CHASE, | ) ) ) ) | |
| Defendants. | ) ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiffs bring this federal securities action on behalf of themselves and a class of persons who held stock of AbbVie, Inc. between October 25, 2013 and September 18, 2018 ("the class period"). The plaintiffs allege that the defendants—AbbVie, AbbVie's then–C.E.O. Richard Gonzalez, and AbbVie's then–C.F.O. William Chase—fraudulently misled investors by concealing two marketing programs that offered healthcare providers free administrative services in exchange for prescribing the drug Humira, in violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). When the alleged violations came to light, AbbVie's share price allegedly dropped due to the news, harming investors who had purchased at prices that had been artificially inflated by the company's misrepresentations about the marketing programs.

Far from constituting unlawful kickbacks, however, AbbVie's Humira-support programs provided legitimate services that were integrally tied to the product itself. Accordingly, the Court finds that the defendants did not falsely certify compliance with the law. Nor did the defendants mislead investors by not specifically flagging the risk of liability associated with AbbVie's Humira-support programs or by omitting details regarding those programs. To the contrary, the

1

record compels the finding that AbbVie adhered to the Anti-Kickback Statute and accurately represented its marketing programs, warranting summary judgment in favor of the defendants.

The Court finds summary judgment warranted on two additional bases as well: Even if the defendants made misrepresentations, no reasonable jury could conclude that they did so with purposeful or reckless intent to deceive. Moreover, even if the Court assumed an intent to deceive, the plaintiffs cannot establish that the defendants' deception *caused* their financial losses.

## BACKGROUND

AbbVie, Inc. is a pharmaceutical development and manufacturing company headquartered in North Chicago. Its flagship product, Humira, is a prescription medication used to treat rheumatoid arthritis (among other disorders). To be effective, Humira must be regularly self-injected, often for an extended period of time. Defs.' Statement of Undisputed Facts ("Defs.' Statement") ¶¶ 1-9, ECF No. 316. Most insurers require pre-clearance to begin Humira treatment, which necessitates the completion of specific authorization forms. *Id.* at ¶ 10

To boost Humira sales, AbbVie launched two initiatives in 2012, both of which continue to operate. *Id.* at ¶¶ 20, 33; Defs.' Mem. in Supp. of Summ. J. ("Defs.' Mem.") 2, ECF No. 315. The first, the Ambassador Program, seeks to improve patients' compliance with Humira regimens by hiring registered nurses to visit homes and provide treatment support. To that end, AbbVie's nurse ambassadors educate Humira patients on how to perform self-injections, answer questions about the drug, encourage adherence to the medication schedule, and assist in obtaining insurance coverage and refilling prescriptions. Def. Statement ¶¶ 17-18.

AbbVie's second initiative, HLink, is an electronic platform designed to help healthcare providers secure pre-clearance authorization for Humira. *Id.* at ¶¶ 24-26. The platform enables providers to submit benefits-verification requests to determine whether an insurer would cover Humira, project out-of-pocket costs, and ascertain whether the insurer requires prescriptions to be

filled at a particular pharmacy. *Id.* at ¶ 28. HLink also provides insurer-specific prior-authorization forms and pre-populates those forms with any patient information that the prescriber might have already entered into HLink. *Id.* at ¶ 32.

In October 2015, a former nurse ambassador named Lazaro Suarez filed a whistleblower complaint against AbbVie in this district. Suarez alleged that the Ambassador Program constituted an illegal kickback in the form of a free, valuable service offered to providers on the condition that they prescribe Humira. Compl. 13-27, *United States ex rel. Suarez v. AbbVie, Inc.* ("*Suarez I*"), No. 1:15-cv-08928 (N.D. Ill. Oct. 8, 2015); *see also United States ex rel. Suarez v. AbbVie, Inc.* ("*Suarez II*"), 503 F. Supp. 3d 711, 716, 719 (N.D. Ill. 2020). Those arguments were also raised in a subsequent case filed in the District of New Jersey. *See United States ex rel. LaFauci v. AbbVie, Inc.*, No. 2:15-cv-07931 (D.N.J. Nov. 5, 2015).

The *Suarez* complaint prompted the California Department of Insurance (CDI) to launch an investigation into AbbVie's Humira-support programs. Meanwhile in March 2018, the *Suarez* complaint was unsealed after the United States and all 31 states named in the complaint declined to intervene. Six months later, on September 18, 2018, California decided to intervene in a separate *qui tam* action Suarez filed in California Superior Court. *See* State of California's Superseding Complaint, *California ex rel. Suarez v. AbbVie Inc.*, No. RG18893169 (Super. Ct. Alameda Cty., Cal. Sept. 18, 2018).

This lawsuit soon followed. The plaintiffs, AbbVie stockholders, allege that the company and its managing executives, co-defendants Richard Gonzalez and William Chase, misled them by deliberately concealing the company's legal liability stemming from the Ambassador Program and HLink—as well as other direct violations of the Anti-Kickback Statute. The plaintiffs claim that during the class period, they purchased stock at prices that had been artificially inflated by the

defendants' deception, in violation of § 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder by the SEC. *See* Am. Compl. 1-9, ECF No. 74.

Following an unsuccessful motion to dismiss, *see* Memorandum Opinion & Order ("Dismissal Order"), ECF No. 104, the parties completed discovery and the defendants filed the summary-judgment motion now under review. In their motion, the defendants raise three independent arguments: First, no reasonable jury could find that a defendant made a misrepresentation or misleading omission to shareholders about AbbVie's Humira-support programs because those programs did not even arguably violate the Anti-Kickback Statute. Second, the defendants did not intentionally or recklessly mislead investors, an independent requirement under § 10(b). Finally, any misrepresentations on the defendants' part did not cause the plaintiffs' loss, since Suarez's legal challenge to the Ambassador Program became public knowledge before the end of the class period.

## DISCUSSION

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in their favor. *Id.*; *see also Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020).

The defendants' summary-judgment motion hinges on whether a reasonable jury could find a violation of § 10(b) of the Securities Exchange Act based on the available evidence. Section 10(b) makes it unlawful for a person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of

4

such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Pursuant to § 10(b), the Securities and Exchange Commission promulgated Rule 10b-5:

> It shall be unlawful for any person, directly or indirectly . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.

17 CFR § 240.10b-5(b).

The Supreme Court has implied a private cause of action from the text and purpose of § 10(b). *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011). It contains six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* at 37-38 (quotation marks omitted). The required scienter is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).

### 1. Misrepresentation

#### a. AbbVie Code of Ethics

The plaintiffs allege that AbbVie and its chief executives violated § 10(b) and Rule 10b-5 by falsely certifying compliance with the Anti-Kickback Statute and other anti-corruption laws in the company's official codes of ethics. Three key passages from the 2013 edition of the code are representative:

- We follow applicable laws and industry guidelines created to avoid potential conflicts of interest.

- We never offer or provide anything of value to healthcare professionals or other individuals to inappropriately influence their medical judgment or purchasing or prescribing practices in favor of an AbbVie product.

- [W]e take special care to avoid even the appearance of unduly influencing the[] decisions [of healthcare professionals.]

2013 AbbVie Code of Conduct 22-23, ECF No. 316-45.[1]

The plaintiffs maintain that each of the above statements is false. Contrary to its ethics code, the plaintiffs argue, AbbVie sought to increase sales by offering healthcare providers a wide variety of goods and services, including cash, gifts, and free administrative support through HLink and the Ambassador Program. Those offerings, the plaintiffs contend, constituted unlawful kickbacks—*i.e.*, valuable "remuneration" given with the intent to induce prescriptions. *See* 42 U.S.C. § 1320a-7b(b)(2) (making it unlawful to "knowingly and willfully offer[] or pay[] any remuneration . . . to any person to induce such person . . . to purchase" a federally funded product).

The defendants respond by arguing that the statements contained in AbbVie's ethics code cannot be "misrepresentations" within the meaning of § 10(b) because they are purely aspirational—proclamations of the ideals AbbVie strives to meet, not representations that the company always lives up to them. Defs.' Mem. 27 (citing, *inter alia*, *Silverman v. Motorola, Inc.*

---

[1] AbbVie's 2017 revised code of conduct contained equivalent but not identical statements. *See* 2017 AbbVie Code of Business Conduct 27, 36, 38, ECF No. 316-44. The accuracy of those statements also turns on whether AbbVie violated or arguably violated the Anti-Kickback Statute. *See id.* at 36 ("We don't give anything of value to induce a healthcare professional to use or recommend pharmaceutical products that are paid for or reimbursed by the government."); *id.* at 37 ("We comply with anti-bribery and anti-corruption laws" and "are careful to maintain accurate books and records to reflect all payments made and received, and we avoid even the appearance of anything improper."). Accordingly, the same analysis applies. In any case, a full list of challenged statements from both codes of conduct is available at paragraphs 139, 141, and 143 of the Complaint, or Appendix B to the Defendants' Memorandum in Support of Summary Judgment. *See* Am. Compl. ¶¶ 139, 141, 143; Defs.' Mem. in Supp. of Summ. J., app. B, ECF No. 315-2.

("*Silverman I*"), 772 F. Supp. 2d 923, 932 (N.D. Ill. 2011) ("[A] company's essentially mandatory adoption of a code of ethics simply does not imply that all of its directors and officers are following that code of ethics" given that "a code of ethics is inherently aspirational." (quotation marks omitted))). The Court previously rejected that argument at the pleadings stage, *see* Dismissal Order 8-9, and it is disinclined to reverse that position at this juncture in light of the law-of-the-case doctrine. *See HK Sys., Inc. v. Eaton Corp.*, 553 F.3d 1086, 1089 (7th Cir. 2009) ("The doctrine of law of the case counsels against a judge's changing an earlier ruling" and has even "greater force" when "there is a change of judges during the litigation and the new judge is asked to revisit the rulings of his predecessor."). That said, the Court agrees that the statements in AbbVie's ethics code are not actionable for a different reason: though falsifiable, they are not false.

### i.  Classic Kickbacks

The plaintiffs fail to establish that AbbVie violated its ethics code by offering cash and gifts to curry favor with providers—the so-called "classic kickback theory." In support of that theory, the plaintiffs cite allegations made by the CDI in its 2018 complaint. Pls.' Resp. in Opp. to Summ. J. ("Pls.' Resp.") 16 & nn.66-69, ECF No. 353; *see also id.* at 38-39. "[A]t the summary judgment stage," however, "the plaintiff is required to point to evidence, not rely on the allegations in a complaint." *Gabryszak v. Aurora Bull Dog Co.*, 427 F. Supp. 3d 994, 999 (N.D. Ill. 2019) (citing *Estate of Perry v. Wenzel*, 872 F.3d 439, 461 (7th Cir. 2017)). Moreover, allegations that the defendants offered cash and other gifts in the CDI complaint constitute inadmissible hearsay offered for the truth and so may not be considered at summary judgment. *See Goldberg v. 401 N. Wabash*, No. 09-cv-06455, 2013 WL 1499043, *5 n.5 (N.D. Ill. Apr. 11, 2013) ("[T]o the extent Plaintiff seeks to introduce the pleadings in other litigation for the truth of the pleadings' allegations, this use is inadmissible hearsay.").

Noting that evidence need not assume an admissible form to be considered at summary judgment, the plaintiffs speculate that they might be able to substantiate the CDI allegations at trial by "having AbbVie authenticate the relevant documents, calling the HCPs as witnesses, or using their deposition transcripts from the CDI action." Pls.' Resp. 39 n.118. Merely gesturing toward proof, however, without including it in the record or identifying its existence, is insufficient to satisfy a non-movant's burden. To defeat summary judgment, the non-movant "must affirmatively demonstrate that there is a genuine issue of material fact for trial," *Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003), by "citing to particular parts of materials *in the record*," FED. R. CIV. P. 56(c)(1)(A) (emphasis added). Hinting at extra-record materials not produced in discovery under the guise of providing an alternative channel for inadmissible hearsay is insufficient. "As the put up or shut up moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotation marks omitted). The plaintiffs have not done so.

Some of the plaintiffs' experts assert in conclusory fashion that classic kickbacks occurred. *See*, *e.g.*, Expert Report of William Trombetta ¶ 21, ECF No. 318-1. Such statements do not create a triable issue, however, as the experts disclose no basis for their opinions. *Zemlick v. Burkhart*, No. 22-cv-02319, 2024 WL 4279491, at *7 (S.D. Ind. Sept. 6, 2024) ("[C]onclusory assertions, unsupported by specific facts . . . are not sufficient to defeat a motion for summary judgment. This is true even for opinions proffered by expert witnesses." (citation and quotation marks omitted)). To the extent the plaintiffs' experts also relied on the CDI allegations, their conclusions are equally inadmissible for Rule of Evidence 703 "does not authorize an expert to be a conduit for otherwise inadmissible hearsay." *Rivers v. B Braun Interventional Sys. Inc.*, No. 19-cv-00988, 2023 WL

7166520, at *19 (E.D. Wis. Oct. 31, 2023) (citing *Gong v. Hirsch*, 913 F.2d 1269, 1273 (7th Cir. 1990)). And in any case the plaintiffs have waived any reliance on expert statements on this matter by not referencing them in response to the defendants' summary-judgment motion. *See Nichols v. Michigan City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

Setting aside the CDI complaint, unsupported expert statements, and extra-record evidence that may or may not exist, the plaintiff's classic-kickback claim fails as a matter of law. The plaintiffs have not identified any evidence—financial documents, witness testimony, or otherwise—indicating that AbbVie offered tangible goods to healthcare providers to induce prescriptions. That shortcoming is fatal, particularly given that the plaintiffs had ample time to identify such support during the six-year pendency of this case.

### ii. HLink and the Ambassador Program

Regardless of whether AbbVie offered classic kickbacks, the plaintiffs claim that HLink and the Ambassador Program constituted unlawful kickbacks in their own right. That argument fails for a different reason: The programs do not qualify as "remuneration" within the meaning of the Anti-Kickback Statute.

The Department of Health and Human Services' Office of Inspector General (OIG) has drawn a distinction between goods and services that carry independent value for healthcare providers and those that do not. "[I]f goods or services provided by [a drug] manufacturer eliminate an expense that the physician would have otherwise incurred (i.e., have independent value to the physician)," OIG maintains that providing them "may be problematic if the arrangement is tied directly or indirectly to the generation of federal health care program business for the

manufacturer." OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, 23737 (May 5, 2003). On the other hand, "free items and services that are integrally related to the offering provider's or supplier's services . . . would have no independent value to the recipient apart from the services the donor provides, and therefore, would not implicate the anti-kickback statute." Medicare and State Health Care Programs: Fraud and Abuse; Electronic Health Records Safe Harbor Under the Anti-Kickback Statute, 78 Fed. Reg. 79202-01, 79210 (Dec. 27, 2013). Product-support services that are "specifically tied to support of the purchased product" fall into the second category. 68 Fed. Reg. at 23735: They "have no substantial independent value to the purchaser" and thus "may not implicate the anti-kickback statute" on their own. *Id.*

Courts in this district and elsewhere have embraced the line drawn by OIG. *See, e.g.*, *United States ex rel. PCTLS, LLC v. Nw. Mem'l Healthcare*, No. 19-cv-00593, 2023 WL 6388328, at *5 (N.D. Ill. Sept. 29, 2023); *United States ex rel. Hart v. McKesson Corp.*, 602 F. Supp. 3d 575, 589 (S.D.N.Y. 2022); *United States ex rel. Forney v. Medtronic, Inc.*, No. 15-cv-06264, 2017 WL 2653568, at *4 (E.D. Pa. June 19, 2017). The rationale behind these decisions is that while "[o]ffering well-supported products might induce physicians to purchase [a company's] products," that is "only because they are better-supported than competing products." *Forney*, 2017 WL 2653568, at *4. Prohibiting such integrated product support would be analogous to mandating that a company strip its product of a beneficial component or feature that a competitor lacked, an outcome that would spark a race to the bottom at odds with sound policy and the purposes of the Anti-Kickback Statute. *Cf. United States ex rel. Cimznhca v. UCB*, 970 F.3d 835, 852-53 (7th Cir. 2020) (holding that the government's position in a *qui tam* case—that a pharmaceutical company's free education and reimbursement-support services were "[n]ot only lawful, but beneficial to patients and the public"—was sufficiently rational to satisfy substantive due process).

Adopting the framework developed by OIG and embraced by precedent,[2] the Court finds that AbbVie's Ambassador Program is "integrally related" to Humira. *See* 78 Fed. Reg. at 79210. Ambassador services are limited to facilitating access to and use of that specific medication. Pls.' Resp. to Defs.' Statement of Undisputed Facts ¶ 19, ECF No. 355. Patients without a Humira prescription may not participate. *Id.* at ¶ 19. And AbbVie prohibits ambassadors from discussing, engaging, or assisting with unrelated ailments, products, and treatments. *Id.* at ¶ 18. Consistent with that prohibition, the record contains no evidence that a nurse ambassador provided a service unrelated to Humira.

HLink was equally tied to Humira. Its services were substantially limited (*e.g.*, locating the correct pre-authorization form and pre-populating it with available information). More importantly, HLink could not be used to prescribe any drug other than Humira during the class period. *See id.* at ¶ 24. Fully restricted to Humira prescriptions, HLink was a quintessential example of an integrated product feature. *See* OIG Advisory Op. 316-75, at 7, ECF 316-75 ("[F]ree assistance to physicians" in the form of "a clearinghouse for information regarding insurance coverage criteria and reimbursement levels for their products . . . have no independent value to providers apart from the products" and "do not implicate the Federal anti-kickback statute.");

---

[2] Naturally, the Court recognizes that agency guidance and district-court holdings lack legally binding authority. The Court considers those authorities strictly for their persuasive value, agreeing independently that integrated product-support services alone do not constitute remuneration. Two other considerations drive that conclusion. First, the Court has already accepted the premise that "[product] support services offered in connection with the sale of a company's own pharmaceuticals do not, on their own, implicate the anti-kickback statute" in this very litigation, *see* Dismissal Order 4-5, a finding to which deference is owed. Second, both parties have relied heavily on OIG guidance in their summary-judgment briefs, so there is plainly no objection to treating it as authoritative for purposes of the pending motion. *See Suarez I*, 2019 WL 4749967, at *6 ("interpret[ing] the parties' reliance on [OIG] guidance as a concession that it is authoritative for purposes of this motion").

*United States ex rel. Gharibian v. Valley Campus Pharmacy Inc.*, No. 16-cv-04777, 2021 WL 4816648, at *12 (C.D. Cal. June 23, 2021) (finding that even a program that provided, rather than simply facilitated applications for, insurance pre-authorization did not constitute an unlawful kickback).

Because HLink and the Ambassador Program apply solely to Humira, the services lack "independent value" and thus cannot be considered unlawful remuneration. *See PCTLS*, 2023 WL 6388328, at *5 ("Remuneration demands the transfer of something with substantial independent value to the physician." (quotation marks omitted)). Just as "a computer that can only print lab results [generated by a specific product] would not constitute remuneration because it is 'part of' the product itself," HLink and the Ambassador Program are more like integrated features of Humira than freestanding physician-support services. *Hart*, 602 F. Supp. 3d at 589. As such, they do not run afoul of the Anti-Kickback Statute. *See Forney*, 2017 WL 2653568, at *4 ("[P]roduct support services are permissible" under the Anti-Kickback Statute "unless they are not tied to the product purchased, or if they provide some substantial independent value to the purchaser."); *see also id.* (acknowledging that "technical product support . . . might induce physicians to purchase [the] products, but only because they are better-supported [] than competing products").

The total absence of evidence that any healthcare provider "reduced their expenses or downsized their own staff as a result of the Ambassadors' support services" or HLink provides further support for the conclusion that the programs provided no independent value. *Suarez I*, 2019 WL 4749967, at *9. If either program had provided value beyond Humira prescriptions, one would expect to see evidence of either reduced expenses or increased productivity following their launch. The record reflects no such changes, strongly signaling that the services provided little value independent from Humira prescriptions.

12

The conclusion that HLink and the Ambassador Program did not constitute independently valuable remuneration aligns with precedent. In fact, a court in our district reached essentially the same outcome in Suarez's original case. *See id.* There, Suarez pressed substantially the same argument as the plaintiffs here: that AbbVie falsely certified compliance with the Anti-Kickback Statute because the Ambassador Program constituted unlawful "remuneration" designed to solicit Humira prescriptions. *See id.* at *6. The court rejected that argument, however, finding that the Ambassador Program did not "relate to anything other than Humira" and so conferred nothing of independent value to healthcare providers. *Id.* at *7-8. In reaching that decision, the court construed the Ambassador Program as a set of "product-related support services that OIG guidance characterizes as permissible"—the same finding the Court adopts today. *Id.* at *9.[3]

### iii. The Plaintiffs' Alternative Reading

Urging the contrary conclusion, the plaintiffs highlight a different passage from the OIG guidance document: "[I]f goods or services provided by the manufacturer eliminate an expense that the physician would have otherwise incurred (i.e., have independent value to the physician) . . . the arrangement may be problematic if the arrangement is tied directly or indirectly to the generation of federal health care program business for the manufacturer." 68 Fed. Reg. at 23737. The plaintiffs contend that the Ambassador Program qualifies as remuneration under that standard because it "eliminate[d] an expense that the physician would have otherwise incurred" by

---

[3] The cited opinion from *Suarez* dismissed the plaintiff's initial complaint with leave to re-file. In a subsequent decision, *Saurez II*, the court partially denied a motion to dismiss the second amended complaint because the complaint alleged that ambassadors "regularly" answered patients' "additional questions and concerns about symptoms and health concerns that may or may not have been related to Humira or their underlying diagnosis treated by Humira." 503 F. Supp. 3d 711, 726 (N.D. Ill. 2020). Those allegations do not dictate the outcome of this case, which, having reached summary judgment, involves no evidence that ambassadors adopted such an expansive role.

outsourcing valuable administrative and patient-support services that are typically provided in-house.

The plaintiffs' position is untenably broad. Under their reading, virtually all pharmaceutical product-support services would qualify as a kickback, since the objective of such services is to reduce a burden (and therefore a cost) associated with prescribing that product. Consider, for example, Humira's self-injection requirement. As a biologic, Humira must be injected by the patient themselves, a process difficult to master without assistance. The more help Humira provides in teaching this skill, the less time the prescriber must spend doing so, and the more time the physician has to see other patients. Under the plaintiffs' interpretation of the OIG guidance, because the physician would otherwise have incurred the costs of educating Humira users about self-injections, the support Humira offered would be impermissible.

The same logic extends, however, to *any* product feature that has the intended or incidental effect of saving prescribers time and/or money. Suppose that AbbVie managed to develop a non-biologic version of Humira. Because prescribers would "otherwise have incurred" the costs of educating patients about self-injection, simply offering the new version of Humira would constitute a kickback by the plaintiffs' reasoning. Likewise, if a company modified a product to reduce manufacturing expenses, simply offering it for sale could qualify as an Anti-Kickback violation, since purchasing the product eliminates costs that the providers would have "otherwise incurred." The same would be true for product improvements that reduce the risk of negative side effects; if insurers decided to waive costly preauthorization requirements in response, simply placing that product on the market could be unlawful by the plaintiffs' logic.

Such outcomes would eviscerate core benefits of private competition in the pharmaceutical space. More importantly, they would do nothing to advance the Anti-Kickback Statute's primary

purpose of combatting fraud. *See United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015) (noting that the Anti-Kickback Statute "was enacted to protect the Medicare and Medicaid programs from increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than cost, quality of care or necessity of services" (quotation marks omitted)).

Given the perverse results it would generate, it is perhaps fortunate that the plaintiffs' interpretation of OIG guidance is incorrect. The OIG passage cited by the plaintiffs states that an arrangement can be "problematic" if it has "independent value to the physician," meaning that it "eliminates an expense that the physician would have otherwise incurred." 68 Fed. Reg. at 23737. The plaintiffs assume that "otherwise incurred" refers to a counterfactual scenario where a physician uses a manufacturer's product without the associated good or service at issue. But the better interpretation is more categorical: "Otherwise incurred" envisions a scenario where the physician does not use the manufacturer's product at all. Under that reading, a good or service carries "independent value" only if it eliminates an expense that a physician would have incurred even had they never adopted the manufacturer's product. *See Saurez I*, 2019 WL 4749967, at *9 (concluding that the premise "that offering free product support or reimbursement support services could violate the AKS merely because it saves physicians money" was "inconsistent with the OIG guidance"); *Suarez II*, 503 F. Supp. 3d at 727 (inquiring instead whether physicians "would otherwise have to perform, or pay staff to perform, such tasks" "if physicians *did not* prescribe Hum[ir]a" (emphasis added)). And under that reading, neither the Ambassador program nor the HLink platform eliminated costs that AbbVie would have "otherwise incurred."

Context supports the Court's interpretation. In an earlier section, the same guidance document refers to "limited reimbursement support services in connection with [a manufacturer's] own products" as "having no independent value." 68 Fed. Reg. at 23735. An updated guidance

document from 2013 makes the same point more directly, emphasizing that "items and services that are integrally related to the offering provider's or supplier's services" have "no independent value" and thus do "not implicate the anti-kickback statute" despite undoubtedly saving providers' money. 78 Fed. Reg. at 79210. Those passages unavoidably clash with the plaintiffs' reading, since reimbursement assistance necessarily reduces a cost that prescribers incur.

Because HLink and the Ambassador Program are limited to facilitating Humira prescriptions, they provide no independent value to physicians. And the plaintiffs' alternative reading of the OIG guidance defies both context and common sense. For those reasons, HLink and the Ambassador Program do not run afoul of the Anti-Kickback Statute as a matter of law.

From that conclusion, it follows that the disputed statements in AbbVie's code of ethics are not actionable misrepresentations. The first representative statement essentially claims that AbbVie follows the law. Am. Compl. ¶ 76 ("We follow applicable laws and industry guidelines created to avoid potential conflicts of interest."). Since AbbVie's Humira-support services comply with the Anti-Kickback Statute, that statement cannot be considered misleading. Indeed, the plaintiffs do not allege any other theory of illegality apart from the Anti-Kickback Statute.

The second category of statements also turns on whether AbbVie offered kickbacks. It proclaims: "We never offer or provide anything of value . . . to inappropriately influence [] medical judgment or purchasing or prescribing practices in favor of an AbbVie product." *Id.* If Humira-support services were fully integrated features of the product, then AbbVie's decision to provide them at no additional cost was perfectly above board. "[S]ervices [with] no independent value separate from the purchased product" are best "considered part of the product purchased such that their cost is already included in the products' price." *United States ex rel. Gohil v. Sanofi U.S. Servs. Inc.*, No. 02-cv-2964, 2020 WL 4260797, at *8 (E.D. Pa. July 24, 2020) (cleaned up). So

16

viewed, AbbVie's "free" integrated product-support programs were entirely appropriate, making the disputed statement true.

The plaintiffs place substantial emphasis on the third claim in AbbVie's ethics code: "[W]e take special care to avoid even the appearance of unduly influencing [prescription] decisions." Am. Compl. ¶ 76 (cleaned up). The plaintiffs argue that AbbVie's Humira-support services bore at least an *appearance* of impropriety and thus violated AbbVie's ethics policy—and misled investors—regardless of whether they were technically lawful. *See* Pls.' Resp. 26, 31-33.

As an initial matter, the plaintiffs misread the ethics provision in a significant way. The provision pledges to "take special care" to avoid appearances of undue influence, not to always succeed in doing so. Just because a company engages in arguably unlawful conduct does not mean its compliance measures were inadequate in retrospect. Reasonable, well-meaning, and even risk-averse executives can and do approve policies that generate substantial controversy.

That Suarez and the CDI ultimately challenged the Humira-support programs in court does not on its own establish that the programs appeared unlawful. And it certainly does not establish that any appearance of unlawfulness was sufficiently widespread or well-founded to support an inference that AbbVie neglected to "take special care" to avoid it. To the contrary (and as discussed below), during the class period the federal government took no action challenging similar practices by other manufacturers. To the extent that the plaintiffs measure the appearance of unlawfulness by litigation activity, the scale tips decisively in favor of AbbVie, as the United States and 30 of the 31 states named in the relator's original complaint declined to intervene in this suit or to pursue their own. As discussed, HLink and the Ambassador Program are permissible, integrated product-support services without independent value to physicians. Even if that conclusion were debatable, the contrary position would be too weak to fairly characterize the programs as legally dubious. Put

simply, the Court rejects the premise that AbbVie's Humira-support programs appeared unlawful in the first place.

In any case, the plaintiffs cannot show that AbbVie neglected to "take special care" to avoid an Anti-Kickback violation. Other than contending that the Humira-support services appeared unlawful (a premise the Court rejects) because they provoked lawsuits (evidence the Court finds inadequate), the plaintiffs provide no evidence that AbbVie was reckless or indifferent as to the lawfulness of its products. Absent such proof, no reasonable jury could find that that the company failed to take reasonable measures to ensure compliance.

The lawfulness of the Humira-support programs renders each of the contested claims in AbbVie's code of ethics accurate as a matter of law. Because the programs complied with the Anti-Kickback Statute, did not generate inappropriate or undue influence, and resulted from reasonable efforts by AbbVie to ensure compliance, the Court finds no basis to conclude that any portion of the ethics code was misleading.

### b. Statements Concerning AbbVie's Growth

Ethics codes aside, the plaintiffs assert a second basis for their § 10(b) claim—the defendants' failure to provide adequate information about HLink or the Ambassador Program during communications with investors such as earnings calls and investor conferences.

The plaintiffs home in on statements by AbbVie officials to investors concerning the reasons for Humira's success. Those statements attributed the increased sales to "several factors, including continued robust market growth . . . across therapeutic categories and geographies," "market share gains," and "very specific marketing programs" that achieved deeper market penetration. Am. Compl. ¶¶ 7, 123. The statements did not describe or mention HLink or the Ambassador Program (at least not by name), an omission the plaintiffs characterize as misleading.

18

The plaintiffs further contend that AbbVie withheld information about those programs even when asked, responding to one inquiry by declaring "I don't want to get specifically on what our marketing programs are." *Id.* at ¶ 145.

The defendants' decision not to provide more information concerning Humira-support programs does not amount to a § 10(b) violation, however. "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx*, 563 U.S. at 44. "Disclosure is required under these provisions only when necessary 'to make … statements made, in light of the circumstances under which they were made, not misleading.'" *Id.* (quoting 17 C.F.R. § 240.10b-5(b)). "[W]hen a speaker says nothing, in circumstances that do not give any particular meaning to that silence," § 10(b) liability will not attach. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024). To sustain a § 10(b) claim, then, a plaintiff must prove that the omitted information was "necessary to ensure that statements already made are clear and complete." *Id.* at 264.

The plaintiffs fail to meet that burden. AbbVie's statements to investors highlighted specific factors that had contributed to Humira's success at a broad level of generality; they did not purport to provide an exhaustive list. If simply mentioning a sales driver were enough to trigger a duty to disclose every other contributing growth factor, then AbbVie (along with virtually every other public company) would be liable for an unending host of omissions. Such a draconian rule would engulf the narrower disclosure requirements of § 10(b), which "does not impose a duty of total corporate transparency." *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021) (quotation marks omitted); *see also Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995) ("Mere silence about even material information is not fraudulent absent a duty to speak.").

In any case, AbbVie executives did discuss Humira-support programs with investors, albeit not with the level of detail the plaintiffs demanded. The defendants repeatedly referenced initiatives designed to streamline the Humira-prescription process (HLink's core function) and improve patient compliance with self-injection schedules (the Ambassador Program's central objective). During a 2015 investor conference, for instance, defendant Chase shared that AbbVie had "put specific programs in place that would drive getting biologics into the right patients, decreasing the amount of time it took to get a biologic in the hands of that patient, compliance programs, et cetera." Am. Compl. ¶ 185. On another occasion, Chase mentioned that the company had "programs in place to drive adherence" and had made investments "to drive patients to have better uptake on biologics; get on biologics sooner; as well as, once on a biologic, improve compliance." *Id.* at ¶¶ 200, 205.

The defendants' decision not to provide more specific details regarding HLink and the Ambassador Program did not violate § 10(b). Case law is clear on this point:

> Merely mentioning a topic [] does not require the company to disclose every tangentially related fact that might interest investors, only those that are sufficiently important. If omitting the fact would make the statement so incomplete as to be misleading, the company must disclose it. But omitting smaller details, even if investors might care about them, is not necessarily misleading.

*Anderson v. Abbott Lab'ys*, 140 F. Supp. 2d 894, 903 (N.D. Ill.), *aff'd sub nom.*, *Gallagher v. Abbott Lab'ys*, 269 F.3d 806 (7th Cir. 2001).

The names, operational details, and specific functions of HLink and the Ambassador Program were not "sufficiently important" to render the defendants' broad reference to those programs "so incomplete as to be misleading." *Id.* The references occurred during general discussions of the company's growth and investment priorities, not technical or comprehensive rundowns of its product-support initiatives. AbbVie in no way misconstrued the programs in the

course of those discussions; its high-level overview accurately described their purpose. Nor did AbbVie state or imply that the programs functioned differently than they did in reality. While additional details might have added color, they would not have contradicted any affirmative statement that the company made; nor would they have cleared up a reasonable misconception stemming therefrom. For that reason, the omitted information regarding HLink and the Ambassador Program cannot be considered misleading within the meaning of § 10(b).[4]

Because the plaintiffs view HLink and the Ambassador Program as illegal—or at least toeing the line of illegality—their insistence that AbbVie misled investors by omitting details about those programs is understandable. To be sure, it would be misleading for an executive to discuss a program that operates in a legally dubious manner without disclosing the aspects of its operation that create a substantial risk of liability. As explained above, however, the Court does not accept the plaintiffs' premise. As integrated product-support services without independent value, neither HLink nor the Ambassador Program meaningfully exposed AbbVie to liability.

---

[4] The plaintiffs contend, correctly, that "a materiality determination is rarely appropriate at the summary judgment stage." Pls.' Resp. 29-30 (quoting *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 815 (N.D. Ill. 2017) (quoting *Marks v. CDW Comput. Ctrs.*, Inc., 122 F.3d 363, 370 (7th Cir. 1997))). In finding that the defendants' omission of information regarding the Humira-support programs did not render any affirmative statement misleading, however, the Court is not making a materiality determination; it is finding that § 10(b)'s foundational falsity requirement has not been met. Those standards are related but different. An omission is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote" (or, in this case, trade). *Smykla v. Molinaroli*, 85 F.4th 1228, 1235-36 (7th Cir. 2023). An omission is misleading if its disclosure was necessary to render an affirmative statement clear and complete. *Macquarie*, 601 U.S. at 264. Because the defendants' remarks concerned general growth drivers rather than Humira-support programs, their decision not to provide further details regarding HLink and the Ambassador program did not render any actually communicated statement *misleading*, regardless of whether an investor might have considered those details material.

Naturally, AbbVie could not rule out the possibility of a lawsuit or enforcement action. Even the most meticulous and compliance-oriented directors cannot eliminate the prospect of being sued, since merit is no prerequisite to filing an action. Nor could the defendants certify with 100% confidence that every court would agree with their assessment that the challenged programs were lawful. But § 10(b) demands no such omniscience. "[C]ompanies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen v. UBS*, 752 F.3d 173, 184 (2d Cir. 2014) (quotation marks omitted); *see also Societe Generale Sec. Servs. v. Caterpillar, Inc.*, No. 17-cv-01713, 2018 WL 4616356, at *5 (N.D. Ill. Sept. 26, 2018) (emphasizing that § 10(b) does not "require[ a company] to admit liability for uncharged, unadjudicated claims"). Nor does the statute compel a company to divulge every activity that could *conceivably* be found unlawful, particularly when, as here, the company had an ample basis to believe (and no concrete reason to doubt) that it was complying with the law.

Even if § 10(b) created a duty to disclose any and all risks of legal action, AbbVie adequately discharged that duty by providing general warnings to investors on the subject. The company's 2012 Form 10-K (the most recent 10-K at the start of the class period) discussed the prospect of legal liability as a "Risk[] Related to AbbVie's Business." 2012 AbbVie Form 10-K, Ex. 37 to Defs.' Statement of Undisputed Facts 20, ECF No. 316-37. It noted that "the health care industry is subject to various federal, state, and international laws and regulations," including "anti-kickback and false claims laws . . . and individual state laws relating to pricing and sales and marketing practices." *Id.* The report emphasized that "[t]hese laws and regulations are broad in scope and they are subject to evolving interpretations, which could require AbbVie to incur substantial costs associated with compliance or to alter one or more of its sales or marketing practices." *Id.* "In addition," the company continued, "violations of these laws, or allegations of

22

such violations, could disrupt AbbVie's business and result in a material adverse effect on its business and results of operations." *Id.*

Neither the contents of AbbVie's ethics code nor the omissions from AbbVie's investor communications thus provides an actionable basis for § 10(b) liability. Whether the former document is misleading turns upon AbbVie's compliance with the Anti-Kickback Statute, and the Court finds no arguable basis for an anti-kickback violation given the lack of evidence of classic kickbacks and the fact that HLink and the Ambassador Program conferred no benefits independent from Humira. Whether the latter statements were misleading turns upon the nature of the omitted information, and the Court finds that additional details regarding AbbVie's Humira-support programs or associated compliance risks were not necessary to make its representations to investors accurate, clear, or complete. For these reasons, the Court finds that no reasonable jury could find that AbbVie made misrepresentations based on the available evidence. Since that is an essential element of the plaintiffs' private § 10(b) claim, *see Matrixx*, 563 U.S. at 37, the finding warrants summary judgment in the defendants' favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986) (summary judgment is warranted if an adequate opportunity for discovery yields "a complete failure of proof concerning an essential element of the nonmoving party's case").

## 2. Scienter

Regardless, even if the Court assumed that the defendants made misleading statements, summary judgment in their favor would still be warranted. That is because the plaintiffs fail to create a triable question of intent. "To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)). Proving a misrepresentation is not enough; the plaintiff must also demonstrate that the defendant harbored

23

"an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham*, 495 F.3d at 756.

Generally, courts are "reluctant to grant summary judgment when intent is at issue." *Danis v. USN Commc'ns, Inc.*, 121 F. Supp. 2d 1183, 1192 (N.D. Ill. 2000) (citing *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 371 (7th Cir. 1992)); *see also Silverman v. Motorola, Inc.* ("*Silverman II*"), 798 F. Supp. 2d 954, 968 (N.D. Ill. 2011). That said, "to survive a summary judgment motion," a "plaintiff[] must present *some* evidence of [deceptive] intent." *Danis*, 121 F. Supp. 2d at 1192 (emphasis added). A record devoid of probative evidence of scienter merits summary judgment for the defendant. *See Searls v. Glasser*, 64 F.3d 1061, 1068 (7th Cir. 1995).

The record contains insufficient evidence of fraudulent intent to submit the question to a fact finder. Even if a court concluded that HLink or the Ambassador Program violated the Anti-Kickback Statute, the arguments for the opposite conclusion would remain strong: OIG has explicitly blessed services that are integrally related to a product and lack independent value. At a minimum, then, the defendants possessed a substantial good-faith basis to *believe* the Humira-support programs were lawful, undermining any inference of deceptive intent.

Longstanding government policy and litigating positions further bolster the case for the defendants' good faith. So far as the record reflects, before the end of the class period, no regulatory body had ever challenged a nurse-education service like the Ambassador Program as an unlawful kickback. To the contrary, multiple federal agencies had concluded that the Anti-Kickback Statute permitted pharmaceutical companies to provide free patient- and physician-education services through hired nurses. Echoing that position, the Department of Justice had consistently declined to intervene in *qui tam* challenges to such services, often going so far as to seek dismissal. In *United States ex rel. Cimznhca, LLC v. UCB, Inc.*, for instance, the government

24

moved to terminate a *qui tam* lawsuit on the grounds that the challenged nurse-education program was "[n]ot only lawful, but beneficial to patients and the public." 970 F.3d at 852. Allowing the civil challenge, it explained, "would undermine . . . practices the federal government has determined are . . . appropriate and beneficial to federal healthcare programs and their beneficiaries." *Id.* (alternations in original) (quoting the government). The district court dismissed and the Seventh Circuit affirmed, finding that the government's stance had been consistent "across nine cited agency guidances, advisory opinions, and final rulemakings." *Id.*

The Justice Department's hesitance to challenge product-support services extended to the services now under review. In both *Suarez* and *LaFauci*, the federal government and at least 29 states reviewed the relevant pleadings and declined to intervene. *See* Defs.' Statement ¶ 44.[5]

The plaintiffs observe that the government's litigating position in a case in no way reflects that case's merits, or even necessarily the government's view of the merits. That is true. Because "[t]he Justice Department may have myriad reasons for permitting the private suit to go forward[,] including limited prosecutorial resources," "[t]here is no reason to presume that [its] decision . . . not to assume control of [a] suit is a commentary on its merits." *United States ex rel. Chandler v. Cook County*, 277 F.3d 969, 974 n.5 (7th Cir. 2002). So to the extent the defendants seek to rely on government policy or litigating positions to establish that they in fact complied with the Anti-Kickback Statute, their reliance is misplaced.

_____

[5] As the plaintiffs emphasize, CDI did intervene in a separate *qui tam* filed by Suarez: *California ex rel. Suarez v. AbbVie, Inc.*, No. RG18893169 (Cal. Super. Ct. Oct. 5, 2015). CDI did not file its superseding complaint, however, until the final day of the class period, September 18, 2018. Am. Compl. ¶ 19. As such, the intervention by that regulatory group cannot have put the defendants on notice during the applicable period. *See Higginbotham*, 495 F.3d at 760 ("[T]here is no fraud by hindsight." (quotation marks omitted)). From AbbVie's vantage point at the time, no government body had *ever* brought an Anti-Kickback challenge to a product-support service like the Ambassador Program.

25

Whether the defendants actually offered kickbacks—and thus made misleading statements denying the same—is only indirectly relevant to the question of scienter, however. What matters is whether the defendants *believed* that their programs were legal and their statements truthful. Any such belief would be significantly bolstered by the fact that the federal government and a near-supermajority of states have persistently declined to initiate challenges to nurse-education services. The Justice Department's history of seeking to dismiss private lawsuits on the grounds that they were meritless no doubt provided a further boost. *See United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 155-56 (2d Cir.), *cert. denied*, 145 S. Ct. 163 (2024) ("A defendant could innocently rely on a published advisory opinion to conclude that her conduct is lawful, even if she is ultimately incorrect.").

Moreover, even though the Justice Department's reluctance to challenge nurse-education services did not affect the lawfulness of those services, it did reduce the likelihood that AbbVie would face regulatory action, which is independently relevant. The plaintiffs allege that AbbVie executives misled investors by withholding details about HLink and the Ambassador Program. That claim hinges on the contextual importance of the omitted facts, which, in turn, depends on the likelihood of adverse litigation. If the prospect of a government challenge to a given program is sufficiently high, then glossing over that program without explaining the company's liability exposure may well constitute a misleading misrepresentation. By the same token, however, a fiduciary need not flag every unlikely but conceivable risk of adverse litigation. If the prospect of regulatory action is sufficiently remote, an executive could be forgiven for omitting legally salient details regarding the hypothetical target of that challenge. Here, the government's long and uninterrupted history of declining to intervene in Anti-Kickback actions involving pharmaceutical

26

product-support services on the grounds that they are lawful bolstered the defendants' reasonable belief in the same. That belief is categorically at odds with an intent to deceive.

Taken together, the strength of the legal case for Humira-support programs, coupled with the government's well-established pattern of leaving similar programs unchallenged, suggest that the defendants did not intentionally aim to mislead investors.[6] That said, even a compelling case for good faith is rarely enough to warrant summary judgment on its own; the plaintiff's contrary position must also be insufficient as a matter of law. Or, stated otherwise, the plaintiff must lack substantively admissible evidence that could support a reasonable jury finding of scienter.

The plaintiffs' first argument for scienter fails as a matter of law. The plaintiffs posit that the mere fact that Gonzalez and Chase were familiar with HLink and the Ambassador Program proves they intended to mislead investors. Pls.' Resp. 40-41. In most cases, however, that is a non sequitur. "Even if Defendants knew about a [] promotion or practice, it does not necessarily follow that Defendants knew those promotions or practices were fraudulent or wrongful." *W. Palm Beach*

---

[6] In support of its good-faith argument, the defendants also claim that AbbVie had thorough procedures for its legal counsel to vet the accuracy of any public statements. Defs.' Statement ¶¶ 54-59. That argument is precluded, however, by AbbVie's decision to rely on attorney-client privilege. A defendant's desire "to rely on documents reflecting that its usual processes included consultation with legal counsel . . . would leave a fact finder with the distinct impression that [defendant] relied on advice by counsel on the matters at issue in [the] case." *Claffey v. River Oaks Hyundai*, 486 F. Supp. 2d 776, 778-79 (N.D. Ill. 2007). "[T]o create this impression but still maintain [] attorney-client privilege . . . would in effect be using the privilege as both a shield and a sword, which is not permitted." *Id.* at 779. That is not to say that a company is categorically barred from introducing evidence of internal vetting to rebut an accusation of willfulness simply because an attorney participated in that review process. That will depend on the nature of the allegation. Here, the truth or falsity of the disputed statements turn on a legal question: whether the Humira-support programs complied with the Anti-Kickback Statute. To the extent the attorneys conducting AbbVie's internal review answered that question, their answers would constitute inadmissible legal advice. Inversely, to the extent the procedures ensured accuracy regarding non-legal issues, they are not relevant to the plaintiffs' § 10(b) allegations.

*Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 663 (N.D. Ill. 2020), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, No. 21-1155, 2022 WL 1449184 (7th Cir. May 9, 2022); *see also Higginbotham*, 495 F.3d at 758 ("[T]here is a big difference between knowing about the reports . . . and knowing that the reports are false."). Awareness fosters complicity only when underlying conduct is so obviously illegal that anyone familiar with it would presumably recognize as much. The Court has already reached the exact opposite conclusion, however, finding that no reasonable person could view Humira-support programs as unlawful kickbacks. The defendants' familiarity with those programs, then, actually cuts *against* a finding of intentional deception. Their knowledge of how those programs functioned—and, in particular, of how neither provided benefits independent from Humira—gave the defendants an ample basis to believe the programs were lawful.[7]

The plaintiffs' second contention fares no better. They argue that, because the defendants revised AbbVie's code of conduct after receiving a subpoena in connection to the CDI investigation, they must have known the code's assertions of compliance with the Anti-Kickback Statute were false. Pls.' Resp. 42. Once again, however, that does not follow. As an initial matter, the modifications made do not meaningfully alter the substance of the principles contained in AbbVie's original code of conduct. *Compare* Ex. 44 to Defs.' Statement of Undisputed Facts, ECF No. 316-44, *with* Ex. 45 to Defs.' Statement of Undisputed Facts, ECF No. 316-45. Indeed, the plaintiffs themselves highlight multiple passages from the revised code that, they assert, make the same false representations as the earlier version. *See* Am. Compl. ¶ 143. Further, a modification does not necessarily indicate that the prior statements were false. Nor, for that matter, does notice

---

[7] Even if the Court set aside that finding for purposes of ruling in the alternative on scienter grounds, it would not follow that the unlawful nature of the programs would be clear enough to infer complicity from familiarity alone.

of a nascent investigation constitute a notice of unlawful activity. That is particularly true where, as here, the CDI investigation was not yet connected to an administrative or judicial proceeding, and every prior investigation into similar programs had not yielded a complaint. Given that the defendants had a well-supported basis to believe the Humira-support services were lawful, the fact that a single state regulator was seeking information about the program is too insignificant to sustain a finding of scienter.

As a third argument for scienter, the plaintiffs claim that defendants "Gonzalez and Chase were highly incentivized to engage in fraud through the nature of their compensation." Pls.' Resp. 43. Specifically, the plaintiffs ask the Court to infer fraudulent intent from the fact that the executives received performance-based bonuses tied to the volume of Humira sales. *Id.* That argument fails to persuade.

Having a general financial stake in a company does not equate to a desire to supercharge its success by means of fraud. *See Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012) ("[T]he fact that managers benefit from higher stock prices does not imply that any particular manager committed fraud); *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 939-40 (7th Cir. 2018) ("[A] generalized motive common to all corporate executives is not enough to establish scienter."); *see also In re Bally Total Fitness*, Nos. 04-cv-03530 *et al.*, 2006 WL 3714708, at *9 (N.D. Ill. July 12, 2006) ("Regarding the motive to earn bonuses and awards, we agree with the view of numerous courts that these allegations are too common among corporations and their officers to be considered evidence of scienter."). Tying executive compensation to the performance of a company's best-selling product is functionally equivalent to providing a general financial stake in the company's success. So the

fact that Gonzalez and Chase benefitted financially from Humira sales does not give rise to an inference of fraudulent intent.[8]

Shifting focus from the defendants' compensation model to their share-trading history, the plaintiffs argue that Gonzalez and Chase suspiciously decided to sell significant quantities of AbbVie stock after learning about the CDI complaint. The timing and volume of those sales, the plaintiffs contend, suggest that the defendants knew the share price was about to drop due to the investigation. That, in turn, raises a specter of bad intent—that the defendants knew the Humira-support programs were unlawful, arguably unlawful, or at least likely to be challenged, but deliberately withheld that information from investors.

In some cases, evidence of suspicious stock sales can support an inference of fraudulent intent. *See W. Palm Beach*, 495 F. Supp. 3d at 666. That said, "because executives sell stock all the time, stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Pugh v. Trib. Co.*, 521 F.3d 686, 695 (7th Cir. 2008). An "unusual or suspicious" sale is one that is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 903-04 (N.D. Ill. 2020) (quotation marks omitted). Relevant considerations include "the amount and percentage of overall shares sold, the profit made, the timing of the stock

---

[8] The plaintiffs cite *Norfolk County Retirement System v. Ustian*, No. 07-cv-02009, 2009 WL 2386156 (N.D. Ill. July 28, 2009), for the proposition that receiving high bonuses as a result of meeting company benchmarks is sufficient to raise an inference of scienter. The court in that case, however, never held that high performance-based bonuses is sufficient on its own to create a triable issue of intent. Rather, the court inferred intentional fraud when accounting errors "were too basic, there were too many of them, and the bottom line discrepancies were too big (and the inconsistencies in the errors too small) to raise a compelling alternative inference." *Id.* at *10.

sales and the consistency of the sales with the insider's prior trading history." *Id.* at 904 (quotation marks omitted).

The plaintiffs fail to establish that the defendants' stock sales were sufficiently "unusual or suspicious" to infer scienter. For one thing, the timing of the sales did not evince bad intent. *See Pension Tr.*, 895 F.3d at 940 ("[T]he probative value of stock sales depends greatly on timing."). The plaintiffs claim that Chase and Gonzalez began to dump stock after learning of the CDI investigation on October 6, 2016. But Gonzalez's next sale did not occur until March 8, 2017, more than five months later. Defs.' Statement ¶¶ 62-63. Chase next sold on May 18, 2017, more than seven months after learning of the investigation.[9] *Id.* at ¶¶ 62, 64. If the executives had been driven to divest before the investigation became public—something that could have occurred at any time—one would expect to see trades shortly after they first received the CDI subpoena, not half a year later.

The volume of post-subpoena trading activity is not suspicious either. "Simply noting the aggregate amount of shares sold does not inform as to whether such sales were significant when compared to individual holdings." *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 1001 (E.D. Wis. 2009). Recognizing this, courts in this District have found that "[t]otal sales amounting to a low percentage of an insider's percentage of stock holdings undercut any inference of scienter." *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 943 (N.D. Ill. 2015). While both Gonzalez and Chase sold large quantities of stock after October 6, 2016, those sales represented only a fraction of their total equity holdings at the time of sale. *Compare* Expert Report of Prof. Daniel Taylor ("Taylor Report") 12 figs. 10-11, ECF No. 356-103 *with* Expert Rebuttal

---

[9] Chase executed a stock sale on December 2, 2016, about two months after receipt of the CDI subpoena. But that sale was made pursuant to a 10b5-1 trading plan adopted before receiving the subpoena. Defs.' Statement ¶ 64.

Report of Prof. Wayne R. Guay ("Guay Report") Exs. 7A, 7B, ECF No. 316-67. None of Gonzalez's four next trades after receiving the subpoena involved even 10% of the value of his holdings at the start of that year.[10] *See* Taylor Report 12 figs. 10-11. Moreover, all four sales were significantly smaller than Gonzalez's final trade before the investigation commenced ($4.7 million at most compared to $18.2 million pre-subpoena). *See id.* Chase's trades tell a similar story. While high in aggregate terms, the value of Chase's sales was always eclipsed by that of his overall holdings. Indeed, even Chase's single largest trade ($4.6 million in February 2018) represented no more than 7.7% of his holdings at the start of that year (approximately $60 million). *Compare* Taylor Report 12 fig. 11, *with* Guay Report Ex. 7B.

The defendants' trading history appears even more benign in light of share-vesting schedules. At the start of the class period, much of the equity held by Chase and Gonzalez was unvested, meaning it could not have been exercised or sold. Guay Report ¶ 65. Over time, that equity began to vest, increasing the amount of tradable stock and options available to the defendants. The executives' trading volume rose in roughly equal proportion to that increase in tradable shares. As a result, the number of vested shares actually available to sell—a better metric for assessing abnormalities in trading history—either remained constant or increased after AbbVie received the CDI subpoena. Guay Report ¶ 65, Exs. 7C, 7D. Both outcomes, of course, are inconsistent with a fire sale.

The broader trajectory of the defendants' trades cuts against an inference of deceptive intent as well. On net, both Gonzalez and Chase substantially increased their shares of AbbVie

---

[10] If anything, the 9% figure likely overestimates the relative value of Gonzalez's 2017 trades by several degrees, considering that all but two of the trades were executed in the second half of that year and the value of Gonzalez's holdings ballooned to approximately $90 million by January 1, 2018. *See* Guay Report Ex. 7A.

during the relevant class period. Indeed, the increase in their respective holdings was dramatic. At the start of the period, Gonzalez and Chase held $39.5 million and $16.4 million in company equity, respectively. Defs.' Statement ¶¶ 66-67. By its end, those amounts had nearly doubled and tripled to $78 million and $47.1 million. *Id.*[11]

The fact that the defendants accumulated rather than dumped shares during the class period undermines the notion that they intentionally, knowingly, or recklessly misled investors. *See W. Palm Beach*, 495 F. Supp. 3d at 666-67 (concluding that the fact that defendants "bought, rather than sold stock at the allegedly inflated prices . . . weigh[s] against the possibility of a strong inference of scienter"). The plaintiffs assert that the defendants' post-subpoena stock sales indicate that they were aware the share price had been artificially inflated by concealing AbbVie's Anti-Kickback liability and were hoping to maximize profits before the truth came to light. As in *In re Harley-Davidson*, however, that argument misses the mark. 660 F. Supp. 2d at 1001. Observing that "the defendants retained significantly more stock than they sold during the class period" and that one defendant "actually increased personal holdings during the class period," the court concluded that "it [was] difficult to conclude that the sales [were] sufficiently unusual or suspicious to generate a strong inference of scienter." *Id.* That logic applies here with equal force. Any circumstantial inference of scienter that might arise from looking at the defendants' stock sales in isolation evaporates upon zooming out to view the overall trend of investment activity.

---

[11] If one controls for share value by comparing the number of shares over time, the same trend emerges: Both Gonzalez and Chase held a higher number of AbbVie shares at the end of the class period than at its start. Guay Report ¶ 64, Ex. 7.

Netting more equity than one sells is fundamentally inconsistent with attempting to preempt an expected crash.[12]

Evidence also suggests that the defendants had legitimate reasons to execute the allegedly suspicious sales. The Seventh Circuit has explained the significance of such legitimate explanations as follows:

> In some cases, an insider's suspicious sale of holdings followed by the publication of material adverse information may support an inference of bad faith and scienter. That inference may be rebutted, however, by information which provides a legitimate reason for the sale. The summary judgment burden then shifts back to the plaintiffs to produce additional evidence of scienter.

*Searls*, 64 F.3d at 1068 (citations omitted).

Gonzalez testified during deposition that he needed to liquidate stock in 2017 in order to complete the processes of purchasing a house, establish a trust for his daughter and grandchildren, and diversify assets. *See* Ex. 68 to Defs.' Mot. for Summ. J. 307:20-24, ECF No. 316-68; *see also* Guay Report ¶ 66 (explaining that it is common for executives to diversify where, as here, share prices rise considerably over a short period of time). For his part, Chase explained that he sold

---

[12] The plaintiffs argue that the increase in total equity holdings does not undermine an inference of scienter because much of the holdings flowed from long-term incentive and compensation programs rather than acquisitions on the open market. Pls.' Resp. 45-46. The plaintiffs cite no in-circuit precedent for that contention, however, and the plaintiffs' out-of-circuit precedent does not support their proposition. *See In re Romeo Power Inc. Sec. Litig.*, No. 21-cv-03362, 2022 WL 1806303, at *5 (S.D.N.Y. June 2, 2022) (discounting the significance of a net increase in the defendants' holdings at the pleadings stage because it was unclear from the complaint whether the defendants had the *capacity* to sell shares obtained through compensation packages); *In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 1002 (W.D. Ark. 2017) (concluding that the defendants' "accumulation and retention of shares earned through employment incentives hardly suggests that they sought to dump their shares at an inflated price" and that the defendants' "accumulation and retention of [] stock both temper the strength of any nefarious inference that the Court could otherwise draw from the transactions" (cleaned up)).

stock because he was considering retirement and also required capital to complete a house purchase. Defs.' Statement ¶ 69. These legitimate explanations for the defendants' post-subpoena trading activity—which the plaintiffs have done nothing to discredit—further undermine any inference of bad intent that the trades might have otherwise generated. *See Searls*, 64 F.3d at 1068; *Silverman I*, 772 F. Supp. 2d at 937 (affirming summary judgment where plaintiff failed to raise "any issue of material fact" as to whether defendant's sale of stock was "dramatically out of line with prior trading practices" (quotation marks omitted)); *cf. Tellabs*, 551 U.S. at 314 (holding that, to satisfy the particularity pleading requirement of the Private Securities Litigation Reform Act, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent").[13]

The plaintiffs contend that the structure and use of the defendants' 10b5-1 trading plans provides additional evidence of scienter. Pls.' Resp. 44. According to the plaintiffs, those plans contained "highly abnormal" features that stood "in stark contrast to how such plans conventionally operate." *Id.* (quotation marks omitted). Namely, the plans lacked a mandatory

---

[13] The plaintiffs cite *Securities & Exchange Commission v. Van Wagner*, No. 97-cv-06826, 1999 WL 691836 (N.D. Ill. Aug. 25, 1999), for the proposition that "a defendant cannot secure summary judgment merely by offering an innocent explanation for his trades." Pls.' Resp. 45. That case concerned not scienter but actus reus—whether a triable issue existed as to the commission of insider trading. *Van Wagner*, 1999 WL 691836, at *1-4. In that context, the court applied the customary principle that inferences must be drawn against the summary-judgment movant to find the defendants' innocent explanation for their trading activity non-dispositive. *Id.* at *4. In reaching that holding, the court in no way suggested that innocent explanations are categorically unavailing at summary judgment; rather, it relied on specific reasons for why those innocent explanations did not hold water. *Id.* Importantly, the trading patterns in *Van Wagner* were more suspicious than those in this case, given that "certain defendants had never previously sold . . . [company] shares before." *Id.* Moreover, the defendants in *Van Wagner* did not articulate a plausible basis—or indeed any basis—for a reasonable belief that their conduct was lawful. This case is distinguishable in both regards.

cooling-off period, which allowed executives to order and execute trades on the same day. The plans also allowed the defendants to sell large blocks of stock at once rather than in incremental phases, which is "generally considered" a sign of "opportunistic or abuse trading." *Id.* (quotation marks omitted).

To the extent the plaintiffs contend that the structure of the defendants' 10b5-1 plans provides an independent reason to suspect malfeasance, their argument fails as a matter of law. The plaintiffs ignore the fact that Chase and Gonzalez had no input into the structure or design of their 10b5-1 plans and were required to use them for all trades as a condition of their employment. *See* Defs.' Mem. in Supp. of Mot. to Exclude Daniel Taylor 10, ECF No. 327. So the fact that the plans contained certain features (or permitted certain trades, or were used by Chase and Gonzalez) is immaterial to the defendants' state of mind.

The plaintiffs also assert that the manner in which the 10b5-1 were used was problematic. That, of course, is not an independent critique of the plans themselves, but an encore of the plaintiffs' suspicious-trading-activity argument. It fails for the same reasons outlined above.

For the reasons stated above, the Court finds that the plaintiffs' proffered evidence of scienter fails to "present[] a sufficient disagreement to require submission to a jury." *Searls*, 64 F.3d at 1065 (quoting *Anderson*, 477 U.S. at 251-52). The fact that AbbVie's chief executives were monetarily incentivized to sell AbbVie's best-selling product is insufficient to trigger an inference of scienter under governing case law. Likewise, any inference of scienter that might arise from the defendants' post-subpoena trading activity evaporates once considered in the context of the defendants' broader trading patterns, aggregate holdings, vesting schedules, and legitimate proffered reasons for each sale. Those considerations, combined with myriad unrebutted reasons to infer good faith, establish that the record does not "permit an inference of fraudulent scienter"

as a matter of law. *U.S. Sec. & Exch. Comm'n v. Church Extension of the Church of God, Inc.*, No. 02-cv-01118, 2004 WL 771171, at *2 (S.D. Ind. Mar. 23, 2004); *see also Searls*, 64 F.3d 1061, 1065 (7th Cir. 1995) (granting summary judgment to the defendant on the question of fraudulent intent after finding that the evidence "is so one-sided that one party must prevail as a matter of law" (quoting *Anderson*, 477 U.S. at 252)).[14]

### 3. Loss Causation

The Court finds summary judgment warranted for a third independent reason as well: Even if the plaintiffs could convince a reasonable jury that the defendants intentionally mislead investors, they could not establish that those misstatements resulted in financial injury.

To prevail on a § 10(b) claim, "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate [the law] caused the loss for which the plaintiff seeks to recover." 15 U.S.C. § 78u-4(b)(4). Doing so requires the plaintiff to "establish that the price of the securities [he] purchased was 'inflated'—that is, it was higher than it would have been without the [defendants'] false statements—and that it declined once the truth was revealed." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015). Summary judgment in favor of the defendant is warranted if the plaintiff cannot meet this burden—in other words, if the defendant can "establish that, as a matter of undisputed fact, the depreciation in the value of the [securities]

---

[14] Consideration of the report of the plaintiffs' proffered financial expert, Professor Daniel Taylor, does not change the Court's analysis. Professor Taylor was retained to provide an opinion regarding the inferences that can be drawn from the defendants' compensation model, trading history, and trading plans. In his expert report, Professor Taylor concludes that Chase and Gonzalez were highly incentivized to boost Humira profits, used abnormal trading plans that facilitated misconduct, and suspiciously increased the frequency and volume of stock sales after receiving the CDI subpoena. *See* Taylor Report 1-2, 17. The Court has already addressed each of those arguments, however, and [it] has explained why they fail to establish a triable question of scienter as a matter of law. Professor Taylor's report provides no basis to deviate from the Court's reasoning—and, in many cases, fails to address it at all.

could not have resulted from the alleged false statement or omission." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 650 (7th Cir. 1997).

The plaintiffs attempt to show loss causation by emphasizing that the value of AbbVie stock plummeted on September 18, 2018—the day the CDI announced its decision to intervene. According to the plaintiffs, those two events are causally linked: Before the CDI intervention, AbbVie had successfully and artificially inflated its value by deliberately concealing illegal kickbacks. By exposing AbbVie's misrepresentations and unlawful practices, the CDI caused, not merely coincided with, a dramatic market correction. Pls.' Resp. 48-49.

While intuitively appealing, the plaintiff's loss-causation theory rests on a critical false assumption: The CDI complaint did not, in fact, expose AbbVie's alleged misrepresentations to the public for the first time. The existence and characteristics of Humira-support services were a matter of public record well before September 18, 2018. AbbVie prominently featured HLink and the Ambassador Program on its website during the class period. Defs.' Statement ¶ 20; Defs.' Mem. 11. It also provided literature on the programs, advertised them to healthcare providers, and emphasized them during discussions with insurance companies. Defs.' Statement ¶¶ 22-23, 36. Third parties further contributed to the public's awareness of the programs. In March 2018, for example, Credit Suisse published a report that highlighted the Ambassador Program, describing it as "one of the more comprehensive programs . . . that deals with various facets of potential non-adherence." Ex. 13 to Defs.' Statement of Undisputed Facts 13, ECF No. 316-13.

The fact that Humira-support services had been challenged in court was also not breaking news. The *Suarez* and the *LaFauci* complaints were unsealed in March 2018—six months before the CDI intervened. Each previewed the same allegations later made by the CDI: that the Ambassador Program constituted an unlawful kickback, that AbbVie deployed the program to

manipulate doctors into issuing more Humira prescriptions, and that AbbVie made false statements in an attempt to disguise those facts. Furthermore, the *Suarez* and *LaFauci* complaints spelled out the basis for their challenges in some detail, enabling readers to make a fully informed assessment of AbbVie's risk of liability.

The extent of public awareness is fatal to the plaintiffs' loss-causation theory. Because "the value of new information is itself reflected in prices quickly after release," *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010), "[i]t takes *new* information to move prices either up or down," *Fulton Cnty. Emps. Retirement Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1050 (7th Cir. 2012) (emphasis added). For the defendants' alleged misrepresentations to serve as a plausible cause of the September 2018 stock decline, then, the coinciding CDI complaint must have been the first publicly available document to correct those misrepresentations. *See Amgen v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 472 (2013) ("[A] misrepresentation's impact on market price is quickly nullified once the truth comes to light."). But that was far from the reality. Taken together, preexisting public records provided an ample basis for an informed observer to familiarize themselves with both the Humira-support programs and the litigation surrounding their lawfulness prior to September 18, 2018. That suggests, contrary to the plaintiffs' argument, that AbbVie's share value already reflected the public's awareness of the Anti-Kickback allegations against AbbVie before the CDI intervened. *See Associated Randall Bank v. Griffin*, 3 F.3d 208, 213 (7th Cir. 1993) ("[O]nce the truth was out, known to sophisticated traders, the price of the securities would have reflected all risks.").

Although well-grounded in case law, the assumption that the market had already corrected for any effects of the defendants' misrepresentations before the CDI intervened does invite an important question: If the truth behind the Humira-support programs was already reflected in

AbbVie's share price, why did the price experience a nosedive immediately after the CDI published its complaint?

The answer lies in the nature of the defendants' alleged misrepresentations. The plaintiffs allege that AbbVie officials hid the fact that HLink and the Ambassador Program were designed to offer valuable services in exchange for prescriptions—that they were, in essence, kickbacks. That allegation, if true, made regulatory action a distinct possibility—perhaps even a probability. But that probability did not become a certainty until the CDI intervened, a material new development that impacted share value in its own right. The impact was doubtless magnified by the authority wielded by the CDI, the country's largest state regulator, and the severity of the remedies it sought: a permanent injunction and billions in recovery. It stands to reason, then, that the mere publication of the CDI complaint altered share prices for reasons unrelated to any correction of a defendant's prior misstatement.

The plaintiffs dispute the premise that the investing public was aware of the Anti-Kickback allegations against AbbVie before the CDI intervened. The *Suarez* and *LaFauci* complaints, they emphasize, were never publicized or widely disseminated, despite being technically available on the federal judiciary's electronic-docket-search service. As such, the plaintiffs contend that at least a triable question exists as to whether the public was sufficiently aware of AbbVie's wrongdoing to assume that the market priced that awareness into the company's stock before September 18, 2018. Pls.' Resp. 49-51.

The plaintiffs' position is inconsistent with the longstanding presumption that "the market price of shares traded on well-developed markets reflects all publicly available information." *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 268 (2014) (quotation marks omitted). The Supreme Court developed that presumption in *Basic Inc. v.*

*Levinson*, 485 U.S. 224 (1988), and has applied it many times in the context of class certification of § 10(b) claims. *See*, *e.g.*, *Halliburton II*, 573 U.S. at 268, 277-78 (holding that *Basic* gives rise to a rebuttal presumption that material and public misrepresentations are reflected in the price of stock in an efficient market, such that an investor may be certified as a class member without individualized proof of reliance upon that misrepresentation); *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 117 (2021).

To invoke the *Basic* presumption, a party need not prove that a given document "actually affected the stock price." *Haliburton II*, 573 U.S. at 277; *see also id.* at 279. Nor does the invoker need to establish that the document was widely circulated or actually viewed by a particular stakeholder. *In re BancorpSouth, Inc.*, No. 17-0508, 2017 WL 4125647, *1 (6th Cir. Sept. 18, 2017) ("BancorpSouth urges us to distinguish between 'publicly available' and 'publicly known,' but neither *Basic* nor *Halliburton* makes this distinction."). Contrary to the plaintiffs' assertions, the *Basic* presumption requires only that a document be available and *accessible* to the public. *See Goldman Sachs*, 594 U.S. at 117 ("The *Basic* presumption is premised on the theory that investors rely on the market price of a company's security, which in an efficient market incorporates all of the company's public misrepresentations."); *see also In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 605 n.2 (7th Cir. 2020) ("Whatever the empirical merits of critiques of the efficient market hypothesis, as a matter of law it remains the foundation for fraud-on-the-market claims." (citation omitted)). That indisputably includes unsealed legal filings accessible through online dockets, like the *Suarez* and *LaFauci* complaints. *See White v. Keely*, 814 F.3d 883, 885 n.2 (7th Cir. 2016) (noting that public court documents are matters of the public record for purposes of judicial notice); *Geraci v. Union Square Condo Ass'n*, 891 F.3d 274, 277 (7th Cir. 2018) ("The moment Geraci

41

filed a lawsuit . . . is the moment her PTSD became public knowledge." (alterations in original)).[15] As such, the Court finds that the *Suarez* and *LaFauci* complaints presumptively impacted AbbVie's stock value once they were unsealed, correcting any price inflation that might have resulted from the defendants' misrepresentations well in advance of the CDI intervention.

As a general matter, the *Basic* presumption is rebuttable. *See Halliburton II*, 573 U.S. at 279. In an ordinary case, therefore, the Court would afford the plaintiffs "an opportunity to rebut the presumption by showing, among other things, that the particular [public statement] at issue did not affect the stock's market price." *Id.*; *see also Goldman Sachs*, 594 U.S. at 126 (clarifying that a party may rebut the *Basic* presumption by "prov[ing] a lack of price impact . . . by a preponderance of the evidence"). In this case, however, the plaintiffs have already ceded their right to oppose the presumption by explicitly invoking it to obtain class certification.

In their operative complaint, the plaintiffs explicitly adopted the position that investors traded AbbVie stock in an efficient market that "promptly digested current information regarding

---

[15] In support of their argument, the plaintiffs cite two decisions from courts in this District. *See* Pls.' Resp. 49-51. Neither is binding, of course, and in any event neither one helps their cause. The first, *Spicer v. Chicago Board options Exchange, Inc.*, No. 88-cv-02139, 1992 WL 380929 (N.D. Ill. Dec. 10, 1992), rejected a party's truth-on-the-market defense as inconsistent with its own position that it could not have known about a given risk. *Id.* at *8. If anything, that rationale cuts against the plaintiffs in this case, who have themselves staked out inconsistent positions on the applicability of the efficient-market theory. *See infra*. The second case, *In re Motorola Securities Litigation*, 505 F. Supp. 2d 501 (N.D. Ill. 2007), is also readily distinguished. In that case, the court found reason to question whether the information that supposedly predated a corrective disclosure "was truly publicly available," given that it was effectively "buried" in a proxy statement and did not directly identify the relevant company. *Id.* at 555 (quotation marks omitted). Here, by contrast, both the *Suarez* and *LaFauci* complaints explicitly and repeatedly identified AbbVie. Moreover, the *Motorola* court found that the "Defendants' position contain[ed] a more fundamental flaw": The defendants were attempting to argue that "one piece of news was reflected immediately [in market prices], and the other a week later, where both pieces of news were disclosed at the same time and in the same manner." *Id.* at 556. No such issue presents here.

the Company from *all* publicly available sources and reflected such information in AbbVie's share price." Am. Compl. ¶ 322 (emphasis added); *see also id.* ¶ 321 (stating that "AbbVie's common stock traded in an efficient market during the Class Period," and that "[t]he market reacted promptly to public information disseminated by the Company"). When seeking class certification, the plaintiffs reiterated their contention that "the market for AbbVie common stock was efficient," contending that the stock prices reflected publicly available information concerning the company. Pls.' Mem. in Supp. of Class Cert. 6, 9-12, ECF No. 123. "Having based their claim of reliance on the efficient market theory, the Investors must now abide by its consequences." *Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013). The plaintiffs cannot have it both ways; they may not "contend that the market is efficient for purposes of reliance and then cast the theory aside when it no longer suits their needs for purposes of loss causation." *Id.* at 1198-99. Doing so is inconsistent with the doctrine of judicial estoppel, which "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quotation marks omitted); *see also* Edward H. Cooper, 18B Federal Practice and Procedure (Wright & Miller) § 4477 (West 2025) ("Absent any good explanation, a party should not be allowed to gain an advantage by litigating on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.").

Here, the plaintiffs explicitly argued that the market for AbbVie stock was efficient such that it reflected "*all* publicly available sources" of "information regarding the Company." Am. Compl. ¶ 322. As such, they are judicially estopped from contending that the market price of AbbVie's shares did not reflect the publicly available information set forth in the *Suarez* and *LaFauci* complaints filed in March 2018. The plaintiffs certainly have adduced no evidence that

43

the market was efficient in September 2018 but not six months earlier. "Either the market is efficient or it is not." *Meyer*, 710 F.3d at 1199.

Consistent with the *Basic* principle, then, the Court finds that the Anti-Kickback allegations contained in the *Suarez* and *LaFauci* complaints presumably corrected any price inflation that might have resulted from the defendants' (alleged) misrepresentations concerning its Humira-support programs. Moreover, the Court concludes that no reasonable jury could find that that presumption has been rebutted, given that the plaintiffs have previously conceded, in their pleadings and class certification arguments, that AbbVie traded in an efficient market that "promptly digested current information regarding the Company from all publicly available sources and reflected such information." Am. Compl. ¶ 322. Accordingly, any impact that the CDI complaint might have had on AbbVie stock prices was due to new information that it relayed, not any correction of a prior misrepresentation. The plaintiffs cannot, therefore, establish loss causation as a matter of law, as the record precludes a finding that a defendant's misstatement caused the stock price to drop on September 18, 2018.

## CONCLUSION

For the three independent reasons outlined above, the Court finds summary judgment in favor of the defendants to be warranted. First, the lawfulness of HLink and the Ambassador Program under the Anti-Kickback Statute undercuts any basis upon which a reasonable jury might conclude that AbbVie made misrepresentations or misleading omissions to shareholders. Second, even if the defendants had misled investors, the record precludes the finding that they did so with deliberate or reckless intent. And third, even assuming a deliberate intent to deceive on the part of one or more defendants, the plaintiffs cannot establish loss causation as the impact of any

misstatement was presumptively nullified by the release of the *Suarez* and *LaFauci* complaints six months before the plaintiffs' purported losses.

The defendants' motion for summary judgment is granted.[16]


Dated: July 10, 2025

John J. Tharp, Jr.
United States District Judge

---

[16] Because the Court's decision in no way rests upon the admissibility of any expert witness proffered by either party, the Court need not address the merits of any of the 11 *Daubert* motions pending before it. Those motions are denied as moot in light of the grant of summary judgment to the defendants.